# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### February 28, 2024 Session

## STATE OF TENNESSEE v. DAVID LYNN RICHARDS, JR.

### Appeal from the Criminal Court for Knox County
### No. 108766    Steven W. Sword, Judge

_____

### No. E2022-01468-CCA-R3-CD
_____

The Defendant, David Lynn Richards, Jr., appeals his Knox County Criminal Court convictions for three counts of sexual battery by an authority figure (Counts 1, 2, and 9), two counts of rape (Counts 3 and 4), three counts of statutory rape by an authority figure (Counts 5, 6, and 7), and one count of incest (Count 11).[1]  On appeal, the Defendant argues: (1) if newly discovered forensic biological evidence had been presented to the jury, then it likely would have changed the result of his trial; (2) if newly discovered forensic electronic evidence had been presented to the jury, then it likely would have changed the result of his trial; (3) if the newly discovered records related to victim's mental health history had been presented to the jury, then it likely would have changed the result of his trial; (4) his due process rights were violated under Brady v. Maryland, 373 U.S. 83 (1963), and Pennsylvania v. Ritchie, 480 U.S. 39 (1987); (5) the trial court committed plain error by permitting the State to play the entire recording of victim's forensic interview; (6) he received ineffective assistance from trial counsel; (7) the State's erroneous election for the rape offense in Count 4 failed to protect his right to a unanimous jury verdict in that count; (8) the evidence is insufficient to sustain his conviction for sexual battery by an authority figure in Count 1 and his conviction for rape in Count 4; (9) his dual convictions for sexual battery by an authority figure in Counts 1 and 2 violate the prohibition against double jeopardy; (10) the trial court abused its discretion by denying all forms of alternative sentencing and by imposing a partially consecutive sentence; and (11) the cumulative effect of these errors entitles him to a new trial.  After review, we affirm the judgments of the trial court.[2]

_____

[1] It is the policy of this court to protect the anonymity of minors and victims of sexual abuse.  To the extent possible, we have done so in this case.

[2] The record in this case is comprised of three banker boxes and several compact discs of records and/or exhibits.  Moreover, the unusual length of this opinion is due in large part to the complexity of the issues presented; the extensive pre-trial and post-trial litigation; and the combination of direct and post-conviction issues presented in a single appeal.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, P.J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and TIMOTHY L. EASTER, JJ., joined.

Stephen Ross Johnson and S. Renee Hammond, Knoxville, Tennessee, for the appellant, David Lynn Richards, Jr.

Jonathan Skrmetti, Attorney General and Reporter; Edwin Alan Groves, Jr., Assistant Attorney General; Charme P. Allen, District Attorney General; and Nathan Ogle and Sharon Kumi, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

In 2016, the Knox County Grand Jury charged the Defendant by presentment with four counts of sexual battery by an authority figure (Counts 1, 2, 9, and 10), two counts of rape (Counts 3 and 4), three counts of statutory rape by an authority figure (Counts 5, 6, and 7), one count of sexual exploitation of a minor via electronic means (Count 8), and incest (Count 11).

**Pre-Trial Proceedings.** The Defendant's trial counsel filed a motion to dismiss the presentment based on the delayed presentment and the loss or destruction of cell phone evidence. In addition, counsel filed a motion to suppress the wooden drawer containing the Defendant's DNA because this evidence exceeded the scope of the search warrant. Trial counsel also filed a motion in limine, claiming that because testing on the drawer eliminated the victim as a contributor of the tested mixture, the results in the Forensic Biology Report should not be admitted because they were irrelevant. The trial court denied all these motions.

Following a request for exculpatory material pursuant to Pennsylvania v. Ritchie, 480 US. 39 (1987), the trial court ordered the Tennessee Department of Children's Services (DCS) to produce all "records, including but not limited to notes, memoranda, records, and reports, and [the DCS] Master File for [the victim]" to the court for inspection "to determine whether the records contain[ed] any information that could be exculpatory to the defense in the trial court this case, or otherwise relevant." After conducting its in camera review, the trial court filed the DCS records under seal and disclosed a small number of documents to the parties.

**Trial.** The victim, age 21 at the time of trial, testified that the Defendant, her adoptive father, had sexually abused her. She first met the Defendant, who was employed at the Smoky Mountain Children's Home, when the Defendant transported the victim and her siblings when they were placed in other foster homes.

The victim said she and her biological sister, M.R., were adopted by the Defendant and his wife Jessica in 2008 the victim, and they all moved to Millertown Pike in East Knoxville. Shortly after moving there, the Defendant and his wife divorced, and Jessica and the couple's biological child left the home the victim, which left the Defendant, the victim, M.R., and their adopted brother living together in the home. The victim said that Jessica left with J.B. because Jessica "suspected something was going on between . . . M.R.[] and [her husband]."

The victim said that before she turned fourteen years old, the Defendant began encouraging her and M.R. to sleep in his bedroom at night. The Defendant told them their parents "never loved" them and that he was "the only one that was ever going to love [them] and take care of [them] and be there for [them]." She said the Defendant would come to her and M.R. and ask them to "sleep with him at night so he wouldn't feel so lonely about his wife leaving." At the time, she believed the Defendant really cared about her, so she and M.R. slept in the bed with the Defendant at night, and nothing happened "for a long time."

However, the victim said that on Christmas Eve 2011, when she was fourteen years old, the Defendant "put his hand down [her] pants" and that was "the first time [she could] remember [the Defendant] actually doing anything [to her]." That night, M.R. was on the left side of the bed, the Defendant was in the center, and the victim was on the right side of the bed. She said they all went to sleep, and the victim awoke when she felt the Defendant's hand "around [her] pants," and she "was scared because [she] didn't really know what was happening at such a young age." The victim added that "by the time [she] knew it was happening, [the Defendant] had already removed his hand and everything went back to normal." She said that during this incident, the Defendant touched her "on her vagina," touched her "on top of her underwear," and "move[d] his hand up to [her] belly area and onto [her] chest area." She said the Defendant stopped touching her when she "would move away" or she "would roll over or try to pretend that it wasn't happening."

The victim stated that the Defendant inappropriately touched her "multiple times." The Defendant would refer to these incidents as "naps" and would ask her if she wanted to take a nap later, and she would "brush it off" or try to pretend that he was talking about something else. Although the victim slept on her back, she would often roll over to her stomach "to try to get him to stop." She said sometimes "[the Defendant] would stop" and

"sometimes he would huff and puff and get mad." She acknowledged that these incidents with the Defendant all ran together for her.

The victim asserted that the Defendant continued to touch her after the Christmas Eve incident and that the Defendant eventually used his "genital area" to touch her. She said this often happened late at night after she came home from work or when she traveled with him to an office building in Oneida when she was approximately fourteen years old.

The victim stated that the Defendant eventually did more than simply touch her body. She recalled one night when she was fifteen years old when she got off late from work, and the Defendant got mad at her. She said the Defendant often became angry if she was not home from work by a certain time because he would not have the opportunity to abuse her. During one of these incidents, the Defendant put his finger inside the victim's vagina when they were in his bed in the middle of the night. She stated, "Normally[,] I would wake up[,] and I would feel him doing that, or I would be falling asleep, and he would do it as I was falling asleep." She said the Defendant "normally tried to keep it pretty quiet so that no one would find out." She said that these incidents occurred prior to her turning fifteen years old, that these incidents also happened in her bedroom, and that these incidents would occur both at night and during the day. When she was asked to describe an incident that occurred during the day, victim replied, "It all runs together."

The victim said the first time the Defendant had sex with her was after she turned fifteen years old. The victim, the Defendant, and M.R. were in the Defendant's bed at night. The victim stated that she was turned on her side and she was awakened when the Defendant "was moving around my pants area" and then "began to pull [her] pants down." She said, "I felt him moving me, and I felt his penis go in me." She clarified that the Defendant's penis went inside her vagina.

The victim stated that during these incidents, sometimes M.R. "would roll over and move," and the Defendant "would stop." However, as soon as M.R. would get back to sleep, the Defendant "would keep doing it."

The victim asserted that the Defendant would sometimes have sex with her in her bedroom. He would tell her that she needed to go to bed, and she would turn off her light and go to sleep, and then the Defendant would come into her bedroom. Sometimes she would wake up with the Defendant in her bed. When asked if she recalled a particular occasion when the Defendant got into her bed, the victim said she could not. However, she said these incidents occurred after her fifteenth birthday, and she would wake up when she would feel the Defendant "pulling the covers off of [her], pulling [her] pants down, undressing [her]." During these incidents, victim pretended to be asleep, like it wasn't

- 4 -

happening." She said that in her bedroom, the Defendant would "just pull his boxers down," but in his own bedroom "he would be completely undressed." When the Defendant would get in her bed with his boxers pulled down, he would then put his penis in her vagina usually when she was lying on her back. The victim said that when she would try to move away, "sometimes [the Defendant] would stop and get mad and stomp off" but sometimes the Defendant "would keep doing it." During these times, the Defendant's "genitals would get harder and it hurt." She also said a "clear, like thin, slick . . . liquid" would come out of his body. She explained that sometimes this liquid "would get on [her] sheets" or her "belly" or "on [her] body a lot of the times." She said that after the Defendant ejaculated on her or her sheets, he would "wipe it away with a towel or his shirt." She denied that the Defendant ever had sex with her in another part of her bedroom. The victim said that while the Defendant was putting his penis inside her vagina, he would try to kiss her, and she would close her mouth or turn her head away. The victim asserted that the Defendant's ejaculate got on her bedding and on her purple rug when the Defendant was walking away.

The victim remembered the Defendant sending her a text message in October when he was coming home from a hunting trip. She and M.R. were cleaning, and the Defendant sent her a text stating that she "was going to be his forever and that he wanted to marry [her] one day and that he loved [her] more than just his daughter." The victim texted the Defendant back that she "wasn't adopted to be anything more than his daughter and that it was wrong[,] and [she] didn't feel comfortable with him saying that." The Defendant got "really, really upset with [her]," and when victim told M.R. about these texts, M.R. said that whenever the Defendant got home, they were all going to talk about it.

The victim stated that she had an iPhone 4 at the time and that the Defendant "tracked all of [her] messages and matched the times that [she] would send and receive things so [she] wouldn't be able to delete anything." She noted the Defendant also "had a tracker on [her] phone to see where [she] was at all times of the day, and [the Defendant] had an iCloud sharing account," which meant that "anything that [she] had on [her] phone would be on his phone." The victim said the Defendant deleted inappropriate messages from her friends from her phone and "would frequently go on [her] phone and delete messages" between the Defendant and her. Some of her friends saw messages in the fall of 2013 from the Defendant to the victim asking her if she wanted to "take a nap" or "cuddle" later. Around this time, the victim told M.R. that the Defendant had abused her, and she showed M.R. the Defendant's messages. At the time, M.R. said she believed her and claimed that she and the victim were going to get their own apartment. She told the victim to allow her to talk to the Defendant away from the house because she was not sure what he was going to do, and she wanted the victim to stay behind where she would be safe. M.R. and the Defendant then went to get ice cream, and after an hour, they returned home, and M.R. told her that she thought the victim should give the Defendant another

chance. At the time, the victim felt "[b]etrayed" by M.R. Thereafter, she, M.R., and the Defendant sat down on the floor, and the Defendant "apologized" and "admitted" to the abuse and promised to "never do it again as long as [the victim] gave him another chance." During this conversation, the Defendant told the victim that if she did not want to stay at his home, the victim could go live with Joy and Don Baker, the Defendant's best friend and co-worker, or Dewayne and Laura, who were also his friends. The victim did not choose to leave the Defendant's home because she was "scared" that she "would still have to see [the Defendant] every single day" and that the Defendant "would still have access to [her] life." The victim said she knew at the time that she might have to go back into foster care.

The victim also disclosed the Defendant's abuse of her to one of her close friends, S.V., the same day she told M.R. about the Defendant's abuse. The victim asked to stay with S.V. but asked S.V. not to tell her parents about the Defendant's abuse because she did not want the Defendant to get into trouble at that time. The victim said that within thirty minutes of her arrival at S.V.'s house, the Defendant appeared because he had a tracker on her phone and car. The Defendant forced the victim to return home.

The victim stated that a girl named I.M., who was a senior in high school, moved into their home in February or March 2013 so she could graduate from that high school after her family had to move. She said I.M. spent most of her time inside her room. The victim was not close to I.M. and did not tell her about the Defendant's abuse.

The victim said that J.B., the Defendant's biological daughter, was her good friend and would visit the Defendant once a month and would sleep with the victim in her bed. When J.B. stayed in her bedroom, the Defendant would not sexually abuse the victim. The victim never told J.B. about the Defendant's abuse because she was "trying to protect her" and "didn't want to hurt her" because the Defendant was her father.

The victim regularly saw a therapist named Dr. Mary Barker, after the Defendant initially set up appointments for her. The Defendant knew Dr. Barker and would talk to Dr. Barker about her therapy sessions with the victim. In addition, the victim had group therapy sessions with Dr. Barker, where the Defendant would be present. The victim did not tell Dr. Barker about the Defendant's abuse of her, stating, "[A]nything I would tell her she would just go tell him, and I was scared that I couldn't trust her or that she wouldn't help me."

The victim also tried to talk to M.R. about the Defendant's abuse at other times. She stated, "Every time that I would tell [M.R.] or talk to her about [the abuse], she tried

to just brush it off and tried to tell me that it was going to be okay, and that I should just keep giving him chances."

On December 3, 2013, the victim decided to tell someone in an authority position about the Defendant's abuse of her. That morning, the Defendant came into her bedroom and took her hand and placed it on his penis inside his pants. When the victim awoke and realized what was happening, she "jerked [her] hand away," and the Defendant told her that it was time to get ready for school. The victim denied taking the sheets and comforter off her bed before leaving for school that morning. She then drove I.M. to school. When the victim got to her fourth period class, her friend, S.V., could tell that something was wrong. The victim began crying and told S.V. that the Defendant had not stopped abusing her, even though he promised he would stop, and S.V. told her to go talk to Marissa Buchanan, the guidance counselor. The victim and S.V. went together to talk to the guidance counselor, and the victim told Buchanan everything she could remember about the Defendant's abuse. As she was talking to Buchanan, the victim received text messages from the Defendant and M.R. asking where she was because she had not come home from school, and the victim texted them that she was sick. Buchanan then called DCS, and Detective Allen Merritt interviewed the victim shortly thereafter. During this interview, the victim said her cell phone was taken, and she was later sent to stay with Don Baker, the Defendant's friend. She said her phone was turned over to Baker and the next day, December 4, 2013, the victim was moved into foster care. The victim was also interviewed by Child Help in Knox County on December 4, 2013, and she told the interviewer everything she could remember about what had happened with the Defendant. She also willingly provided a DNA sample to the police.

The victim stated that at the time of her disclosure, the Defendant was not dating anyone, and there were no grown women coming over to the house. She said that the Defendant had not been dating or seeing any women since his wife left him.

The victim said she knew that the Defendant was the administrator of the iCloud account because he told her he was the administrator. She said the Defendant used that access to locate her, including when he showed up at S.V.'s home thirty minutes after she got there.

On cross-examination, the victim acknowledged that she initially disclosed the Defendant's abuse of her on December 3, 2013; that she was interviewed by Child Help on December 4, 2013; that she gave a statement to attorneys on April 7, 2014; and that she filed the civil lawsuit against the Defendant and the Smoky Mountain Children's Home on April 6, 2016. She admitted that she asked for monetary damages in this civil suit in the amount of seventeen million dollars. The victim agreed that some of the dates for the abuse

listed in the civil complaint were incorrect because the Defendant's abuse did not start until December 2011.

The victim acknowledged telling Detective Merritt at the high school on December 3, 2013, that the first time the Defendant abused her, she had fallen asleep on the couch, and he turned her over, and they had sex on that couch. However, she admitted she had just testified on direct examination that the first time the Defendant abused her was in bed on Christmas Eve 2011 when M.R. was also in the bed. She claimed she told Detective Merritt a different story during the interview because the Defendant had sex with her on the couch and she could not remember whether it was the first time because it happened frequently. Although the victim admitted to testifying on direct examination that the Defendant's abuse only occurred in his room and her room, the victim acknowledged that she just disclosed that the abuse also occurred in the living room on the couch, and then stated, "I don't remember." The victim said she did not recall having an argument with the Defendant in the summer of 2013. However, she admitted stating during her April 7, 2014 deposition that she had an argument with the Defendant in the summer of 2013 about her texting a boy named Chris, who the Defendant thought was a bad influence.

The victim admitted that the Defendant was strict and that she did not like following all his rules. She said that in 2016, she texted her friend Rachel about the number of her sexual partners but did not include the Defendant on that list.

The victim said that on December 2, 2013, she got home late from work. She acknowledged that the next morning, December 3, 2013, she and the Defendant were mad at each other, and the Defendant threatened to make her change schools or quit her job. She admitted being upset about those things when she went to school the morning of December 3, 2013.

During her recorded interview on December 4, 2013, the victim recalled telling Detective Merritt that during these incidents, the Defendant's ejaculate would get on her comforter and on her purple rug. She said that although she remembered telling the detective that she did not wash her purple rug, she did not tell him that she washed her comforter.

The victim admitting stating during her April 7, 2014 deposition that she and the Defendant had sex two to three times a week throughout the summer of 2013. She said this sex would occur in the Defendant's room or her room.

The victim asserted that the Defendant did not like Chris or her best friend S.V. and that the Defendant did not like her coming home late after work. She admitted that she never told J.B., I.M., or Dr. Barker about the Defendant's abuse.

On redirect examination, the victim said that she had talked to a lot of different people about what happened between her and the Defendant and that she did not remember the details of every single one of these conversations. She said that although the civil lawsuit, which was drafted by her attorney, said that the abuse took place from December 2010 to December 2013, the Defendant's abuse of her actually began in 2011.

The victim reiterated that the morning of December 3, 2013, she woke up when the Defendant put her hand down his pants and made her touch his genital area. She said she jerked her hand away, and the Defendant told her it was time to get ready for school. After she got up, she and the Defendant argued because he threatened to make her change schools because she was getting close with a lot of her friends there. He also threatened to make her quit her job. She said that on December 3, 2013, the Defendant knew she had already told M.R. about the Defendant's sexual abuse of her.

The victim said that during the big argument with the Defendant in the summer of 2013, she acknowledged telling one of her siblings she was going to get the Defendant in trouble with the law because of all the things he was doing to her, but she never disclosed that the Defendant had been sexually abusing her.

The victim did not tell her friend Rachel that the Defendant was one of the men she had sex with because she did not consent to the sexual intercourse with him. She said she did not consider any of the sexual acts with the Defendant consensual.

The recording from the victim's December 4, 2013 forensic interview was played for the jury. At the conclusion of this recording, the victim agreed that she stated during the forensic interview that the Defendant penetrated her vagina with his penis in his bedroom several times. The victim claims that although she did not have an opportunity to describe all those instances of penile penetration during her forensic interview, she was able to describe at trial some of those particular instances of penile penetration by the Defendant when M.R. was also in the bed. She claimed she did not think to mention those specific instances during her forensic interview.

When the State asked the victim about the incident she described in her forensic interview shortly after Christmas 2011, when the Defendant put his finger inside her vagina, the victim said that the Defendant did this to her "several times, so it kind of runs together." She said that the Defendant also put more than one finger inside her both before

and after she turned fifteen years old. She noted that there were several times after she turned fifteen when the Defendant would come into her bedroom and put his hand in her pants at night and during the day, whenever they were alone at the house by themselves.

The victim acknowledged stating during her forensic interview that she did not want to tell an authority figure about what was going on with the Defendant. She explained:

[The Defendant] had me manipulated to think that he was a good dad, and I wanted to believe that he was going to be a good dad. So I didn't want anybody to get hurt. I didn't want to tell because I was scared that [J.B., the Defendant's biological daughter,] would get hurt, or I was just scared of anything that was going to happen. I didn't know what was going to happen. So I was scared to tell because I didn't have anybody to really trust.

The victim said that on December 3, 2013, the day that she disclosed the Defendant's abuse to her guidance counselor, she was "scared" and did not know what to do or what to expect but did not want "to be in [the Defendant's] house anymore." She clarified that she wanted to leave the Defendant's home, not because of the Defendant's rules, but because the Defendant "controlled everything that [she] did and made [her] feel like [she] didn't have anybody to tell, and [she] didn't know what to do."

On recross examination, the victim agreed that the last thing she said during her forensic interview was that she had been truthful. She asserted that she had been truthful at trial about everything she said during the forensic interview "[t]o the best of her knowledge[.]" She agreed that the previous day at trial she had testified that the first time she had sex with the Defendant was when she, the Defendant, and M.R. were in the bed together.. She acknowledged that during the forensic interview, she said the first time that she and the Defendant had sex was when he walked into her bedroom, and M.R. was not around. She also admitted that when she spoke to Detective Merritt on December 3, 2013, at the high school, she told him that the first time she had sex with the Defendant was on a couch in the living room. When she was asked which story she wanted the jury to believe, the victim said, "I want them to believe all the stories, but I don't remember the first occasion specifically because it all runs together in my head now." Defense counsel questioned her about whether the first occasion would be very traumatic, and victim replied, "They all were."

When defense counsel asked the victim how she was able to see the Defendant having sex with her and then see him pull his penis out and start using his hand while she was pretending to be asleep, the victim claimed that she "could kind of hear him doing it." When trial counsel challenged victim's testimony that the Defendant would come in while

she was asleep or pretending to be asleep, pull off all her clothes, have sex with her while she was still pretending to be asleep, and then put her clothes back on while she was still pretending to be asleep, the victim confirmed that this happened. The victim said that although she asserted during the forensic interview that she did not remember anything ever coming out of the Defendant's body, she claimed that the Defendant's ejaculate came out on top of her, although she never saw the Defendant ejaculating. Defense counsel then questioned how she was able to see all these things if she was pretending to be asleep, and victim replied, "It's hard to remember specific instances because it happened a lot."

Defense counsel also questioned the victim about why she said during her forensic interview that she first told M.R. about the Defendant's abuse on October 19, 2013, but then asserted during her April 7, 2014 deposition, which was under oath, that she first told M.R. about the abuse in November 2013. When he asked which date she wanted the jury to believe, the victim said the October 19, 2013 date because her forensic interview occurred shortly after this happened, and her memory was fresher at that time.

Defense counsel then asked if the Defendant's abuse would have been fresh on her mind when she talked to Detective Merritt on December 3, 2013, and the victim agreed it was. However, the victim claimed she did not tell Detective Merritt that the first occasion of sex with the Defendant was in the bed with M.R. because she did not remember. Instead, she agreed that she told Detective Merritt that the first time she had sex with the Defendant was on the couch in the living room.

The victim said she never washed the purple rug in her room. However, she acknowledged washing her comforter "[e]very now and then." The victim admitted that at the time of her disclosure, she did not want to be in the Defendant's home anymore because he was strict, she did not like his rules, and the Defendant did not like her friends.

Marissa Buchanan, the guidance counselor at the high school, testified that when she saw the victim on December 3, 2013, the victim was "in tears" and "had a friend on the side of her and kind of holding her up[.]" Buchanan talked to the victim for approximately thirty minutes and then called DCS. Thereafter, Buchanan continued to talk to the victim for an hour or two. During their conversation, the victim had her cell phone and was receiving text messages. At some point, M.R., who appeared "kind of nervous" and "uncomfortable," was allowed in to talk with the victim. At first, the victim and M.R. got along okay, but then M.R. said something to upset the victim, and the victim told her to leave.

On cross-examination, Buchanan confirmed that the friend with the victim on December 3, 2013, was S.V. She confirmed that S.V. came into the office with the victim.

Detective Allen Merritt with the Knox County Sheriff's Office (KCSO) testified he worked in the family crimes unit at the time he first spoke to the victim in this case.. He explained that anytime there is an allegation of child abuse, the sheriff's office and DCS work together to conduct "a parallel investigation[.]" He responded to the high school on December 3, 2013, and conducted a preliminary interview with the victim in the presence of DCS investigator Blair Brown.. After this preliminary interview, the victim was sent to stay with Don Baker, a family friend. Detective Merritt said that the victim still had her cell phone when she went to Baker's home. He confirmed that he intended for the victim to keep her cell phone while at Baker's house because she was a young person who had just made a serious allegation, and he wanted to have her phone in case she became depressed or suicidal.

Detective Merritt also interviewed M.R. at the high school to determine whether there was some truth to the victim's allegations against the Defendant. He interviewed the Defendant a short time later. Detective Merritt described the Defendant's demeanor during his interview:

> [The Defendant] presented very well, seemed to be somewhat of an educated man. His profession alone put him in a position where he knew basically the [ins] and outs of the system. I mean, . . . he kind of pretty well understood the process. And at some point or another [the Defendant] even tried to, you know, interject and make suggestions on, you know, what we could do to reach an agreement on both sides.

Detective Merritt said the Defendant wanted to know where the victim's cell phone was and if he could have it. The Defendant was concerned that the victim had received messages that might be important to clear his name and that if the victim had her phone, she might delete those messages. During this interview, the Defendant denied that he sexually abused the victim. He said the Defendant "tried to explain it away or redirect the allegations," and the Defendant claimed the victim's allegations "had something to do with her friends[.]"

Detective Merritt said the next day, December 4, 2013, the victim had her forensic interview with Child Help. After observing the victim's Child Help interview, he realized there could be physical evidence that could implicate or exonerate the Defendant. He then obtained a search warrant for the Defendant's home and went with the officers who executed the search warrant. He stated that the only two people present at the home when they executed the warrant were the Defendant and M.R.

During this search, Detective Merritt used a black light, which indicated there was semen on the purple rug in the victim's bedroom. While he acknowledged that cleaning chemicals and hair chemicals could also react to a black light, Detective Merritt said a semen stain would "not shine as brightly as maybe a household cleaning chemical or hair chemical." He believed the stain on the purple rug was semen based on the spot's reaction to the black light. He then collected the rug into evidence. He also found what appeared to be an elongated drip of semen on the bottom left-hand wooden drawer of the victim's bed; he also collected this drawer as evidence and sent this drawer with specific areas marked to the Tennessee Bureau of Investigation (TBI) for further testing. He said his field test of the drawer showed that the substance on it was semen.

Detective Merritt also found an animal print comforter, sheets, and pillowcases, like the ones described by the victim as belonging to her, in the dryer of the home's laundry room. However, he noted that the comforter and sheets were still on all the other beds inside the home. Detective Merritt said that although the Defendant said he was not in a relationship at that time, there were two toothbrushes in the Defendant's bathroom. Detective Merritt located and collected the Defendant's cell phone from his bedroom. He observed that the Defendant's sheets and covers were piled up in the center of his bed, which indicated that two people had slept in there. He also noticed staining on the sheets of the Defendant's bed, so he collected these sheets as evidence, and they were eventually sent to the TBI for testing. Detective Merritt also collected a blue gift bag, containing a black and pink lacy negligee and a teddy bear, which set off "bells and whistles" because this case involved an allegation of sex crimes against a minor. Detective Merritt also collected the Defendant's laptop computer. In the kitchen, he photographed two empty wine bottles. He said there was an open wine bottle in the refrigerator and two wine glasses on the ottoman in the living room, with one of these glasses near where M.R. was lying on the couch at the time the officers arrived. Detective Merritt and the officers also collected additional laptop computers, a tablet, and a cell phone from the living room.

Detective Merritt said that the purple rug was sent to the TBI for DNA testing. In addition, buccal swabs from the victim and the Defendant were sent to the TBI to obtain their DNA profiles.

Detective Merritt asserted that the victim's cell phone was collected on December 5, 2013, at 7:50 p.m. from the home of Don Baker. Upon request, Baker retrieved the victim's phone from his bedroom dresser, even though Detective Merritt had intended for victim to have use of her phone while she was staying at Baker's residence. He obtained consent to search the victim's phone on December 10, 2013, at 9:50 a.m. He said the victim's phone was later forwarded to a forensic technician in the computer crimes unit for further examination with the hope that evidence could be extracted.

- 13 -

On cross-examination, Detective Merritt acknowledged that the victim never discussed anything about the wooden drawer or lingerie during her interviews. When he met with the Defendant at the school, he informed the Defendant that he was not under arrest and that he did not have to answer any questions. At the time, Detective Merritt identified himself as a child abuse detective and informed the Defendant that some serious allegations had been made against him.

Detective Merritt confirmed that he talked to the victim, the Defendant, and M.R. at the school on December 3, 2013. He reiterated that the victim was interviewed by Child Help on December 4, 2013, that he executed the search warrant on the Defendant's home on December 5, 2013, that he sent the evidence he obtained to the TBI on March 6, 2014, and that he received the TBI report back on November 24, 2014. He also talked to Jessica, the Defendant's ex-wife, and confirmed that electronic devices found inside the Defendant's house were searched.

Amory Cannon testified that she currently worked as a medical laboratory scientist but had previously worked as a special agent forensic scientist at the TBI for three-and-a-half years. She stated that after performing an analysis in any case, she could not generate a report until two levels of verification or review had been completed. First, a technical level of review occurred, where another analyst reviewed the data to ensure that there were no errors made in transcription. Second, there was an administrative review, for "a general overall review of the report" and to check "things such as typos." She acknowledged that she had been previously qualified as an expert in the area of DNA analysis. The trial court then accepted her as an expert in the field of serology and DNA analysis.

Special Agent Cannon stated that on March 5, 2014, she received several items from the KCSO for DNA analysis. She received buccal swabs from the victim and the Defendant, so that she could obtain a DNA profile for each of them. She also tested the purple rug from the victim's bedroom and determined that it did not indicate the presence of semen. Special Agent Cannon explained that while this did not mean that semen had never been on this rug, it did mean that she was unable to detect any semen present on it. She also tested the swab taken from the foot of the victim's mattress, but it also did not reveal the presence of semen.

Regarding the wooden drawer from the victim's bed, Special Agent Cannon said she first used an alternative light source to see if any areas on the drawer fluoresced, meaning that they possibly contained biological fluid, and for the areas that did, she circled them for further testing. On the areas that fluoresced, she performed a color-change test, which is a presumptive or preliminary test, with a piece of wet filter paper and a chemical.

She explained that if the chemical changed colors, then that would be considered a positive test. Special Agent Cannon said that although there were a few areas on the drawer that fluoresced, only two areas on the drawer tested positive during the color-change test. She then performed "a further test or confirmatory test for the presence of semen or spermatozoa." She took a swab to both of these areas that tested positive during the color-change test, "collected as much of the material as [she] could on the swab," and then "cut a small portion of that swab and mixed it with some sterile water and put it on a slide in order to examine [it] for the presence of sperm." Special Agent Cannon said that Area 1 of the drawer "was positive for the presence of sperm with [] rare heads and rare microscopic fields," so it was further tested for DNA analysis. She explained that "if there had been a sperm head in every single field that [she] looked at, then it would have been . . . many heads present." However, when she documented "rare heads and rare fields" in this case, it meant that "there were 10 to 15 [sperm heads] on the whole slide." She noted that while the number of sperm heads was "a somewhat decreased amount," it was "not unusual." She noted that sperm heads can last on "a hard surface for a long period of time, . . . years, even." She also said that because "[s]perm is only present in seminal fluid," she was able to determine that the substance in Area 1 was seminal fluid.

Special Agent Cannon stated that for Area 1, she ultimately performed two separate DNA extractions. In the first extraction for Area 1, she "did not obtain sufficient DNA for a profile," but she "did obtain a profile from the non-sperm fraction." She added, "The DNA profile from the non-sperm fraction was consistent with the mixture of at least two individuals, where at least one was male, and the major contributor profile matched Exhibit 6-A, [the Defendant]." She opined that based on her analysis of the non-sperm fraction, extraction 1 of Area 1 was seminal fluid because "the DNA testing that [she] performed was from the same swab that [she] made the slide from that [she] found sperm on." She explained that she performed extraction 2 on Area 1 to determine whether the sperm fraction from "the first set of swabs had somehow ended up in the non-sperm fraction" and "in order to potentially get a cleaner [DNA] profile of the minor contributor that was present without the major contributor overwhelming that DNA." However, in extraction 2, she was "not able to obtain a profile that was usable for comparison."

In Area 2, which tested positive with the color-change test, she took swabs and made a slide. However, she "did not see any sperm present" on the slide made from Area 2. She then did "a confirmatory test, which is called a P30, which tests for an enzyme in prostatic fluid." She explained that this enzyme "would be found in seminal fluid and not other body fluids, in a high enough level to be test[ed] with that kit." She confirmed that Area 2 tested positive on the P30 test, which meant it was "positive for seminal fluid." She then took those same swabs through the DNA process and was able to get "limited information" with the DNA profile "low enough that it was only available for exclusion." She stated

that because she was "not able to do a direct comparison" of this DNA profile, results regarding the inclusion of victim and the Defendant for this sample were inconclusive.

Special Agent Cannon said that she memorialized the results of this DNA testing in her forensic biology report issued on November 24, 2014. She was confident, within a reasonable degree of scientific certainty, that the substance she described as seminal fluid in Area 1, extraction 1 matched the genetic profile of the Defendant. She noted that "the probability of randomly selecting an unrelated individual with the same DNA profile as the major contributor, which is Exhibit 6-a, [the Defendant,] is one in a number greater than the current world population."

On cross-examination, Special Agent Cannon reiterated that in Area 1, extraction 1, she identified two contributors in the non-sperm fraction. She stated that one of the contributors was the Defendant and the second contributor was unknown, although the victim could be excluded. She also agreed that in Area 1, extraction 2, no DNA profile was obtained due to insufficient and/or degraded DNA. Special Agent Cannon also agreed that in Area 2, the Defendant and the victim could not be included due to "having such a low amount of DNA present."

On redirect examination, Special Agent Cannon reiterated that in Area 1, extraction 1, the major contributor in the non-sperm fraction was the Defendant. She also said that Area 1, extraction 1 was "taken from an area that was positive for seminal fluid." She agreed that Area 1 appeared to be a vertical drip. When asked how confident she was that this was "[the Defendant]'s semen" on Area 1, Special Agent Cannon replied, "The DNA profile that I obtained, I'm confident it belongs to [the Defendant]."

On recross examination, Special Agent Cannon stated that she was also confident that the victim was excluded as a DNA contributor in Area 1. She was confident that the minor contributor in Area 1 was another individual who could not be identified.

Lieutenant James Smithhart in the cyber investigation unit of the KCSO testified that he processed digital evidence for criminal investigations by using forensic recovery techniques and by doing extractions from digital devices. He was familiar with Apple devices and Apple iCloud accounts. Lieutenant Smithhart said that when an individual purchased an account through a phone provider, there were administrative tools for family plans, and the person paying for that account would be designated the administrator for that plan.

Lieutenant Smithhart stated that a "remote wipe" of a device was "basically a factory reset of the device" where all the content linked to a particular device would be

erased, and "the device would be set to the initial setup state."." He agreed that it was possible to conduct a "remote wipe" of a cell phone if it was stolen so that whoever had the phone could not gain access to information on the phone. He asserted that the administrator for a particular iCloud account would have the ability to conduct a "remote wipe" of a cell phone.

Lieutenant Smithhart identified the victim's phone and the Defendant's phone. He stated that he initially sought to identify the state the device was in so he could "account for any changes that may have occurred subsequent to the collection of the device."." The first thing he did was look for whether the device was "on or off." He said that it was not apparent to him whether the power to victim's phone was on or off. The second thing he did was determine whether there was "a change" where the device had "lost power" and might "restart," which he did not want. When Lieutenant Smithhart received the victim's cell phone, he "applied power" to it and discovered that her phone was "displaying the setup screen." He also applied power to the Defendant's cell phone, which also displayed the setup screen.

On cross-examination, Lieutenant Smithhart said that although he received the victim's phone and the Defendant's phone on December 5, 2013, he did not provide an affidavit concerning his work with victim's phone until July 12, 2017. He explained that he did not provide this affidavit until the district attorney's office asked him to describe what he found when he powered on victim's phone. He also said that he did not discuss the Defendant's phone in this affidavit. Lieutenant Smithhart acknowledged that he did not know who factory reset the victim's phone or the Defendant's phone. He also acknowledged that he did not know when the victim's phone was factory reset or when the Defendant's phone was factory reset.

On redirect examination, Lieutenant Smithhart acknowledged that the district attorney's office asked him to draft the affidavit to document that he had not found any evidence on the victim's phone. He said the district attorney's office had not asked him to draft an affidavit regarding the lack of evidence he found on the Defendant's phone.

On recross-examination, Lieutenant Smithhart acknowledged that an individual could factory reset an Apple phone from the iCloud account.

At the close of the State's proof, defense counsel made a motion for judgment of acquittal as to Count 10, which the trial court granted.

Dr. Barker, a senior psychological examiner, testified that as a part of her private practice, she was a Tennessee-approved sex offender treatment provider. She explained

that seventy percent of her counseling clients included sex offenders and sex offender victims.

Dr. Barker said that she first met the victim through the Defendant, who worked at the Smoky Mountain Children's Home and brought many of the foster children from there to see her. When the Defendant's marriage ended, the Defendant brought his adopted daughters, the victim and M.R., to see her in case they needed to talk to a woman. Thereafter, Dr. Barker began seeing the victim on a regular basis and counseled her weekly for approximately a year and a half. At first, the Defendant or M.R. would drive the victim to the sessions, but later, the victim drove herself. Dr. Barker said that she often met with the victim alone. During these sessions, she said the victim never disclosed that she was being sexually abused by the Defendant.

On cross-examination, Dr. Barker acknowledged that there were a few sessions in which she conducted family therapy with the victim and the Defendant at the same time. She stated that she first met the Defendant a few years prior when he was employed at the Smoky Mountain Children's Home as a case manager. She agreed that she and the Defendant developed a friendly rapport when she interacted with him as a case manager.

On redirect examination, Dr. Barker agreed that she also developed a friendly rapport with the victim over the course of her counseling.

M.R., age twenty-four, testified that she was the victim's biological sister and was approximately three years older. She stated that she had just graduated from the University of Tennessee with a bachelor's degree and was about to start her master's degree in the fall. M.R. agreed that she and the victim had a close relationship, but they had "a very hard life." She said they went into state custody for the first time when they were toddlers, and they did not get adopted until M.R. was thirteen years old. For that ten-year period, M.R. and the victim "were in and out of [the] state's custody with family members and with different foster parents and foster homes" and that they "had a lot of negative, really bad experiences." M.R. asserted that she and the victim were in approximately seventeen different foster homes in three different states and that they always remained close. M.R. took on a "motherly role with [her] siblings" because they "didn't really have any stability or parent support[.]"

M.R. maintained that the victim "couldn't really tell the difference between right and wrong." She said the victim thought that the "very negative, very bad, very illegal things" they had experienced growing up "were funny," even though M.R. "did not find any humor in any of [those experiences]" because "[t]hey were negative" and "brought up a lot of emotions." M.R. said initially she, the victim, and their two siblings moved in with

- 18 -

the Defendant, his wife, their adopted son, and their biological daughter, J.B. She said things were "chaotic" because there were "six children in the house, total," and she acknowledged that she and her siblings were "difficult" because of what they had gone through. Ultimately, M.R. and the victim stayed with the Defendant's family and their two siblings went somewhere else to live. When M.R. was fourteen years old, M.R. and the victim were adopted by the Defendant and his wife. At the time, they were both relieved and excited to not have to move or change schools again. Although they sometimes had disagreements, M.R. said that she and the victim were really close when they were adopted. M.R. said she was "extremely protective" of all her siblings, including the victim.

M.R. explained that eventually the Defendant and Jessica separated because they were having marital troubles related to "tension in the home" because of the presence of M.R. and the victim. Jessica took J.B. with her when she left the home, which left M.R., the victim, the Defendant, and the Defendant's adopted son in the home, until he moved out. M.R. said that when the victim got to be high-school age, she "became a lot more concerned with her physical appearance" and became "a little more defiant, as far as pushing the parental boundaries[.]" M.R. acknowledged that the Defendant was "very strict" and "had a lot of rules." She said that initially, the victim was unhappy and would argue if the Defendant would not allow her to go somewhere, but later, the victim did what she wanted regardless of what the Defendant told her.

M.R. stated that she graduated from high school and began attending the University of Tennessee but still lived at the Defendant's home. At that point, the victim was in high school, they were still close, and the victim still confided in her. However, the victim was "hanging around people that [the Defendant] thought were negative influences," and the victim continued to spend time with these people, despite what the Defendant told her. When the Defendant questioned the victim, the victim denied that she was spending time with these individuals, which caused them to argue.

When asked if she would have done something if she believed that the Defendant was hurting the victim, M.R. said, "Absolutely." She added, "Whatever it took to get [the victim] out of there." M.R. claimed that the victim "[n]ever" told her that the Defendant was abusing her. She also said she "[n]ever" noticed the Defendant doing anything inappropriate toward the victim. She said the victim never gave her any indication that she was scared to be at the Defendant's home. M.R. stated that she worked for one month as night staff at the Smoky Mountain Children's Home, but she kept getting sick, so she quit. During that month, M.R. said the victim never asked her not to go to work at night.

M.R. agreed that the Defendant's biological daughter, J.B., would frequently stay at the Defendant's home after the Defendant and Jessica divorced. She and victim got along

well with J.B., and victim and J.B. were "very close." J.B. would usually stay in the trundle portion of the victim's bed when she visited. In 2013, she, the victim, and I.M. were all living with the Defendant, and J.B. would periodically visit her father. M.R. said that the Defendant worked on I.M.'s case and allowed her to live with them so she would not have to change high schools her senior year. M.R. said that victim eventually got her driver's license and would drive herself to her appointments with Dr. Barker and would drive herself and I.M. to school.

M.R. stated that on December 3, 2013, the victim drove I.M. to school that morning. Prior to them leaving for school, M.R. learned that the Defendant and the victim had argued. That afternoon, I.M. returned from school on the bus and told her that the victim was still at the high school because she was sick. M.R. was concerned and immediately texted the victim to ask if she was okay and why she told I.M. to ride the bus home. The victim replied that she was sick at school, and when M.R. asked for additional information, the victim replied that she was sick in the math hall bathroom. Thereafter, M.R. called the Defendant to let him know what was going on and told him that she was headed to the school to check on the victim. The Defendant told her to take the victim to the doctor, and that he would meet them there.

When M.R. got to the high school, she was unable to get inside because it was after regular hours. Eventually, an assistant principal saw M.R. and took her to the guidance office, where she saw the victim and her friend S.V. sitting across from the guidance counselor. When M.R. asked if the victim was okay, the victim said, "I told them," and when M.R. asked if she told them she was sick, the victim said, "No. I told them everything," and nodded her head with her eyebrows raised. M.R. replied, "I don't know what you are talking about" and asked if the victim was sick, and the victim again stated, "I told them everything." At that point, the victim "grabbed the arms of the chair that she was sitting in and stood up and started screaming" at M.R. that she hated her, and she never wanted to see her again, which resulted in a police officer dragging M.R. out of the office. M.R. said that she felt "confused" and like she "had done something wrong" and "didn't know what was going on." She said the victim had "[n]ever" told her about the sexual abuse allegations against the Defendant in the prior two-year period. She also said she had "[n]ever" seen anything inappropriate between the Defendant and the victim. M.R. reaffirmed that she never would have allowed this to go on if she had known about it and that she would have gotten the victim out of the Defendant's home as soon as possible.

On cross-examination, M.R. admitted that she called the Defendant "David" rather than "[D]ad," although she referred to him as her dad. When asked if she called him "David" because they did not have a father-daughter relationship, she denied this,

explaining that she had called him David before they were adopted and "making the switch" after they were adopted "did not seem natural."

M.R. denied that she and the victim ever slept in the Defendant's room; however, she did admit that there was one time when she, the victim and J.B. watched a scary movie, and they all slept in the Defendant's bed, but the Defendant slept in another room.

M.R. acknowledged that when the police executed the search warrant late on December 4, 2013, she had been lying on the couch. She did not recall a wine glass being placed in front of her on the ottoman. She agreed that she was nineteen years old at the time. M.R. acknowledged that if she were shown a photograph of two wine glasses on the ottoman at the time the police entered the home, she would agree that there were two wine glasses there. She also agreed that she and the Defendant were the only people present when the officers executed the search warrant.

M.R. acknowledged that at the time that this search warrant was executed, the comforter and sheets were still on the Defendant's bed, her bed, and I.M.'s bed. She said it would not surprise her that the victim's comforter and sheets were not on her bed because she had read somewhere that the victim had previously stated that she washed her comforter. She said that she could not recall whether the victim's comforter and sheets had been stripped off of her bed on December 4, 2013, although she confirmed that she did not remove them from the victim's bed.

M.R. said she and the other girls "suspected" that the Defendant was dating, but he never introduced anyone to them as his girlfriend. Although there were females that visited the home, she did not know of any women who spent the night. She was not surprised that there were two toothbrushes in the Defendant's bathroom or that there was a bag of makeup on the Defendant's dresser because she, the victim, and I.M. got ready in different parts of the house. When asked if she was surprised that both sides of the Defendant's bed had the comforter and sheets pulled back, M.R. replied, "I can't speak to that."

M.R. said she "[v]aguely" recalled her interview with Detective Merritt on December 3, 2013. She acknowledged telling Detective Merritt that someone would have to show proof of the Defendant's abuse of the victim because otherwise she could not believe it. When asked if she had heard that the Defendant's semen was found on the drawer of the victim's bed, M.R. said, "I've heard a lot of things." M.R. agreed that she still lived with the Defendant in Lenoir City and that she worked with the Defendant at his trucking company, Purpose Transport.

M.R. reiterated that the victim "[n]ever" talked to her about sexual allegations against the Defendant and that if the victim had said she told M.R. about the Defendant's abuse in the early fall 2013, it would be a lie. M.R. also denied that she, the victim, and the Defendant discussed the Defendant's abuse of the victim during a conversation. When asked if she admitted telling Detective Merritt on December 3, 2013, that the victim was a fairly honest person, M.R. replied, "Yes, for the most part."

J.B., the Defendant's biological daughter, testified that her mother was Jessica Richards. She said that following her parents' divorce, she saw her father, the Defendant, every other weekend and a couple of weeks in the summer. When she visited, the victim, M.R., and I.M. would be at the Defendant's home. J.B. agreed that she and the victim had been best friends but that they were no longer friends.

J.B. stated she would share a bed with the victim when she visited her father. Although she and the victim would confide in one another, J.B. said the victim never told her that the Defendant was sexually abusing her. She also said she never saw her father saying or doing anything inappropriate to the victim. J.B. asserted that if the victim had told her about the Defendant's abuse, she would have told her mother and "would have definitely let somebody know." However, she said that the victim never disclosed any abuse to her.

On cross-examination, J.B. said that she primarily lived with her mother following her parents' divorce. She agreed that she did not see her father every other weekend because sometimes she missed weekends with him. However, she recalled telling Child Help that she spent two weeks at the Defendant's home during the summer of 2013. At that time, M.R. would sleep in her own room or fall asleep on the couch watching television. She said she never saw M.R. sleep in the Defendant's room. J.B. recalled that one time, after watching a scary movie, she, the victim, and M.R. slept in the Defendant's bed, and the Defendant slept on the couch.

J.B. said that after the victim made the allegations against the Defendant, J.B. did not regularly see her father. Thereafter, J.B. said the first time she saw her father was in February 2018. She said that she previously worked with the victim at Applebee's, but the victim got fired in December 2017 or January 2018 and that she stopped talking to the victim a month or two before J.B. began talking to her father again. J.B. said that since that time, her father had paid for her wedding and had walked her down the aisle. J.B. agreed that her father had become an important part of her life but was not really present in her life until February 2018 because of a court order. She acknowledged that although her father was older when she was born, her mother was seventeen years old at that time.

On redirect examination, J.B. stated that her parents were married for approximately ten years.

I.M. testified that when she was a senior in high school, the State wanted her to have a permanent place to live, but there were no foster homes located in the district of the high school she had been attending. Because of that, she went to live with the Defendant and his family for approximately eight months. Near the end of her first semester, she and the other children were removed from the Defendant's home, and she was placed in a different foster home until she graduated from high school.

I.M. said that she had her own room at the Defendant's home and that she lived with the Defendant, M.R., and the victim there. Her room was right next to the victim's room and was separated by a wall. She denied staying in her room all the time and watching television; she stated that she only had a television in her room the last two months she lived at the Defendant's home.

I.M. said that although she had a "small relationship" with the victim, she was closer to M.R. because they were closer in age. She heard arguments between the Defendant and the victim concerning the victim's failure to come home on time, problems at school, and the victim's refusal to follow his rules. I.M. noted that there were times when the victim got "pretty angry" at the Defendant.

I.M. stated that the victim never told her that the Defendant was abusing her and that she never observed anything that might lead her to believe that something inappropriate was happening between the Defendant and the victim. When asked if the victim talked to her about any issues in her life, I.M. replied, "I don't feel like we were close enough for her to want to talk to me about all of that." I.M. said she never observed the Defendant doing or saying anything inappropriate to her, M.R., or J.B.

On cross-examination, I.M. acknowledged that at some point, the victim indicated that she had some information on the Defendant. On December 3, 2013, the day that the victim disclosed the Defendant's abuse at school, I.M. said the victim told her, during the ride to school, that "she had something on [the Defendant] and he needed to watch out, and that she had told M.R. at one point about it" but M.R. did not do anything, which surprised I.M. I.M. stated that when she and the victim went back into foster care, the victim apologized that I.M. had been affected by all of this.

On redirect examination, I.M. said that the victim was "crying" and "angry" on the way to school on December 3, 2013. When the victim said that she had something on the

Defendant, I.M. said she had "no idea" what it was and just knew that the Defendant and the victim had gotten into an argument that morning.

The Defendant testified on his own behalf. He stated that he was currently forty-one years old, was the owner of a trucking company called Purpose Transport and had never been in trouble in his life. He said he started as a foster parent at OmniVisions and in 2005 or 2006, he began working for Smoky Mountain Children's Home as a foster parent because of his church's connection to that organization. He said that for him and his wife Jessica to become licensed foster parents, they had to attend a twelve-week course on Saturdays and had to undergo a home study, interviews, and extensive background checks at the federal, state, and local levels. The Defendant said that initially, his wife did office work for the Smoky Mountain Children's Home and that she still worked there in some capacity, although he was no longer employed there. The Defendant and his wife first had J.B. and then decided to adopt their son when he was twelve or thirteen years old because the Defendant knew his family from church. He said that their son lived with him and his wife until they separated and then he lived with the Defendant for a few months after his eighteenth birthday. The Defendant noted that his son was in the courtroom and that he currently drove a truck for his trucking company.

The Defendant said that he and his wife wanted to adopt M.R. and the victim, who were biological sisters, because they lived with a foster parent, Ms. Buckner, nearby. He did some "crisis intervention" with M.R., the victim, Logan, and K.H. while they were living with Ms. Buckner because the children were "consistently getting into trouble[.]" During this time, he was self-employed, and Smoky Mountain Children's Home would call him when children were getting out of control at the foster homes. He noted that the four children lived with Ms. Buckner for five or six months until Ms. Buckner said that she was going to ask for them to be removed from her home because she could not handle them. At that time, the Defendant said his wife talked to him about adopting all four of them, but he thought that "it was a bad idea" because he knew about the problems they had at Ms. Buckner's home and knew his wife tended to be passive. He said all four children moved in with him and his wife around January 2008 and by mid-February 2008, when the Defendant was out of town, the children were constantly arguing and fighting. Eventually, the Defendant and his wife went back to the State and Smoky Mountain Children's Home and said their home was not a good fit because there was too much chaos with all the children, and Logan and K.H. decided to stay with another foster family. Later, the Defendant and his wife signed an intent to adopt M.R. and the victim, but two months after that, his wife began having reservations about the adoption because things were still chaotic. His wife eventually changed her mind, and they adopted M.R. and the victim in September 2008. After having some financial issues with a house he rented, the Defendant and the family moved back to Knox County in the summer of 2009. At the time, J.B.,

Defendant's adopted son, M.R., and the victim were living with them. The Defendant said his wife got to the point that she did not want the children around her, even though M.R. and the victim had settled down, because the victim still had times where she would overreact to minor things.

Just over a year later, the Defendant and his wife separated. The Defendant admitted that they separated because he "wasn't a good husband" and "didn't take care of [his] wife in the way [he] should have." He said there were "a lot of problems between [his wife] and the children and me," and his wife refused to go to counseling with him.

The Defendant said that although he and his wife separated in 2009, they did not get divorced until 2012 because he did not want the divorce. His wife demanded that he make M.R. and the victim go back into the foster system, and he could not do that. In December 2009, the Defendant made appointments for M.R. and the victim to see therapist Dr. Barker, so they would have a female to talk to about the fact that all the women in their life, including his wife, had left them. He specifically chose Dr. Barker because he had worked with multiple therapists over the years and Dr. Barker "made a huge difference in children' behavior, and she worked really hard to work with the parents." He said every few weeks he would talk to Dr. Barker about how things were going with M.R. and the victim. Although Dr. Barker never disclosed the specific things that M.R. and the victim shared, Dr. Barker would tell him to watch out for certain behaviors the girls were exhibiting. Eventually, M.R. stopped going to counseling, but the victim continued to see Dr. Barker every week.

When he was working as a community support coordinator for the Smoky Mountain Children's Home, the Defendant encountered I.M., who was going to be moved into another foster home that would have required her to change high schools during her senior year. He eventually allowed I.M. to live with him and his family until she graduated from high school.

The Defendant acknowledged that he was strict with M.R. and the victim and had rules for them to follow. He purchased cell phones for the girls and eventually bought M.R. and the victim vehicles for them to drive. He denied placing a tracker on their phones, but he acknowledged that when the victim inherited his iPhone in October 2013, it had the Find My iPhone App on it that allowed him to see where she was. He also could see where M.R. and the victim were, when needed. In January 2013, the victim stopped hanging out with some of her friends and spent all her time with S.V., who was very disrespectful to the Defendant. Around this time, the victim started being totally focused on her appearance and would spend a lot of time in the girls' bathroom getting ready, so the other girls would

often get ready in other areas of the house, including the Defendant's bedroom and bathroom, which was the only other bathroom in the home.

The Defendant said he and the victim often had arguments about her friends, especially Chris. The Defendant knew Chris and his family from church, and although the mother and father were nice people, Chris was not a good person. He said Chris "screamed and cussed at his mom [and] kicked her" and had problems at school and at church. The Defendant told the victim that she could not hang around Chris and should not text him. When the victim told him she would do what she wanted to do, the Defendant took her phone away for about a week. He said that the victim got a job at Chick-fil-A in the mall when she turned sixteen, which he encouraged, but the victim started getting home after the 10:00 p.m. curfew, even though her work ended at around 9:30 p.m. On December 2, 2013, the victim got in at 11:00 p.m. and claimed that she had been at work, although she was much later than normal coming home. The Defendant told her they would discuss it the next morning.

The Defendant said that on the morning of December 3, 2013, he walked into the kitchen, saw the victim, and told her to come into the living room for a discussion. By the time the victim got ready, I.M. was in the living room, so they went into the Defendant's bedroom to talk. The Defendant informed the victim that he was going to take away her makeup for a week because she came home late the night before, and the victim handed him her makeup bag and told him that she did not care about him. The Defendant informed her that she needed to change her behavior and that if she refused, "there'd be drastic changes coming," including "not working at Chick-Fil-A at the mall" and "the possibility" of the Defendant changing high schools. the victim "got mad, stomped her foot" and "[h]er face turned red, and she just turned around and walked out." The Defendant got a text from the victim that she got to school and then did not hear anything about the victim until 4:15 or 4:30 p.m. that afternoon, when he got a call from M.R. that I.M. had ridden the school bus home and that the victim was sick at school. M.R. said she would pick up the victim from school, and the Defendant asked her to let him know what was going on because he was still at work.

The Defendant texted the victim to ask if she was okay and to let her know that M.R. was coming to the school. However, after the Defendant texted the victim, she said only that she was sick or that she was fine. When the Defendant was unable to reach M.R. or the victim by phone or text, the Defendant left work around 5:30 p.m. and drove to the high school. When he got there, he noticed a couple of police cars in the parking lot, and he walked up to the front door. An officer came to the door, and when he asked to enter because the victim was sick and M.R. was there, the officer told him to sit down on a bench outside the school.

The Defendant said that he waited approximately an hour before he talked to Detective Merritt. During that time, he tried to text M.R. and the victim, but neither one responded. He said he had "no idea" that the victim had told the authorities that he had been sexually abusing her.

Detective Merritt eventually told the Defendant that "someone had made allegations" and that the victim was "supposed to be the victim." With regard to the victim's allegations, the Defendant denied taking his clothes off in her room, denied having sexual contact with the victim, denied that the victim ever slept in his room with him and M.R., denied having sex with the victim on the couch, denied texting the victim and saying that he wanted to take their relationship to the next level, and denied making statements to the victim of a sexual nature.

The Defendant stated that he had a vasectomy in 2001. At that point, the defense and the State entered a stipulation, stating that Dr. Katoura R. Patterson tested the Defendant for a post-vasectomy sperm evaluation, which showed that "[n]o sperm were seen in three aliquots of the uncentrifuged specimen" and that "if sperm are present[,] they are below the limit of detection."

Regarding the presence of wine bottles in the house at the time of the execution of the warrant, the Defendant said that he had a colleague who bought three of the four bottles of wine and gave them to him because she thought he needed them to decompress. He said the two bottles of wine that were sitting there were consumed by him, the colleague, and a couple of other people with whom he worked. He also said regarding the other half bottle of wine, he drank a glass of this wine on December 3 and a glass on December 4, and he left both glasses there. He agreed that he was not great at keeping a clean house. He also claimed that the second toothbrush in his bathroom belonged to his biological daughter J.B. because she thought the victim might stick it in the toilet if she got mad at her.

The Defendant asserted that he did not commit the charged offenses. He stated that he was "absolutely not guilty."

On cross-examination, the Defendant said that he took the victim's makeup away on the morning of December 3, 2013, but he admitted telling Detective Merritt that he took the victim's makeup away on the night of December 2nd and then gave it back to her on the morning of December 3rd. He admitted that although he believed the makeup bag in his room belonged to the victim, it could have belonged to any of the women living in his home.

Regarding the iPhones, the Defendant agreed that he used an iPhone both professionally and personally and that he used Apple's iCloud services. He stated that his work phone was on the Verizon network while the phones for his children were probably on the AT&T or US Cellular networks. He acknowledged that all the cell phones used by members of his family were connected and used "the same iCloud." The Defendant admitted he used the Find My iPhone feature one time to track the victim but denied that the administrator of the iCloud account could prevent a user from turning off the Find My iPhone feature. Nevertheless, the Defendant admitted telling Detective Merritt during his interview that he overrode the feature that allows users to turn off the Find My iPhone feature. He acknowledged that the facts about the Find My iPhone feature were fresher in his mind at the time of his interview with Detective Merritt.

The Defendant agreed that he told Detective Merritt during his interview that he needed to get the victim's iPhone to ensure she did not contact S.V. He also said he asked Detective Merritt to give the victim's phone to him. He stated that Detective Merritt refused to give him the victim's iPhone and informed him that he was going to allow the victim to keep her phone while she went to a temporary placement. The Defendant suggested to Detective Merritt that Don Baker, his friend, with whom the victim was going to stay, maintain the victim's phone while she stayed at Baker's home. While the Defendant admitted that he had been in direct contact with Baker while he was at the high school on December 3, 2013, he claimed he called Baker after there had been a conversation about where the victim and I.M. would stay. He said Detective Merritt informed him at his interview on December 3, 2013, about the nature of the allegations the victim had made against him.

During the execution of the search warrant, the Defendant said he told Detective Merritt that he was concerned about possible HIPAA violations because his Smoky Mountain Children's Home emails were on his iPhone. He said Detective Merritt replied that this would not be a problem.

The Defendant reiterated that Dr. Barker did not tell him the details of what she and the victim discussed. He denied that he and Dr. Barker were very close, although he agreed they were colleagues and had talked a fair amount over the years about different cases.

The Defendant stated that he was almost twenty-two years old and that his wife was seventeen years old when his daughter was born. He denied telling the victim that it was her and M.R.'s fault that his wife Jessica left him.

The Defendant admitted that during his December 3, 2013 interview with Detective Merritt, he did not tell the truth when he said his last relationship had been very brief and

had taken place approximately one year prior to his interview. He claimed he was not honest about his personal relationships because he did not feel that was "pertinent information." Instead, the Defendant said he dated "three different women" at different times and that one of these women had spent the night at the house when his daughters were staying with friends. He acknowledged that this was the first time he had mentioned a woman spending the night at his home. The Defendant said that the black and pink lingerie and the teddy bear were for the woman he was dating.

The Defendant admitted that he and M.R. were the only ones at home between December 3, 2013, and the night of December 4, 2013, when the search warrant was executed. He heard M.R. testify that she did not remove the victim's comforter and sheets from her bed, but the Defendant denied removing the victim's comforter and sheets himself. He acknowledged that everyone else's comforter and sheets were on their beds and that the victim's comforter and sheets were the only ones in the dryer when the search warrant was executed.

The Defendant said that photographs of the sheets on his bed showed that there were yellow stains concentrated on the midsection of the sheets on one side. He also agreed that at the time the search warrant was executed, his comforter and sheets were pulled back on both sides of the bed at a time when only the Defendant and M.R. were present in the home.

The Defendant acknowledged that he heard Detective Merritt's trial testimony that the drawer on the victim's bed field tested positive for semen. He also agreed that Special Agent Cannon testified that there was semen on that drawer and that there were two different DNA profiles, including his DNA profile, present in that sample. He stated that he was twenty-three years old when he had his vasectomy because he was "positive [he] didn't want other children." The Defendant said he "[n]ever" had sex with the victim in her bedroom and "did not masturbate in front of her, around her, anywhere near her." He also said he never touched the victim's vagina, never put his fingers inside her vagina, and never attempted to kiss her.

The Defendant said he told Detective Merritt on December 3, 2013, that the victim and M.R. never slept with him in his bed, and he asserted that this was the truth. He said that there was one time that the girls had watched a scary movie, and they slept in his bed, and he slept in the living room on the couch. However, he admitted telling Detective Merritt that there would be times when he was sick and would sleep on the couch, and the girls would sleep in his bed on those occasions.

The State presented S.V., age twenty-one, as a rebuttal witness. S.V. said the victim was her best friend in high school and that the victim told her that the Defendant, her

adoptive father, had raped her. S.V. also said the victim told her that the Defendant was "very controlling" and that the victim's relationship with the Defendant "was more like an abusive boyfriend than a dad." S.V. stated that when the victim told M.R. about the Defendant's abuse, M.R. and the Defendant got something to eat, and when they returned, M.R. told the victim she was lying about the Defendant.

S.V. also said that the Defendant "made a fake [Instagram] account" by presenting himself as a "teenage boy" and then tried to "follow" S.V. and the victim's other friends on their Instagram accounts.

On December 3, 2013, S.V. first saw the victim in driver's education class. That day, the victim had a very different demeanor than normal and was "just scared to go home." She said the victim had sent her texts that she was upset. S.V. eventually decided that the victim needed to talk to the school's guidance counselor. She remembered the victim being "nervous, scared," but S.V. and several other friends "convinced her that that's what she needed to do." S.V. said that the victim was in a bad situation because the Defendant "had raped [the victim]" and the victim was "scared to go home."

When S.V. took the victim to the counselor's office, the victim was "[n]ervous, scared" and wanted her to "stay with her." She said that after December 3, 2013, she remained friends with the victim for a while but lost touch two years after high school.

On cross-examination, S.V. acknowledged that she never saw the Defendant rape the victim. She claimed the victim told her through a text message in late November or early December that the Defendant had raped her. She confirmed that the victim told her about the rape via text message prior to the victim's disclosure at school on December 3, 2013. S.V. said she and the victim told a lot of their friends about the victim's rape after the victim sent this text message. However, S.V. stated that she did not save the victim's text disclosing the rape. S.V. also told her dad about the victim's rape prior to December 3, 2013. S.V. stated that she did not take the victim directly to the guidance counselor when she first discovered that the Defendant had raped the victim because S.V. "was a teenager" and the victim "was scared" and "didn't know what to do," and S.V. "had to convince her" to tell the guidance counselor about the abuse. S.V. could not remember how many days passed between the day that the victim first sent her the text about being raped and the day S.V. took the victim to the guidance counselor to disclose the rape.

At the conclusion of trial, the jury found the Defendant guilty of sexual battery by an authority figure in Counts 1, 2, and 9; rape in Counts 3 and 4; statutory rape by an authority figure in Counts 5, 6, and 7; and incest in Count 11. The trial court, in its role as

thirteenth juror, dismissed Count 8, which charged the Defendant with sexual exploitation of a minor via electronic means.

Prior to the sentencing hearing, the Defendant retained new counsel. At the conclusion of the sentencing hearing, the trial court imposed partially consecutive sentencing because the Defendant was convicted of two or more statutory offenses involving the sexual abuse of a minor. See Tenn. Code Ann. § 40-35-115(b)(5). The trial court also denied the Defendant probation based on the circumstances of the offense, which were particularly horrific given the Defendant's relationship with the victim, his adopted daughter, and the lengthy period of abuse. Ultimately, the trial court imposed an effective sentence of twelve years.

**Post-Trial Filings and Investigation.** Following entry of the judgments of conviction, the Defendant timely filed a "Motion for New Trial, Arrest of Judgment and Judgment of Acquittal," alleging in pertinent part that the evidence was insufficient to sustain his convictions, that he received ineffective assistance of counsel during the pre-trial and trial proceedings, that the State and the trial court violated his due process rights, that the trial court imposed an excessive sentence, and that the cumulative effect of these errors denied the Defendant his right to a fair trial.

Following his conviction, the Defendant used the discovery process in the victim's civil suit to obtain the victim's records from her medical providers, social service entities, educational institutions, and governmental agencies. The Defendant then filed a motion to compel and a memorandum in support of the production of the victim's foster care, psychological, medical, educational, and other records for review by the parties or for an in camera review by the trial court in his criminal case. In his memorandum, the Defendant specifically asked for the disclosure of any records favorable to the defense, including exculpatory or impeachment evidence. The Defendant later filed another motion to compel the same records concerning the victim in conjunction with his motion for new trial. Pursuant to a protective order, the Defendant filed some of these records as well as affidavits from M.R. and himself under seal.

In response to the Defendant's motion, the trial court on November 23, 2020, ordered the "TBI to provide to the court any investigation file or other written record, whether confidential or open to public inspection, relating to the investigation of former Special Agent Amory Cannon[,] which may or may not have led to her subsequent resignation." Following an in camera review of the provided records, the trial court entered an order on December 7, 2020, concluding that "the file contain[ed] potentially exculpatory material." The court then provided this TBI investigative file concerning Special Agent Cannon to the parties under a protective order.

On January 6, 2021, the trial court entered an order granting the Defendant's motion for independent analysis of biological evidence in possession of the State. Specifically, the court ordered the State to release any biological evidence in its possession, custody, or control (including but not limited to any slides, swabs, slide scrapings, and DNA extracts) to the defense expert, Katherine L. Cross, for forensic examination. In addition, the State was required to release the following trial exhibits to Cross: the purple rug, the swabs from the mattress, the buccal swabs from the victim, the buccal swabs from the Defendant, bedding sheets, and the drawer from the victim's bed.

The same day, the trial court entered an order granting the Defendant's motion for independent analysis of electronic evidence in the possession of the State, including any forensic extractions obtained by law enforcement, and required them to be released to defense expert Andy Spore. In particular, the court ordered the State to release to expert Spore the iPhones belonging to the Defendant and the victim as well as a variety of other electronic devices collected during the search of the Defendant's residence.

On July 12, 2021, the Defendant filed his "First Amended Motion for New Trial, Arrest of Judgment and Judgment of Acquittal." In it, the Defendant alleged in pertinent part that trial counsel provided ineffective assistance during the pre-trial and trial proceedings by failing to obtain the victim's records from DCS, foster care, counseling, medical and educational entities, and the juvenile court, and by failing to consult with and retain an expert regarding the victim's diagnoses. The Defendant also alleged that the State violated Brady by suppressing various pieces of evidence; that the Defendant's due process rights were violated by having to proceed to trial without obtaining the victim's records; and that the cumulative effect of these errors deprived the Defendant of his right to a fair trial.

An affidavit signed by M.R. was presented to the trial court under seal. In it, M.R. stated, "One investigation that I remember concerned whether my older sister [K.H.] was sexually abusing us, her siblings. I do not remember whether this allegation was based on a report or [was] observed, just that I was questioned about it." In addition, a note from Smoky Mountain Children's Home also indicated that K.H. "need[ed] special individual therapy due to a sexual abuse case that occurred involving her."

On August 26, 2021, the trial court entered an order granting the Defendant's motion to compel the victim's records in part and denying it in part. The court concluded that the Defendant had failed to make the necessary showings to justify the need for an in camera review of the Defendant's requested records from "every care provided or organization that even remotely had contact with [the victim]." The trial court noted that the Defendant had

provided certain records from the Smoky Mountain Children's Home under seal, and after reviewing these Smoky Mountain Children's Home records in camera, the court disclosed a single page that "could possibly contain potentially exculpatory material." In addition, after reviewing M.R.'s affidavit, the trial court ordered that DCS investigatory records related to the victim's prior claim of sexual abuse by an older sibling be given to the court for an in camera review, so long as the Defendant was able to provide "additional information to allow the court to enter a sufficiently specific order; e.g. the state and/or county in which the investigation occurred, the name of the older sibling, the approximate year of the investigation, etc." After noting Dr. Barker's testimony at trial that she did not see any signs that the victim had been sexually abused and that the victim never disclosed that she was sexually abused, the trial court held that there was "no indication that Dr. Barker's records would contain potentially exculpatory material." In response to the Defendant's claim that the size of the DCS file placed under seal by the court after the in camera review in 2017 was "too small to possibly encompass all of the records that should exist, the trial court stated that it "re-reviewed the DCS records that were placed under seal in 2017," which contained "over 300 pages and 7 compact discs." The court acknowledged that although it was "very likely" that the DCS records placed under seal in 2017 did "not contain every record DCS ever compiled" regarding the victim and her siblings, the 2017 DCS records placed under seal "appear[ed] to constitute a complete and total copy of . . . any records relating to the charges and [the victim]" Accordingly, the trial court concluded that the Defendant "ha[d] not made a sufficient showing for any additional demands on DCS." In response to this order, DCS responded that it "no longer has paper records associated with [this older sibling]" because "those paper records would have been destroyed" in accordance with the office's retention policies.

On April 22, 2022, the Defendant filed his "Second Amended Motion for New Trial, Arrest of Judgment and Judgment of Acquittal." In this motion, the Defendant alleged in pertinent part freestanding claims of newly discovery biological evidence, newly discovered electronic evidence, and newly discovered evidence consisting of the victim's records. The Defendant also alleged that the State violated Brady and its progeny when it failed to disclose records containing favorable information and key impeachment evidence that would have been material to the Defendant's case at trial; that he received ineffective assistance of counsel; that the evidence was insufficient to sustain his convictions; that the trial court erred in allowing the State to introduce the victim's entire "child forensic interview"; that the Defendant's sentence was excessive; and that the cumulative effect of these errors deprived the Defendant of his right to a fair trial.

Also on April 22, 2022, the Defendant filed a renewed motion to compel discovery and additional information related to the work of former TBI Special Agent Cannon, specifically the entry and exit logs and time sheets for the time period of the present case,

a complete set of corrective actions regarding Special Agent Cannon, and a complete set of external audits of the laboratory where Special Agent Cannon worked. The trial court subsequently entered an order finding that the requested additional information concerning Special Agent Cannon was not subject to Rule 16 discovery but that the State had an ongoing duty to provide to the defense any information that would qualify as Brady material. The court noted that if the State had information "that [Special Agent] Cannon was not actually present in the lab on the date[s] and time(s) she claims she conducted the testing in this case, then the State would be required to provide that information to the defense." The court also stated that if the State had information that Special Agent "Cannon was subjected to corrective actions based upon the performance of her duties relating to this case or errors on any case that would affect her reliability as an expert or [her] credibility as a witness during this case, then that information would likely be subject to a Brady disclosure."

On September 21, 2022, the Defendant filed his "Third Amended Motion for New Trial, Arrest of Judgment and Judgment of Acquittal and In the Alternative, Motion to Supplement the Record." In this motion, the Defendant asked that the trial court supplement the record with newly obtained evidence from DCS records concerning the victim that were recently received by defense counsel.

**Motion for New Trial Hearings.** Several hearings were conducted over a period of days to allow for the presentation of all the proof relevant to the motions for new trial. Katherine Cross, a DNA technical engineer and a forensic biologist at Guardian Forensic Sciences, testified as an expert in DNA and forensic serology for the defense. Cross stated that the main item of interest in the Defendant's case was a wooden drawer and that the TBI had tested two different areas on that drawer. She explained that each area tested had a sperm fraction and a non-sperm fraction. Cross said that the sperm fraction contained sperm cells. However, she stated that the non-sperm fraction contained cells from skin, saliva, sweat, urine, or vaginal cells, noting "[a]nything that is not a sperm cell will open in that fraction."

Cross asserted that although the TBI tested the sperm fraction of Area 1 of the drawer twice, the TBI was not able to obtain a DNA profile either time. During the TBI's first test on Area 1, the non-sperm fraction contained a mixture of two people, with one of the people being male, and the majority contributor was consistent with the Defendant; however, the victim was excluded as the minor contributor. The second time the TBI tested the non-sperm fraction of Area 1, there were "no interpretable [DNA] profiles, due to limited data." Cross stated that the P30 test that Special Agent Cannon performed was only "presumptive in nature," because the P30 test is "so highly sensitive to other body

- 34 -

fluids," including "breast milk for women," "female urine," and for bodily fluids "not specific to a human."

Cross said her interpretation of the result from Area 1 was that the sample was "either an old compromised semen stain, where the sperm cells were starting to become damaged and would open in the non-sperm fraction, or that the DNA is coming from something other than sperm cells, which would be some form of epithelial cells or white blood cells, but, since there was no indication of blood being present, more than likely epithelial." She agreed that epithelial cells could come from someone just touching that drawer. Cross noted that when one finds DNA that is likely the result of skin cells in a common household, it is very difficult to determine whether any sexual abuse happened "because you would expect to find [the DNA of someone] living in a household . . . [as] they're shedding millions of skin cells every day."

Cross said that in Area 2, the TBI conducted a P30 test, considered presumptive at the time, which "indicated the presence of semen, but not spermatozoa ." When this sample was DNA tested, there was no DNA profile obtained in the sperm fraction, and the non-sperm fraction was inconclusive with regard to the victim and the Defendant "due to limited data." Cross said that it was now known that the P30 test was "so highly sensitive" that it could react to bodily fluids that were not semen and to bodily fluids that were not human. With Area 2, Cross said that "with nothing in the sperm fraction of the DNA and no sperm cells observed," it was "a good indication that it's probably not coming from . . . semen itself[.]"

Cross acknowledged that "given the very small amount of sperm that were observed in this case," one of the possibilities was that the source of the sperm was a vasectomized male. She explained that a vasectomy reduces, but does not totally eliminate, a man's sperm count "to reduce the chances of pregnancy, but there will still be some sperm found in [a vasectomized male's] ejaculate, just not the normal hundreds of millions of sperm that we would expect to see in an unvasectomized male." She added then whenever a low number of sperm is detected, one has to consider that it is from a vasectomized male; however, she stated that if someone has had a vasectomy, it will not affect "the chemical components of their semen" and will only affect "the sperm component."

When reviewing the TBI case file, Cross noted an "off-ladder peak" in the DNA printouts, which "tends to occur" when there is "non-human DNA." She noted that this "non-human DNA could come from saliva, semen, or anything from . . . an animal source." She believed the "most likely" explanation for the "very few sperm cells," the "positive presumptive P30 test result," and the "anomalous peak" in the DNA was that the sample came from "canine or dog" sperm because the "morphology, or the shape and size of a dog

sperm cell, is almost identical to a human sperm cell." She said the only difference is that "where the sperm head connects to the tail, it is flattened and truncated a little bit in dogs," and she added that someone "could easily overlook" this difference if that person was not "looking for canine sperm." Cross said that dog semen would yield a positive result on the P30 lateral flow test that was done on Area 2 "because of the sensitivity of the test."

Cross said that her interpretation of the TBI report and the TBI raw data was that for Area 1, spermatozoa was seen under a microscope. She explained that no presumptive test was done for that part of Area 1 because there was already a "positive result" from Special Agent Cannon's visual confirmatory test of seeing the spermatozoa under the microscope, and the sample was forwarded so a DNA test could be conducted.

After reviewing the entirety of the trial testimony in the Defendant's case, Cross said that Special Agent Cannon did the original testing of Area 1 and 2 but was no longer employed by the TBI when she testified at trial. Cross said that Special Agent Cannon testified that she did a "confirmatory test, called the P30 test" in Area 2 for "an enzyme and prostatic fluids" but that Special Agent Cannon's testimony was not scientifically accurate because "P30 is a protein, not an enzyme" and because the P30 test is "not a confirmatory test" but it is only "a presumptive test." Cross said that Special Agent Cannon's testimony that her result in Area 2 was "positive for seminal fluid" was scientifically misleading because Special Agent Cannon could only state that her result "might be" positive for seminal fluid. She said that to her knowledge, the only confirmatory test that the TBI has for semen is to see if sperm is seen under a microscope.

Cross also said that when Special Agent Cannon was asked how confident she was that the sample contained the Defendant's semen, Special Agent Cannon replied, "[T]he DNA profile I obtained, I'm confident it belongs to [the Defendant]." She noted that although Special Agent Cannon's answer was "technically correct," the question was "misleading" because a layperson would understand Special Agent Cannon's testimony to mean that the sample contained the Defendant's semen.

When Cross reviewed the TBI's case file, she learned that Special Agent Cannon had been reprimanded and then left the TBI for misconduct, but the file did not detail Special Agent Cannon's misconduct. She said that this information, along with her conclusion that Special Agent Cannon's trial testimony was scientifically misleading, led her to recommending that additional information be obtained about why Special Agent Cannon left the TBI.

Cross said that when she reviewed the more complete personnel file from the TBI, she learned that Special Agent Cannon "included incorrect time recordings on payroll time

sheets over multiple pay periods," which Special Agent Cannon claimed were "mistakes" that occurred when she "prefill[ed] out her forms" and then did not go back and correct them. The TBI file also showed that the TBI performed an internal investigation into Special Agent Cannon's "case notes for work performed on . . . days [she] wasn't present in the laboratory." Cross stated that in her opinion, Special Agent Cannon's claim that she performed work on days she was not in the lab was "more concerning than the payroll issues." Cross said these documents indicated that, at best, Special Agent Cannon was doing "sloppy casework" and, at worst, this could be an indication of "falsification of results." Cross opined that because Special Agent Cannon had documented that she had done testing when the lab records showed she was not in the lab that day meant that "the integrity of those results is questionable." Consequently, Cross recommended that defense counsel request the entry and exit logs for the time period that Special Agent Cannon was working on the Defendant's case. Cross said that once she received more complete documentation from the TBI, she learned that Special Agent Cannon was facing termination, but she chose to resign prior to being terminated.

Cross said that in light of the findings in the TBI's earlier report, she recommended an independent examination of the physical evidence in the Defendant's case. However, she claimed that she asked for the independent analysis of the evidence before she reviewed the TBI's personnel documents for Special Agent Cannon. She said she later got the opportunity to test Area 1 and Area 2 of the drawer from the victim's room. She also received the DNA extracts from the two samples from the drawer.

Cross said that when she used an ultraviolet light on the portions of the drawer the TBI marked as Area 1 and Area 2, she noticed several pinprick spots that fluoresced. When she conducted the AP Spot test on Area 1, Cross said this test was negative, although she continued testing. Then, for the sample from Area 1 that she collected from the drawer, she made a slide to look for spermatozoa, but she did not see any spermatozoa on the slide. In addition, when she conducted the double immunodiffusion test, which is the confirmatory test for semen, the result was negative for semen.

Cross said that she also reviewed the slide that Special Agent Cannon originally examined for the TBI. When Cross visually inspected this slide, she did not see any spermatozoa but observed "rare epithelial cells still on the slide and quite a bit of debris, which would be consistent with [Special Agent Cannon] having swabbed the surface for testing." She explained that the TBI report indicated that Area 1 was tested twice. Consequently, Cross concluded that Special Agent Cannon's initial extraction was directly from the drawer, which revealed DNA profiles in the non-sperm fraction, and then Special Agent Cannon went back to the slide, where she knew there were sperm cells, and conducted the second extraction, which explained "why the [TBI] slide . . . had very little

on it" when Cross looked at it. Cross noted that Special Agent Cannon did not take any photographs of the slide to document that she had observed spermatozoa on that slide. Cross added that because Special Agent Cannon had a limited amount of material that she was going to consume with testing, she should have photographed the slide or had a second analyst review it to confirm that spermatozoa was on the slide. Cross said that the laboratory's accreditation standards would have stated that an analyst could not consume a sample without notifying individuals that the sample was being consumed. Cross stated that because Special Agent Cannon consumed the sample, there was no way to go back and visually see whether there was human or dog spermatozoa on the slide when Special Agent Cannon looked at it.

When Cross conducted DNA testing the TBI's slide, she got no DNA profile at all in the sperm fraction and in the non-sperm fraction, she got only "one allele" that was "at the sex determining marker" of "X," which meant it could be male or female human because everyone has an X chromosome. She also said that this one allele could be from any type of DNA, including "touch DNA" from someone simply touching the drawer. Cross said that for the non-sperm fraction she could not say that her results were necessarily discrepant from Special Agent Cannon's results on that slide, but she did say that there was "less material" on the slide to collect and work with when she did her testing. Cross agreed that when Special Agent Cannon did her testing on that slide the first time, before she swiped the slide, she reported having a DNA profile that was consistent with the Defendant's DNA as well as an unknown DNA profile that was not consistent with the victim. Cross also said that when Special Agent Cannon swiped the slide and retested it, she did not get an identifiable DNA profile.

Cross asserted that M.R. and J.B. had informed her that the family had a "pet Chihuahua" in their home during the investigation in this case and that this dog was "unneutered" and had "a habit of mounting and ejaculating on both inanimate objects and humans within the household." After considering Special Agent Cannon's records and her own independent analysis, Cross said there was a possibility that the sample Special Agent Cannon obtained from Area 1 of the drawer was "canine in origin," although she said this finding was not definitive because she did not have a way to confirm this without looking at the sperm that Special Agent Cannon saw. Cross said she felt "relatively confident" that Special Agent Cannon observed sperm on the slide; however, Cross was unsure whether the sperm Special Agent Cannon saw was "human or canine." Cross also could not rule out the possibility that Special Agent Cannon falsified the result that she observed sperm on the slide.

On cross-examination, Cross acknowledged that where there is sperm, there is semen, but that is not necessarily true that where there is semen, there is sperm. She also

agreed that because the Defendant had a vasectomy, this would affect the number of sperm present in a semen sample. Although Cross said that she believed the first extraction from Area 1 was an older compromised semen stain, she acknowledged that neither the non-sperm fraction nor the sperm fraction contained a "ski slope pattern" in the DNA profile that would indicate a degraded semen stain. Cross also admitted that if the sample was old or degraded, she would expect sperm cells to survive longer than epithelial or white blood cells, although the only DNA profile generated for Area 1, extraction 1 was in the non-sperm fraction.

Cross admitted that she never conducted any species testing on the items in this case, even though she was able to perform species testing. She also said that while the TBI had documented a timecard discrepancy with the work Special Agent Cannon claimed she performed on specific dates, Special Agent Cannon's testing in the Defendant's case took place prior to the time period associated with this timecard discrepancy.

Cross admitted that neither M.R. nor J.B. ever told her that the pet Chihuahua died six months prior to the victim's disclosure of sexual abuse in this case. Cross said she never talked to the victim about the family's dog.

Although Cross had previously testified that Special Agent Cannon should have taken a microscopic photograph of the sperm she observed or should have had another forensic scientist confirm the presence of sperm before she consumed the sample, Cross acknowledged that she did not know whether the TBI had the ability to do microscopic photographs at that time. She acknowledged that the TBI had just recently made it a requirement that analysts document the consumption of a sample, and that prior to this time, it had just been a recommendation.

On redirect examination, Cross stated that one explanation for the non-sperm fraction having a profile consistent with the Defendant's DNA profile was that the Defendant could have touched the drawer in the victim's room at some point. Cross also asserted that Special Agent Cannon's documented misconduct at the TBI took place prior to her testimony at the Defendant's trial because Special Agent Cannon was no longer employed at the TBI when she testified at the Defendant's trial.

On recross examination, Cross confirmed that the samples from Area 1 and Area 2 were taken from a drawer in the victim's bedroom, not the Defendant's bedroom. She also agreed that if this was "touch DNA" in the sample, she would have expected the victim's DNA to be there as well.

Andy Spore, a Senior Forensic Examiner at Legility, an E-discovery support company, was accepted as an expert in mobile forensics. Spore identified a receipt showing that electronic and other evidence was seized from the Defendant's residence on December 5, 2013, at 1:44 a.m. Spore then identified a property receipt from the KCSO showing that the victim's phone was seized on December 5, 2013, at 7:50 p.m. He noted that the victim signed a consent form for the KCSO to search her iPhone on December 12, 2013, at 2:38 p.m. Spore said he reviewed the victim's forensic interview, wherein the victim stated that she used her iPhone sometime during the evening of December 3, 2013.

Spore also identified a July 12, 2017 affidavit of Lieutenant James Smithhart with the KCSO, stating that both the Defendant's iPhone and the victim's iPhone had been factory reset, which prevented Lieutenant Smithhart from doing any additional examination of the cell phones. Spore said it was not standard forensic mobile device practice to wait three years to document that a cell phone that had been examined had been factory reset.

When he analyzed the Defendant's and the victim's phones, Spore confirmed that they had been factory reset. He said that the Defendant's phone was reset on December 5, 2013, at 9:08 a.m., Eastern Time, and the victim's phone was factory reset on December 4, 2013, at 12:24 a.m., Eastern Time. Spore said that after reviewing the transcript from the Defendant's trial, he believed that the information regarding the iCloud account was not accurately conveyed at trial. Specifically, he asserted that there was a single iCloud account (based on a single Apple ID) with a single username and password across the Defendant's phone, the Defendant's iPad, and the victim's phone, which meant that anyone who had a device tied to the Apple ID could factory reset the device. Spore said that while it is possible for the iCloud account to have been set up where only the administrator could factory reset the devices, which is called a Family Plan with parental controls, this was not how the Defendant's phone, the Defendant's iPad, and the victim's phone were set up. Spore confirmed that anyone on any of these devices, not just the Defendant, could have factory reset the iPhones, although this information was not presented at the Defendant's trial.

Spore stated that the Defendant's phone was not in the Defendant's possession at the time it was factory reset because the Defendant's phone had been in the possession of the KCSO for nearly eight hours at the time it was factory reset. He said there was a possibility that when the Defendant's phone was seized, it was not put in airplane mode, and when Lieutenant Smithhart turned on the phone and the phone connected via cell service to the internet, the phone got a command from iCloud to factory reset itself. In that scenario, the phone would power on first to the normal operating system and then the factory reset would initiate afterward. Spore said another possibility was that when

Lieutenant Smithhart conducted some sort of forensic analysis of the Defendant's phone, this analysis could have caused the phone to factory reset itself. He said that he was unable to determine which of these possibilities occurred because Lieutenant Smithhart did not do any contemporaneous documentation of his analysis of the iPhones.

Spore said that the victim's phone was at Don Baker's home when it was factory reset on December 4, 2013. He said that the victim had said she had spent the night at Baker's home from December 3 through December 4 and that the victim's forensic interview occurred on the morning of December 4.

On cross-examination, Spore acknowledged that the victim's trial testimony was that Don Baker took her phone as soon as she got to his house on December 3, 2013, and that the Defendant's trial testimony was that he wanted Baker to take the victim's phone when she got to Baker's home on December 3, 2013. He agreed, based on the proof at trial, that when the victim's phone was factory reset on December 4, 2013, at 12:24 a.m., the victim was not in possession of her phone. He also admitted that if the victim's phone was factory reset on December 4, 2013, then she would not have been able to use her phone to factory reset the Defendant's phone. Spore also agreed that the Defendant told Detective Merritt that he was the administrator of the iCloud account, so any misrepresentation stemmed from the Defendant's description of his status on the account. Spore admitted that when the Defendant's phone was factory reset on December 5, 2013, at 9:08 a.m., this factory reset could have been done remotely, assuming the phone was not in airplane mode. Spore said that a person would be able to go to iCloud.com from any computer device with a web browser, put in the username and password, and then send a remote factory reset command for a particular Apple device.

On redirect examination, Spore said that if the web browser already had the username and password saved on it, then someone would not have to log in with the credentials to get into the iCloud account to start a factory reset. He said that he confirmed with several family members that there was a single iCloud account across all devices. Spore noted the testimony at trial that the Defendant was the administrator and therefore the only person who could factory reset these phones, was "[t]echnically" inaccurate. He also said that although the victim testified at trial that Don Baker took her phone from her when she got to his house, the victim stated during her forensic interview that she had used her phone while she spent the night at Don Baker's house. Spore acknowledged that it would have been impossible for the victim to use her phone after it was factory reset on December 4, 2013, at 12:24 a.m. However, he said it was possible that the victim factory reset both her phone and the Defendant's phone, given that she said in her forensic interview that she was using her cell phone the night of December 3, 2013. Spore also agreed that it was possible that the factory reset command could have been sent by anyone

who logged in to the iCloud account from anywhere. Spore confirmed that a factory reset could not be scheduled because it was "immediate."

Attorney David L. Raybin testified as an expert in criminal law regarding the standard of effective assistance of counsel. Raybin stated that he believed the Defendant's trial counsel was deficient in failing to have subjected the DNA evidence in this case to separate independent analysis and in failing to acquire DNA evidence to refute that of the State. He also asserted that trial counsel was deficient in failing to acquire an expert on the cell phone proof and in failing to acquire evidence contrary to that of the State. He believed that such experts might have helped trial counsel prepare for cross-examination at trial, although he admitted that "[r]easonable minds could differ" on that issue. Raybin clarified that "the presentation of contrary evidence" was the constitutionally significant requirement for seeking expert assistance, "not necessarily the ability to cross-examine."

Raybin maintained that these "two professional errors," when considered independently or cumulatively, prejudiced the defense. In particular, he said the State's DNA evidence "enhanced" victim's credibility and the State's cell phone evidence "vaporized" the Defendant's credibility. He argued that if trial counsel had presented contrary evidence, this could have created reasonable doubt and "call[ed] into question the reliability of the [trial's] outcome." He claimed that either the error regarding the DNA evidence or the cell phone evidence met the prejudice standard in this case. He also stated that these two errors in combination met the prejudice prong in this case.

On cross-examination, Raybin claimed that the presence of the victim's comforter in the Defendant's dryer was not that damaging because trial counsel had shown on cross-examination that there was no ejaculation by the Defendant on the day the search warrant was executed and that the victim frequently washed her comforter. He stated that for the purposes of the Sixth Amendment, trial counsel had competently dealt with the evidence of the comforter in the dryer and diminished the value of that evidence on cross-examination. Raybin said that while the comforter proof constituted evidence against the Defendant, this was "not anywhere near [as damaging] as the cell phone or the DNA [evidence]."

Raybin acknowledged that trial counsel cross-examined Special Agent Cannon regarding the DNA evidence and presented a theory that the Defendant was incapable of producing sperm because of his vasectomy. Raybin also acknowledged that trial counsel cross-examined the State's expert on the cell phones and asked him several questions about who would have had access to the iCloud account. Raybin agreed that trial counsel cross-examined the victim and presented the theory that the victim could not be believed because she had been so inconsistent in her allegations against the Defendant.

- 42 -

Dr. Laura Brodie, who was accepted as an expert in forensic psychology, was asked about her opinion on the victim's forensic interview. The State objected to Dr. Brodie providing testimony regarding the victim's credibility, citing State v. Copeland, 226 S.W.3d 287 (Tenn. 2007) and Tennessee Rule of Evidence 702. Defense counsel countered that the forensic interview statute in Code section 37-1-612 provides a statutory exception that was recognized in Copeland, which concerns whether there are issues with the reliability of the forensic interview. Ultimately, the trial court stated that it was going to take the State's objection under advisement and allow the defense to present Dr. Brodie's testimony.

Dr. Brodie said she formed several opinions about the victim's forensic interview. In particular, she noted that the forensic interviewer did not ask the victim about her possible motivation for concocting a statement that she was sexually abused. She noted that the interviewer did not ask the victim how she felt about changing schools, the rules in the Defendant's home, or the fact that the timing of this disclosure happened after the Defendant told the victim that she might have to change schools. Dr. Brodie also said the interviewer asked multiple questions, without following up on the victim's answers, and asked leading questions of the victim. In addition, Dr. Brodie noted that the victim had several contradictions in her statement—the victim first said there was no sexual activity in the Defendant's bedroom and then stated there was sexual activity in the Defendant's bedroom; the victim originally said that she had only told her sister M.R. about the abuse and then later said she had also told her friend S.V. about the abuse; the victim said she had first had intercourse with the Defendant on a couch in an interview the previous day and then told the forensic interviewer that the first intercourse with the Defendant occurred in a bedroom. Dr. Brodie noted that adolescents have "some experience with sexuality and sexual situations so they can report something that can sound very plausible, but it is something they, perhaps, may have seen [rather than experienced]." She also stated that the very first time something happens and the very last time something happens tend to "make a more indelible memory," as opposed to what happens in the middle, which made the fact that the victim changed her statement about the first time the Defendant had intercourse with her significant.

Dr. Brodie also stated that she reviewed the victim's records, including records from Child Help Tennessee, DCS, DHS, Helen Ross McNabb Center, Knox County Health Department, therapist Dr. Barker, OmniVisions, Peninsula mental health facility, Smoky Mountain Children's Home, the presentment, and the trial testimony of the victim. When asked to review these records to see if there were any diagnoses that would impair the victim's capacity to make a credible statement pursuant to Tennessee Rule of Evidence 617, Dr. Brodie said the records showed that the victim exhibited symptoms of "[r]eactive

attachment disorder, adjustment disorder with mixed anxiety and depressed mood and Post-Traumatic Stress Disorder," as well as "disorder of infancy, child or adolescence[.]" She noted that the victim's last alleged abuse by the Defendant occurred in December 2013, and the next month, in January 2014, the DCS records stated that the victim experienced "[p]sychosis, impulsivity, hyperactivity, depression, anxiety, oppositional conduct, adjustment to trauma, attachment, anger control, and emotional control." When asked if after reviewing these records she was able to formulate an opinion about whether the victim's diagnoses or disorders adversely affected her ability to accurately perceive and recall events, Dr. Brodie replied, "[the victim] suffers from two disorders[, reactive attachment disorder and psychosis,] that are lifelong that greatly impact her ability to interpret her surroundings, relationships and to be able to describe them accurately." In addition, after considering all these records, Dr. Brodie believed the victim needed a forensic psychological evaluation where she would be given "assessments to compare [her] to others."

On cross-examination, Dr. Brodie acknowledged that she did not speak to the victim, the victim's friends, the victim's guidance counselor at the high school, or the victim's forensic interviewer. She also acknowledged that her report focused on the credibility of the victim's statement made at Defendant's sentencing hearing. Dr. Brodie agreed that although a provider noted that the victim had psychosis, she did not know when that symptom was first described or whether that person was a medical expert, based upon the DCS records. In addition, she agreed that although Emily Beasley with OmniVisions diagnosed the victim with reactive attachment disorder, adjustment disorder with mixed anxiety and depressed mood, and post-traumatic disorder close in time to the victim's disclosure of the sexual abuse, Beasley never diagnosed the victim with psychosis and never suggested that the victim be hospitalized. While she agreed that psychosis affects a person's daily life, Dr. Brodie stated that she never spoke to anyone who lived with the victim.

On redirect examination, Dr. Brodie asserted that in reviewing these records, she was doing more than simply trying to ascertain if the victim was credible and was also trying to offer an opinion about whether there were issues with how the forensic interview was conducted. She stated that mental health professionals often note symptoms as much as diagnoses because many symptoms do not fall nicely into certain disorders. She also said that as a forensic psychologist, she would reasonably rely on symptoms and diagnoses of disorders in forming an opinion and that she routinely relied on information contained within DCS records. Dr. Brodie said it was not typical for someone doing a forensic evaluation to individually interview multiple treating clinicians and that generally, it was just a "records review."

Dr. James Sidney Alexander was accepted as an expert in the field of forensic psychiatry.[3] He reviewed many of the same records that Dr. Brodie reviewed. Dr. Alexander noted that many different providers had documented that the victim exhibited symptoms that fit with reactive attachment disorder, post-traumatic stress disorder, depression, and anxiety, and that the victim had psychotic symptoms that had been documented "[m]any times" in "[m]ultiple source[s]" within these records.

Dr. Alexander concluded that the victim suffered from "borderline personality disorder [,]" which cannot be diagnosed until the age of eighteen. He explained that the victim's "chaotic and abusive and . . . abandoned-filled life [was] absolutely a setup to potentially develop borderline personality disorder." He noted that with borderline personality disorder, the person during times of stress can become psychotic and then return to their pre-psychotic state fairly quickly.

Dr. Alexander stated that the victim's mental health issues were chronic and impaired her ability to accurately perceive events and impaired her ability to record and remember the things she perceived. He said that after reviewing all the victim's records and material, he had concerns about the victim's competency to testify in a court proceeding. He said the victim was "a smart girl, looking at her school records" but the victim's ability to tell the truth "could be distorted," which was reflected in a number of records. He also believed the victim had issues with being able to appreciate the consequences of lying. However, Dr. Alexander said that he was not able to offer an opinion about the victim's competency to testify as a witness because he had not examined her. After evaluating all these records, Dr. Alexander never saw that the victim had been subject to a psychiatric or psychological examination, but he believed that based on these records, there was a compelling reason to conduct a forensic examination of the victim in the Defendant's case. He added that a forensic examination would most likely allow for an expert to determine the exact nature of the victim's psychosis.

On cross-examination, Dr. Alexander admitted he was only able to review three or four pages of handwritten notes made by Dr. Barker, who conducted therapy with the victim for six years. In these three or four pages, he noted that Dr. Barker stated that the

---

[3] Although the State objected to Dr. Alexander's testimony, the trial court noted that Dr. Alexander's testimony "might be admissible for some purposes and not others." It added, "[O]ne of those purposes may be, if [trial counsel] had engaged an expert in this area, such as Dr. Alexander or Dr. Brodie, and they reviewed these records, would the advice have been, yes, you need to ask the Court to order a forensic interview of the child or you need to get these additional records? So it's possible that it could be admissible for some reasons, but not others." The trial court then held that it was going to allow the defense to offer this testimony and then it would decide later whether it should be admissible in the court's decision on the motion for new trial.

victim had psychosis but did not diagnose her with borderline personality disorder. Dr. Alexander acknowledged that repetitive sexual abuse could cause the victim's symptoms of reactive attachment disorder. He also admitted that around the time of her disclosure against the Defendant, the victim was making good grades at school and was able to study and recall information, which indicated that she had the capacity to accurately recall information in that sphere.

While Dr. Alexander testified that the records showed no indication that the victim had undergone a prior psychological examination, he acknowledged that the victim received counseling from Dr. Barker, although he was not aware that Dr. Barker was a senior psychological examiner. He also acknowledged that trial counsel had called Dr. Barker as a witness at trial to offer opinions in this case. Dr. Alexander was not aware that the Defendant had been attending some of the counseling sessions that Dr. Barker conducted with the victim.

On redirect examination, Dr. Alexander said the difference between psychological counseling and a psychological examination is that a psychological examination includes psychological testing and interviewing and involves more in-depth analysis.

On recross-examination, Dr. Alexander agreed that the victim had made some allegations that an older sister sexually abused her on ten different occasions over a period longer than a year." When the State asked Dr. Alexander about the source of the information about these allegations, Dr. Alexander could not recall the source but claimed it was "absolutely" in the records and "was stated several different times." Dr. Alexander asserted that the victim's allegations of abuse by her older sister were never substantiated, which coincided with what he had been discussing regarding the victim's capacity. He acknowledged that he did not know the circumstances giving rise to the victim's allegations against her older sister.

On further redirect examination, Dr. Alexander claimed that the victim's allegation of sexual abuse by her older sister, which DCS was unable to substantiate, was "one of the pieces of information that supports the notion that capacity is a problem for [victim]." He added that the fact that these prior sexual abuse allegations against her older sister were unsubstantiated related to whether the victim was able to accurately perceive reality and whether it was necessary for her to have a forensic evaluation "to get to the bottom of" these issues.

Trial counsel testified that at the time of the Defendant's trial, he had been licensed to practice law more than thirty years. He had worked for approximately ten years at the district attorney's office and more than twenty years in private practice, where he handled

an equal number of civil and criminal cases. Trial counsel said that he was hired by the Defendant in the criminal case. When the victim filed a companion civil proceeding against the Defendant that involved the same underlying factual allegations, he entered an appearance and filed an answer to the complaint.

Trial counsel asserted that in October 2016, he filed a discovery request in the criminal case, asking for Brady exculpatory material and to conduct an inspection of any tangible items in the Defendant's case. He stated that there were Pennsylvania v. Ritchie issues with DCS records in this case and that the trial court did a pretrial in camera review of DCS records and made a determination regarding the information that needed to be turned over to the defense.

Trial counsel said that from June 2016 to September 2020, he represented the Defendant in the civil suit filed by the victim. He acknowledged that the trial court never entered an order staying discovery in the civil case. He explained that the victim's attorney in the civil case was appointed to become a magistrate judge in juvenile court, and "there was a lengthy period of time where there was just nothing going on" in the civil case because the victim did not have an attorney.

In October 2016, trial counsel filed a Rule 16 discovery request in the criminal case. Although trial counsel thought this motion included a request for Brady material, the motion included in the appellate record does not make a request for Brady material. Trial counsel also asked the trial court to review the victim's DCS records for potentially exculpatory information pursuant to Pennsylvania v. Ritchie, 480 U.S. 39 (1987).

Trial counsel said that he met with the Defendant and his adopted daughter M.R. numerous times. Because the Defendant worked at Smoky Mountain Children's Home, he "had a unique knowledge of [the victim]'s background." The Defendant knew from the victim's birth to the present day "what she had been involved in, what kind of treatment she had been in, what kind of family she came from." In addition, because M.R. had been with the victim in "all these different placements," she was "very helpful and instrumental in providing just an . . . unbelievable amount of information with regard to [the victim]"

Trial counsel said he talked to the victim's friend, I.M., who rode with the victim the morning prior to her disclosure against the Defendant. He said I.M. stated that the victim "talked on the way to school [about] what she was going to do to [the Defendant]." He said that on that morning, the Defendant and the victim argued about the fact that the victim was staying out late, and the Defendant threatened punishment. Trial counsel could not recall whether he called I.M. as a witness at trial. He stated that he obtained a recording in discovery from the lead detective who interviewed the victim at the high school, who

commented while his microphone was still on that he did not believe the victim was credible.

Trial counsel stated that he met with Dr. Barker several times but did not ask her about the victim's specific mental health diagnoses because he already had that information from the Defendant and M.R. Instead, trial counsel asked Dr. Barker whether the victim showed any signs of sexual abuse and whether the victim made any disclosures to her. He said he was not focused on identifying the victim's specific mental health diagnoses because he believed her diagnoses could make the victim more sympathetic to the jury. He said the jury would probably not believe that it was the victim's fault that she was "put in three different homes and was not treated well."

When asked if he talked to any mental health experts other than Dr. Barker to better understand whether the victim's mental health issues were something that needed further investigation, trial counsel replied that he spoke to a mental health professional at the juvenile court who evaluated the victim. However, he did not recall whether this mental health professional at juvenile court was able to give him a particular diagnosis for the victim. Trial counsel did not feel that an independent mental health evaluation of the victim was necessary. He admitted that he never consulted with an expert mental health professional to help him understand whether the victim may have had relevant mental health issues. He also acknowledged that he never researched the potential cost of a consulting mental health expert and never talked to the Defendant about engaging a consulting or testifying mental health expert. He asserted that the victim had told at least four or five different stories about when she first had sexual relations with the Defendant, which included "on a love seat," "in the bed," and "in a pool." He also noted that the victim had disclosed the alleged abuse years after the fact and that the Defendant was charged years after the disclosure. He said that the Defendant, who insisted on going to trial, provided "strong" evidence and that M.R., the victim's biological sister, was an "unbelievable witness." In addition, trial counsel believed he had strong testimony from J.B., the Defendant's biological daughter, as well as from I.M., who rode with her to school the day the victim disclosed the abuse. Trial counsel also emphasized the limitations of the DNA proof by highlighting the areas that did not test positive for the Defendant's DNA and by putting on proof of the Defendant's vasectomy. He stated that he felt like he had a strong case with a substantial amount of information to discredit the victim and to make it look impossible that her allegations had occurred.

Trial counsel agreed that the State gathered electronic and biological evidence to enhance the victim's credibility. He did not believe that the electronic evidence was going to be a problem because the Defendant did not have the victim's phone at the time it was erased, because the victim had her own phone when it was erased, and because Lieutenant

Smithhart was unable to determine who erased the Defendant and the victim's iPhones. Trial counsel stated that he owned an iPhone but that he did not understand how iCloud accounts worked. He said that during trial, he relied on Julie Kuykendall, a younger attorney who shared office space with him, to help him understand the iPhone technology. He claimed that Kuykendall was "very knowledgeable" and that she helped him "thoroughly" research the iPhone technology and helped him prepare for cross-examination. Trial counsel acknowledged that he never consulted with a digital evidence expert and never talked to the Defendant about hiring a digital evidence expert. He was unaware that he could have had the electronic evidence independently tested in this case. He admitted that he never engaged a digital evidence expert to help with cross-examination or to present countervailing evidence about how iCloud accounts worked. Trial counsel did not recall the trial court giving an adverse inference instruction against the Defendant concerning the deletion of the cell phone evidence.

Trial counsel agreed that he obtained the TBI forensic biology report by Special Agent Cannon at least a year prior to trial. He did not pursue hiring a consulting DNA expert to help him analyze this report and did not do any independent research into DNA on his own to help him analyze this report. In addition, he did not investigate a potential testifying expert to provide countervailing expert testimony about that report. Although he was aware that he could have had the biological evidence in this case independently tested, he did not do so. Trial counsel could not recall a time in the last twenty-two years when he had hired a DNA expert as a defense attorney. He noted that when the TBI tested six different areas based on the victim's statements regarding where the sexual activity with the Defendant occurred, five of the six came back with no DNA match, except the wooden drawer. Trial counsel said the parties also stipulated the results of testing performed by a physician regarding the Defendant's previous vasectomy. He encouraged the Defendant to get a confirmatory test to show that the vasectomy was successful, which the Defendant did. However, when trial counsel tried to subpoena the physician who performed this confirmatory test, the physician evaded service and refused to cooperate with him. Trial counsel said he finally introduced the proof of the confirmatory vasectomy test through a stipulation.

Trial counsel admitted that this physician never told him that someone with a vasectomy does not produce semen. He said it was his understanding that after a vasectomy, a man still produced semen but did not produce spermatozoa. Accordingly, he believed that because the Defendant had a vasectomy, which was confirmed, "the extraction 1 in area 1 wouldn't be his [DNA]." He also said that if he had known that men who had vasectomies still produced sperm that would show up during forensic testing, he would not have changed his analysis of this proof. Trial counsel believed he would be able to explain away the DNA on the wooden drawer by highlighting the victim's "differing

stories," the victim's "prior behavior and history," the testimony from M.R. and J.B., the testimony from Dr. Barker, the stipulation regarding the Defendant's vasectomy, and Detective Merritt's comments that he did not believe the victim.

Trial counsel said he knew the TBI was going to present proof that there was semen on the drawer and that there was a positive DNA profile for the Defendant on that drawer. Even though Special Agent Cannon said that she confirmed the presence of spermatozoa, trial counsel never got Special Agent Cannon's underlying case file to interpret her report. Trial counsel stated that he had dealt with these types of reports many times in the past and felt comfortable understanding the TBI report in this case. He admitted that he never hired an expert to consult with him about the Defendant's vasectomy and what it meant with respect to the TBI report. However, he reiterated that the defense "had no more money."

Regarding the wooden drawer containing DNA, trial counsel decided to cross-examine Special Agent Cannon about her inconclusive DNA findings rather than hire an expert because the Defendant "had no money." He said he never consulted with a forensic biologist or a DNA expert about the results of a vasectomy on the TBI's forensic testing because he "didn't feel it was necessary." He also never asked the Defendant about hiring a DNA expert because the Defendant was out of money. Trial counsel said that when he made a general request for more money prior to the Defendant's trial, the Defendant said he was "tapped out" because his business was struggling. Although trial counsel knew he could request expert funding through the Administrative Office of the Courts, he believed it was rare for a defendant with retained counsel to get such funding.

Trial counsel learned prior to trial that Special Agent Cannon no longer worked for the TBI. He did not recall whether the TBI or the prosecution disclosed this information or whether he discovered that Special Agent Cannon no longer worked there when he called the TBI and asked to interview her. Trial counsel later learned that Special Agent Cannon was working at a hospital, and although he called and tried to visit her at work, he was unable to talk to her.

Trial counsel admitted that he never made a discovery request to the State concerning why Special Agent Cannon was no longer working at the TBI. He also said he never made a discovery request to the State for Special Agent Cannon's personnel file, even though this was open for public inspection under the Public Records Act. He acknowledged that going into the Defendant's trial, he did not know why Special Agent Cannon was no longer with the TBI. He admitted it was potentially important to learn why Special Agent Cannon was no longer with the TBI and was surprised when he was later informed that he never cross-examined Special Agent Cannon at trial about why she left the TBI. He agreed that if Special Agent Cannon had engaged in misconduct, had been

dishonest, or had falsified records while at the TBI, he would have cross-examined her about these issues at trial because they would have affected her credibility. He agreed that these issues would have been important for a jury to hear to understand and assign weight to Special Agent Cannon's testimony about the DNA evidence in this case. He also acknowledged that it would have been important for the jury to hear expert testimony showing that Special Agent Cannon's finding of semen on the wooden drawer was in question, or that the drawer did not contain semen, or that Special Agent Cannon's finding of the Defendant's DNA on the drawer was inaccurate.

Trial counsel said it was his understanding that someone other than the Defendant could have erased the cell phones, which was what he argued at trial. He also asserted that the victim had her own cell phone when she went to Don Baker's house, so she had the opportunity to erase both cell phones. Trial counsel did not believe that Lieutenant Smithhart ever testified that the Defendant was the person who erased the cell phones. However, he acknowledged that there was law enforcement testimony that the administrator of the iCloud account could erase the phones. He also admitted that if there was proof showing that law enforcement had the Defendant's phone at the time the Defendant's phone was factory reset, this would have been important for the jury to know. He agreed that if he had evidence showing that the victim was at Don Baker's home when her cell phone was factory reset, this possibly could have been important.

On cross-examination, trial counsel asserted that he had five years' experience prosecuting, litigating, and trying sexual abuse cases. He said he was familiar with TBI reports and with different defense strategies in sex abuse cases. Trial counsel reiterated that the Defendant had extensive information about the victim's past from the foster care system as well as the Smoky Mountain Children's Home. He also obtained information about victim from her biological sister, M.R., who was adopted by the Defendant. M.R. provided information about the different homes she and the victim had been in, the victim's personality, attitude, and misbehavior, the people with whom the victim associated, and the lack of respect the victim had for the Defendant, who disciplined her from time to time. Trial counsel described M.R. as "well kept, well educated, . . . had a goal for the future, was very supportive of [the Defendant], very verbal, very articulate," which was "quite the opposite of what [he] had gathered about [the victim]." He agreed that the information shared by the Defendant and M.R. about the victim factored into his defense strategy at trial.

Trial counsel said that in cases like this the credibility of the victim is paramount. He added:

The victim's testimony, is she believable? Is what she's saying plausible? And so you try to attack her by the different stories she gave, the history she has, the non-disclosure for years, what she said to the girl going to [school] that morning, and [D]etective [Allen Merritt]'s initial [belief that victim was not telling the truth].

Trial counsel also talked to J.B., the Defendant's biological daughter, in preparation for her to testify at trial. He also talked to I.M., who was living at the Defendant's home so she did not have to change schools and knew what I.M. would testify about at trial regarding the victim. He said that all these witnesses provided evidence attacking the victim's credibility.

Regarding the Pennsylvania v. Richie review that he requested for the victim's DCS master file, trial counsel said that request was part of his due diligence so the trial court could review the records and disseminate the material if the court felt it was necessary for the attorneys to have. He noted that the documents that were released following the trial court's in camera review were not helpful because he already knew these things from talking to the Defendant and M.R. He also had information from the victim's deposition in juvenile court when DCS was seeking a finding of severe abuse against the Defendant.

Trial counsel stated that I.M.'s testimony at trial revealed a motivation for the victim to make a false statement about the Defendant. He said that the night before or the morning of the victim's disclosure of sexual abuse, the Defendant found out that the victim had done something he disapproved of, and the Defendant was going to discipline her. I.M. rode to school with the victim the day she made this disclosure and during that ride, the victim told I.M. that she had "something for" the Defendant or she was going to "show" the Defendant, which supported the defense strategy that the victim had a motive to lie about the Defendant's sexual abuse.

Regarding Special Agent Cannon's statement in her TBI report that she identified the Defendant's DNA in the non-sperm fraction from the sample from the wooden drawer, trial counsel attacked the victim's credibility by showing that there was no DNA evidence found on almost all the places victim claimed she and the Defendant had sex. He also argued that the victim could have had sex with someone other than the Defendant in her bedroom. He said it was a part of his strategy to attack the DNA evidence on the drawer by thoroughly cross-examining Special Agent Cannon about it. Trial counsel recalled there being a lot of people in and out of the Defendant's home.

When asked why he did not hire a biology or serology expert, trial counsel said that he felt the lay witness testimony he had was strong. He never told the Defendant that he

needed $20,000 for a DNA expert but asserted that he never got to that point because the Defendant was low on funds.

Trial counsel said the Defendant insisted on taking the stand, and he believed the Defendant would be credible. However, the Defendant was not as assertive in denying the abuse as he would have expected. He knew the Defendant would be cross-examined, so he prepared him for the questions the State might ask.

While trial counsel acknowledged not hiring a witness for the electronic evidence regarding the cell phones, he claimed that he and Julie Kuykendall had researched this issue thoroughly. He acknowledged that Kuykendall knew more about the cell phone evidence than he did. Trial counsel said the Defendant denied factory resetting the cell phones at trial. He also asserted that the series of events did not allow the Defendant time to factory reset his and the victim's phones. In addition, trial counsel asserted that Lieutenant Smithhart was never able to identify who factory reset the phones. He acknowledged that if the victim's phone was taken from her at Don Baker's home, this proof would not have been good for the Defendant's case.

Trial counsel stated that he did not hire a mental health expert to reach a diagnosis for the victim because M.R., J.B., and the Defendant were able to testify about how the victim acted, how she treated others, how she had discipline problems, and how she was volatile. He noted that the Defendant and his wife had worked at the Smoky Mountain Children's Home, which was how they became aware of the victim and M.R. and decided to adopt them. He felt that "the people [who] had been with [the victim] . . . her whole life were better suited and equipped to tell [the jury] about the victim" than an expert when it came to his trial strategy.

On redirect examination, trial counsel was asked why he did not try to obtain all the victim's treatment and custody records, since he knew every place that the victim had been, and trial counsel replied that he did not need the records because he had M.R., who could testify about what happened at every placement and why the victim received treatment. He said there were no records he "could have seen that would have told [him] more than what [he] believed [he] knew about [victim] on the first day of trial" based on M.R.'s statements to him. Trial counsel believed M.R.'s testimony would be "more powerful" to the jury because she was someone they could "relate to."

Trial counsel stated that he never attempted to obtain the Smoky Mountain Children's Home records on the victim because he believed he "had more information than those records would ever provide about [the victim]'s history" from the Defendant and M.R. He admitted that he did not try to obtain records from any place other than DCS for

- 53 -

the purpose of his <u>Pennsylvania v. Richie</u> motion. He said he never needed to engage or hire Dr. Barker as an expert in this case because she was extremely cooperative. However, he did not believe Dr. Barker was qualified to testify about the victim's mental health diagnoses. He also noted that the trial court specifically limited Dr. Barker's testimony.

Attorney Julie Kuykendall testified that she was licensed to practice law in 2017 and shared office space with trial counsel, although she did not work for him. She became involved in the Defendant's case several months prior to trial. At the time, she was only in her second year of practice, so her involvement in the Defendant's case was mainly a "learning experience" for her. Kuykendall reviewed the Defendant's case file, organized exhibits, and helped trial counsel with technological issues, such as using a computer to play videos during trial. She noted that trial counsel could not even turn on a computer, so she would often set up the computer in the courtroom and get it ready to play videos. However, she asserted that trial counsel did not rely on her regarding how he would handle the deletion of iPhone data at trial.

Kuykendall recalled trial counsel talking to someone about what Special Agent Cannon's TBI report meant and about why Special Agent Cannon left the TBI, and she was told that Special Agent Cannon had "moved on to better job opportunities." Kuykendall said that she never conducted any research on Special Agent Cannon and that trial counsel never asked her to research why Special Agent Cannon had left the TBI. She confirmed that if the defense had known about Special Agent Cannon's misconduct, dishonesty, and falsification of records at the TBI, they would have emphasized that at trial. Kuykendall said she never made a discovery request for background information about Special Agent Cannon and never asked for Special Agent Cannon's case file on the DNA testing in this case. Kuykendall said she never heard trial counsel asking the Defendant for more money to hire an expert for trial.

Kuykendall acknowledged that she was more knowledgeable about iPhones than trial counsel. She used her own iCloud account to show trial counsel how cell phone data could be remotely erased. She and trial counsel never consulted with an electronics expert and never researched hiring an expert to forensically analyze the cell phone evidence in this case.

Kuykendall said she and trial counsel never discussed making a motion for the trial court to do an in camera review of the records from Smoky Mountain Children's Home because they felt like they already had most of that information from the Defendant and M.R. She recalled obtaining some DCS records concerning the victim but did not remember obtaining any documents from any entities other than DCS.

Kuykendall asserted her belief that she and trial counsel were not deficient in failing to consult with a DNA expert in the Defendant's case. She claimed they investigated the DNA issues, and trial counsel asked the Defendant to confirm that his vasectomy was successful for the purpose of showing that a man who had a vasectomy could produce semen but not sperm. She also believed she and trial counsel were not deficient in failing to consult with an electronic cell phone expert because she did not believe the State could "prove who deleted the phones."

On cross-examination, Kuykendall said trial counsel and the Defendant agreed upon a trial strategy for the DNA evidence and the cell phone evidence. She said the Defendant wanted to testify badly because he was "adamant that he didn't do this." She noted that the Defendant wanted to explain his theory of what had occurred and why he was innocent, which he had the opportunity to do during his trial. Kuykendall said M.R. provided information about negative things from the victim's past and about facts that conflicted with the victim's version of events. She also said that trial counsel spoke with J.B. and I.M. and prepared both of them for trial. She asserted that the information provided by all their witnesses went into the defense's trial strategy that was discussed with and approved by the Defendant.

The State's only witness at the motion for new trial hearing was Terra Asbury, a special agent with the TBI and the technical reviewer of Special Agent Cannon's report, who was accepted as an expert in the field of forensic biology. Special Agent Asbury stated that the double immunodiffusion test performed by Cross was negative for semen in Area 1 of the wooden drawer; however, Special Agent Asbury asserted that this test does not detect lower levels of semen. Special Agent Asbury stated that when dealing with a small amount of sperm, it was not unusual for the sperm to end up in the non-sperm fraction or be taken out of the sperm sample through washing. Special Agent Asbury also noted that Cross said that Exhibit 4B failed the confirmatory microscopic testing for semen; however, Special Agent Asbury said Cross's observation in 4B was broader than scientifically appropriate because this test is looking for the presence of spermatozoa and the absence of spermatozoa does not mean that there is an absence of semen.

As for Cross's conclusion that Area 1 of the drawer was an old or compromised semen stain, Special Agent Asbury disagreed, stating that there is no "ski slope pattern," which is common in a degraded sample, and that the AP test was positive, which would not happen with an old or compromised sample. Special Agent Asbury also noted that sperm cells are hardier and last longer than epithelial cells, so if this were a degraded semen sample, she would expect to find sperm in the sperm fraction and a ski slope pattern indicating a degraded profile in the non-sperm fraction. Special Agent Asbury's explanation for why there may not have been sperm cells in the sample Cross tested was

- 55 -

that the subject was vasectomized, which meant there would be a small amount of sperm already. She said it was possible that the only sperm that were present were on the microscopic slide viewed by Special Agent Cannon and then after this slide was examined, it was treated with different chemicals, so it was not surprising that the sample taken from the slide had no DNA profile.

Despite Cross's conclusion that the sample on Area 2 of the drawer did not originate from semen, Special Agent Asbury thought it was likely this sample originated from semen because the alternate light source test, the acid phosphatase test, and the P30 lateral flow test were all positive for semen. She said that currently the P30 lateral flow test is considered presumptive, rather than confirmatory, because the TBI is required to dilute a sample, which makes it weaker and less likely to react to a P30 test. Special Agent Asbury disagreed with Cross that the P30 lateral flow test could be positive for dog semen. When asked if there was any other animal, other than humans, whose semen would be detected by a P30 test, Special Agent Asbury said that "only a Rhesus monkey" had been identified as reacting positively to that test. She confirmed that a dog had never been identified as reacting positively to the P30 test.

Special Agent Asbury noted that with the double immunodiffusion test, the specificity is very high, but it requires 25,000 more times of the protein to react on the double immunodiffusion test than on the P30 lateral flow test. She added that "in forensics, you have to be looking for smaller amounts" of the protein, so you cannot justify using a double immunodiffusion test "when we could overlook so many small semen stains." Special Agent Asbury said that while "the double immunodiffusion test is very specific, it is not nearly as sensitive as the P30" lateral flow test, which is why the TBI still uses the P30 lateral flow test because it is the "recommended test to be used by forensics."

Special Agent Asbury addressed Cross's conclusion that finding DNA mixtures in the Defendant's household was expected because each person living in a common living environment sheds thousands to millions of skin cells that contain DNA. Special Agent Asbury clarified that most skin cells are fragmented cells called corneocytes that do not contain the nucleus of DNA and that it takes about 400 corneocytes to create a usable DNA profile. She then asserted, "So the argument that we shed thousands and millions of skin cells and that we just create these environments where there's DNA profiles everywhere is not necessarily true and it's very misleading." Special Agent Asbury said that although it was possible to have "touch DNA" on an area that was touched repeatedly, it was "very rare to get a full [DNA] profile from touch DNA." She noted that the stains at issue here were on the face of the wooden drawer, not the handle. In addition, she said that the major contributor "is sometimes five times greater than the minor contributor" and because she often sees degraded or partial profiles with touch DNA and typically sees full DNA profiles

with bodily fluids, she believed the sample taken from the drawer was "possibly a bodily fluid commingled with touch DNA." Regarding Cross's conclusion that an off-ladder peak in the non-sperm fraction indicated a non-human source, Special Agent Asbury said that just because there was non-human DNA present in a particular area did not mean that this was semen from a non-human source.

Special Agent Asbury said that in her training, she had seen DNA profiles developed from dog semen, which contained several off-ladder peaks. However, the sample from the wooden drawer in this case contained a full human DNA profile. She added that all TBI agents were trained to differentiate human sperm from animal sperm. Special Agent Asbury explained that with canine sperm, the acrosomal cap is covered in cholesterol, "so you see an absence of that colorless cap [on the sperm] that we see in humans." She also said that canine sperm has "a colorless band . . . that separates the acrosomal region from the post-acrosomal region." In addition, she noted that canine sperm "is squared off at the bottom . . . where the midpiece butts up to the end of the DNA" but human sperm "is more elliptical in shape." She said TBI agents are trained to observe the "specific characteristics" of human sperm, which include "the bright red color, the size of the spermatozoa, and the acrosomal cap[.]" Special Agent Asbury observed that because a human ejaculates ten times greater volume of ejaculate than a dog, human ejaculate "contains a greater amount of spermatozoa." She said the fact that the sample in Area 1 contained sperm heads was "more consistent with a vasectomized human" than a dog.

Special Agent Asbury asserted that Special Agent Cannon used multiple presumptive tests, with different limitations, to confirm the presence of semen in the sample taken from the drawer. She said that in Area 1, Special Agent Cannon confirmed that semen was present, and that in Area 2, Special Agent Cannon found that while it lacked spermatozoa, it did contain the other three characteristics that TBI agents look for in confirming the presence of semen. She reiterated that Special Agent Cannon used an alternative light source test, where she looked for fluorescence; the AP test, where she was looking for an enzyme through a chemical reaction; and the P30 lateral flow test, where she looked for a specific antibody. She confirmed that it was the use of these three tests in tandem that was used to determine the presence of semen in this case. Special Agent Asbury reiterated that the TBI no longer used the immunodiffusion test because it is "subpar with sensitivity," meaning that "you have to have such a high number of the protein or the antibody" and it "has to have particular affinities to be able to test positive."

Special Agent Asbury agreed with Special Agent Cannon that the DNA profile obtained came from the Defendant; however, she believed that Special Agent Cannon simply forgot to add that this sample came from seminal fluid. Special Agent Asbury opined, as a technical reviewer, that the sample in Area 1 came from seminal fluid.

Special Agent Asbury said she asked Special Agent Cannon to "re[-]perform a swabbing of that area because there was no sperm in the sperm fraction, just to see if we could get a clearer separation"; however, she said "there was nothing to go back to [on the wooden drawer], which is why [Special Agent Cannon] ended up swabbing the microscopic slide." She asserted that TBI agents were trained, with a small sample, to "collect all of the sample to be able to test [it]," so she expected that whatever remained on the slide when Cross conducted the double immunodiffusion test would be "AP negative, sperm negative, and P30 negative."

She stated that TBI policy does not require analysts to take photographs before consuming a sample. Instead, it was TBI policy to document the slide, which Special Agent Cannon did by documenting what she saw on the slide in her notes.

On cross-examination, Special Agent Asbury confirmed that she did not conduct any actual testing herself in this case and only reviewed the reports written by Special Agent Cannon and Cross. She also confirmed that she did not do a visual inspection of the wooden drawer at issue. She agreed that because the drawer had an indentation that would assist in opening it, someone could close it by touching it anywhere on the front surface of the drawer. Special Agent Asbury acknowledged that a parent who put up a child's laundry could open and close a drawer like this repeatedly and that over a lengthy period of time could deposit the requisite number of epithelial skin cells to yield a DNA profile.

Special Agent Asbury admitted that she had not reviewed Cross's case notes because they were not given to her by the State. She stated to do a technical review of another forensic scientist's work, she would need to have the scientist's underlying case notes. As a result, she agreed that she reviewed Cross's opinions and report but did not do a technical review because she did not review Cross's underlying case notes.

Special Agent Asbury stated that the TBI policy changed in 2016 to state that the P30 lateral flow test was presumptive, but the previous policy was that this test was confirmatory. She acknowledged that Special Agent Cannon issued her Official Forensic Biology Report on November 24, 2014, which was before this TBI policy changed.

She agreed that two different screening techniques could be used to confirm the presence of a bodily fluid if the limitations of one test were not subject to the limitations of the other. However, she was unsure whether the AP test and the P30 lateral flow tests had overlapping limitations. She asserted that urine does not test positive on the AP test and that while vaginal fluid can test positive on an AP test, she had not heard of vaginal fluid testing positive on a P30 lateral flow test.

Special Agent Asbury said that the P30 lateral flow test, the AP test, and the alternative light source test have "different false positives" and test for different things. She noted that although the TBI had done in-house examinations on false positives, the TBI had not done examinations on whether the false positives of AP test and P30 lateral flow test overlapped. She also acknowledged that the TBI's in-house examinations were not made public.

Special Agent Asbury confirmed that Special Agent Cannon noted she had seen sperm in only a very small number of her fields of view when she viewed the slide from Area 1 under the microscope. When Special Agent Cannon tested the sample taken from Area 1, she got a DNA profile in the non-sperm fraction and did not get a DNA profile in the sperm fraction. Special Agent Asbury acknowledged that when Special Agent Cannon unfastened the glue holding the cover on the slide and re-swabbed the slide for Area 1, it "remove[d] the majority of cellular material" on the slide.

Special Agent Asbury acknowledged that TBI policy at the time of Special Agent Cannon's testing required that any slide that had less than ten sperm heads had to be verified by a qualified scientist. Although Special Agent Asbury was the technical reviewer of Special Agent Cannon's work at the time she conducted her testing in this case; Special Agent Asbury said she did not visually examine the slide in Area 1 because there were more than ten sperm heads on the slide. Special Agent Asbury said she would interpret Special Agent Cannon's notes to mean that there were at least ten or more sperm heads because Special Agent Cannon did not document that there were less than ten sperm heads. She noted that although Special Agent Cannon could have taken a digital photograph of the sperm on the slide or could have had another scientist verify the sperm on the slide, Special Agent Cannon did not do these things. Consequently, she said the only evidence that Special Agent Cannon actually saw sperm on the slide was Special Agent Cannon's own visual observation that was documented in her notes. While she acknowledged that if Special Agent Cannon misinterpreted what she saw, there was no way to go back and verify it, Special Agent Asbury asserted that all TBI agents were well trained on how to identify human sperm.

On October 17, 2022, the trial court entered a thirty-page written order denying the motions for new trial, arrest of judgment, and judgment of acquittal. The Defendant then timely filed a notice of appeal.

**ANALYSIS**

**I. Newly Discovered Forensic Biological Evidence.** The Defendant claims that the newly discovered evidence presented at the motion for new trial included (1) expert Katherine Cross's opinion and independent testing showing that Special Agent Amory Cannon's trial testimony, which conclusively confirmed the presence of the Defendant's semen on the wooden drawer in the victim's bedroom, was a scientific misrepresentation; and (2) Special Agent Cannon's personnel file showing she resigned from the TBI following an investigation into her misconduct while employed there. The Defendant argues that if this newly discovered forensic biological evidence had been presented to the jury, the result of his trial would have been different. He asserts that the State utilized Special Agent Cannon's questionable DNA evidence during its closing argument at trial not only to bolster the victim's credibility, by calling the DNA on the bed drawer the "biggest piece of physical corroboration" of her testimony, but also to damage the Defendant's credibility, by emphasizing that the Defendant failed to offer any plausible explanation for why his semen would be on this drawer. The Defendant claims the aforementioned newly discovered biological evidence casts "serious doubt on the reliability of the forensic biological evidence presented by the State" at trial as well as "the credibility of [Special Agent Cannon] who presented th[is] evidence to the jury." He also claims this newly discovered evidence is particularly important because the credibility of the Defendant and the victim at trial was "essentially equal," and any evidence that tipped the scales in favor of the Defendant or the victim was "crucial." See State v. Singleton, 853 S.W.2d 490, 496-97 (Tenn. 1993); Cagle v. Davis, 520 F. Supp. 297, 309 (E.D. Tenn. 1980). The Defendant argues the trial court abused its discretion by denying his motion for new trial based on this newly discovered biological evidence.

In response, the State claims that Cross's opinion does not constitute newly discovered evidence. Alternatively, the State argues that if Cross's opinion and the other biological proof is newly discovered evidence, then the Defendant was not reasonably diligent in pursuing this evidence before trial, and this evidence would not likely have changed the jury's verdict. While the State acknowledges that Cross's "limited test results" are newly discovered evidence, it contends that the Defendant failed to be reasonably diligent in obtaining the results of Cross's independent testing. We conclude that Cross's opinion contradicting Special Agent Cannon's testimony is not newly discovered evidence and that the Defendant was not reasonably diligent in obtaining the results of Special Agent Cross's independent testing, which was not likely to have changed the result of the Defendant's trial.

"Whether the trial court grants or denies a new trial on the basis of newly discovered evidence rests within the sound discretion of the trial judge." State v. Caldwell, 977 S.W.2d

110, 117 (Tenn. Crim. App. 1997) (citing Hawkins v. State, 417 S.W.2d 774, 778 (Tenn. 1967)). Accordingly, we must review the trial court's decision to grant or deny a new trial for an abuse of discretion. State v. Bowers, 77 S.W.3d 776, 784 (Tenn. Crim. App. 2001) (citing State v. Meade, 942 S.W.2d 561, 565 (Tenn. Crim. App. 1996)).

To obtain a new trial based on newly discovered evidence, the defendant must show: "(1) reasonable diligence in seeking the newly discovered evidence; (2) materiality of the evidence; and (3) that the evidence will likely change the result of the trial." State v. Nichols, 877 S.W.2d 722, 737 (Tenn. 1994) (citing State v. Goswick, 656 S.W.2d 355, 358-60 (Tenn. 1983)). To show reasonable diligence in the first prong, "the defendant must demonstrate that neither he nor his counsel had knowledge of the alleged newly discovered evidence prior to trial." Meade, 942 S.W.2d at 566 (citing Jones v. State, 452 S.W.2d 365, 367 (Tenn. Crim. App. 1970) (stating that a defendant and his counsel must show that they "were not negligent in the search for evidence in preparation for the trial of the case" and that they had "no pre-trial knowledge of the alleged newly discovered evidence")). To satisfy the second and third prongs, "'[t]he question is not what the jury might do, but, supposing all the evidence new and old to be before another jury, whether they ought to return a verdict more favorable to the defendant than the one returned on the original trial.'" Goswick, 656 S.W.2d at 359 (quoting Evans v. State, 557 S.W.2d 927, 938 (Tenn. Crim. App. 1977)).

Typically, a Defendant will not be granted a new trial where the newly discovered evidence "merely contradicts or attempts to impeach" a witness's testimony at trial. State v. Sheffield, 676 S.W.2d 542, 554 (Tenn. 1984); Evans, 557 S.W.2d at 938 (stating that a new trial will not be granted upon the ground of newly discovered evidence where the evidence has no other effect "than to discredit the testimony of a witness at the original trial, contradict a witness's statements, or impeach a witness, unless the testimony of the witness who is sought to be impeached was so important to the issue, and the evidence impeaching the witness so strong and convincing, that a different result must necessarily follow"). However, "if the impeaching evidence is so crucial to the defendant's guilt or innocence that its admission will probably result in an acquittal, a new trial may be ordered." Singleton, 853 S.W.2d at 496 (citing State v. Rogers, 703 S.W.2d 166, 169 (Tenn. Crim. App. 1985); Rosenthal v. State, 292 S.W.2d 1, 4-5 (Tenn. 1956); Evans, 557 S.W.2d at 938).

**A. Cross's Opinion and Testing.** First, the Defendant argues that Cross's opinion and independent testing showed that Special Agent Cannon's trial testimony, wherein she conclusively confirmed the presence of the Defendant's semen on the wooden drawer, was a scientific misrepresentation. The Defendant asserts that Special Agent Cannon's notes showed that the P30 test, which she described as a confirmatory test for the presence of

semen, was only a presumptive test and that the jury never heard the TBI had changed the P30 test from a confirmatory test to a presumptive test between the time of testing and the time of trial. The Defendant also asserts that the P30 test was not limited to the detection of semen and that the P30 test was unable to distinguish between human and non-human material. Moreover, the Defendant asserts that because Special Agent Cannon consumed the entire sample on her slide from the drawer without ever showing it to another scientist and without creating any documentation of her findings "no avenue exists by which [he] can obtain an independent verification of [Special Agent] Cannon's claim that she saw spermatozoa on the slide." The Defendant insists that if all the proof, both new and old, had been presented to the jury at his trial, the result of the proceeding likely would have been different.

The Defendant notes that the trial court denied his motion for new trial based on its conclusion that Special Agent Asbury's testimony established that "it was not dog DNA" on the drawer. However, he claims that the trial court applied the incorrect standard and that the proper standard is whether the new evidence will likely change the result of the trial. See Nichols, 877 S.W.2d at 737. The Defendant claims that he did not need to prove conclusively that the DNA belonged to a dog, or even that the DNA did not belong to him; instead, he claims that it was enough, under the proper standard of review, to show that Cross's independent analysis raises serious questions about the DNA evidence that was presented to the jury. See Evans, 557 S.W.2d at 938. The Defendant argues that the trial court's application of an incorrect legal standard led to its erroneous conclusion that the Defendant was not entitled to a new trial.

In any case, the Defendant asserts that Special Agent Asbury's testimony was insufficient to prove that the DNA evidence did not belong to a dog. He claims that Special Agent Asbury, who had far less experience and training than Cross and who had never performed tests on canine DNA, merely testified that she "would have expected" to see other markers with canine DNA, not that she conclusively determined that the DNA she tested did not belong to a dog. He claims the trial court's conclusion that the DNA evidence was not dog DNA was "apparently based on its misunderstanding of Ms. Cross's testimony and [her] report about her ability to test for canine semen." He claims that "[a]lthough Ms. Cross indicated that her lab possessed the ability to conduct certain tests [to identify canine or dog DNA], she did not do so in this case because the relevant sample had been completely consumed by [Special Agent Cannon's] TBI testing."

The Defendant also emphasizes that Special Agent Cannon's DNA testing for the "sperm fraction" showed an "off-ladder peak" suggesting the presence of "non-human DNA." He asserts that Special Agent Cannon had never personally analyzed or tested canine spermatozoa or semen and never explained the presence of this "off-ladder peak,"

even though the Defendant's family had an unneutered Chihuahua known to ejaculate on inanimate objects. The Defendant claims that the trial court improperly relied on Special Agent Asbury's testimony that the DNA profile attributed to the Defendant "came from seminal fluid," even though Special Agent Asbury did not reexamine any of the evidence, relied solely on the accuracy of Special Agent Cannon's reporting, and did not review Cross's case notes. In addition, the Defendant asserts that Special Agent Asbury was unable to verify Special Agent Cannon's report she observed less than "15 sperm on the whole slide" because Special Agent Cannon consumed this sample without creating any visual documentation of this finding, without asking another scientist to examine the slide, and without taking a photograph of the slide. The Defendant also argues the jury never heard that Special Agent Cannon consumed the sample with additional testing without creating any visual documentation of her findings.

We agree with the State that Cross's expert opinion testimony about the biological evidence introduced at the Defendant's trial is not "newly discovered evidence." Cross's opinion testimony was offered for the purpose of discrediting or contradicting Special Agent Cannon's expert opinion on the items Special Agent Cannon tested in this case. See Sheffield, 676 S.W.2d at 554. In addition, Cross's testimony was not so crucial to the Defendant's guilt or innocence that it likely changed the result of the trial. See Singleton, 853 S.W.2d at 496. This court has consistently concluded, within the context of error coram nobis cases, that new expert opinions on previously presented evidence do not constitute newly discovered evidence. See Lowery v. State, No. E2017-02537-CCA-R3-PC, 2019 WL 2578623, at *21 (Tenn. Crim. App. June 24, 2019) (concluding that new testimony from two different experts did not constitute newly discovered evidence for the purpose of error coram nobis relief because these new experts simply "disagreed with the expert witnesses who testified at trial" and their new expert testimony "serve[d] no other purpose than to contradict or impeach the evidence adduced during the course of the trial"); see also Garrett v. State, No. M2017-01076-CCA-R3-ECN, 2018 WL 1976358, at *10 (Tenn. Crim. App. Apr. 26, 2018) (observing that new expert opinions "on already-presented evidence" do not constitute newly discovered evidence sufficient for error coram nobis relief); Hugueley v. State, No. W2016-01428-CCA-R3-ECN, 2017 WL 2805204, at *14 (Tenn. Crim. App. June 28, 2017) (stating that "[t]he coram nobis statute is intended to provide relief from what may have been an injustice, not to reward a petitioner who has been successful in his search to find new experts who disagree with the previous experts involved in the matter").

As for Cross's independent testing results, we conclude that while these results could constitute newly discovered evidence, the Defendant has failed to show that he was reasonably diligent in obtaining this evidence, that the materiality of the new evidence is apparent, or that this evidence is likely to change the result of the Defendant's trial.

Because the Defendant made no attempt to obtain independent testing of the biological evidence in this case prior to trial, the Defendant has not shown that he was reasonably diligent in obtaining this evidence. See Meade, 942 S.W.2d at 566; Jones, 452 S.W.2d at 367. Moreover, the Defendant has failed to show that Cross's independent testing was clearly material or that this proof was likely to change the result of the Defendant's trial. Cross acknowledged that Special Agent Cannon saw sperm when she examined the sample taken from the drawer. While this small sample was consumed by Special Agent Cannon in testing, Cross failed to present any evidence contradicting Special Agent Cannon's documented findings, wherein Special Agent Cannon used multiple presumptive tests with different limitations to confirm the presence of semen in the samples taken from Area 1 and Area 2 of the drawer. Cross also acknowledged that the visual observation of sperm is considered a "confirmatory test" and that the "very small amount of sperm" seen by Special Agent Cannon was consistent with sperm from a vasectomized male. Special Agent Asbury stated that although the double immunodiffusion test performed by Cross was negative for semen in Area 1 of the drawer, the immunodiffusion test does not detect lower levels of semen and is no longer used by the TBI because it is "subpar with sensitivity."

We also find Cross's alternative theory, that the sperm on the drawer may have come from a dog, unpersuasive. While Cross testified that it would be easy to misidentify sperm because human and dog semen are similar in morphology, Special Agent Asbury asserted that TBI analysts are trained to distinguish human and non-human sperm. In addition, although Cross stated that the "off-ladder peak" in the DNA printouts tended to occur when there was non-human DNA, Special Agent Asbury opined that dog semen would have contained several off-ladder peaks and that this sample from the drawer contained a full human DNA profile. She also asserted that the presence of non-human DNA in a sample would not mean that the semen in that area was from a non-human source. Third, regarding Cross's claim that the P30 lateral flow test could test positive for dog semen, Special Agent Asbury asserted that the only non-human bodily fluid that had tested positive with the P30 lateral flow test was "a Rhesus monkey." Cross also acknowledged that although she could have tested the drawer in this case for canine or dog semen, she did not.

The trial court, in its order denying the motion for new trial, found that Special Agent Asbury's testimony that this semen was not from a canine "to be credible" and that had Special Agent Asbury's testimony been presented at the Defendant's trial along with Cross's testimony, "the fact finder would have discounted the canine semen theory." The trial court ultimately denied the motion for new trial on this ground because the Defendant "had not shown that the result of the trial would likely change with the information discovered between the verdict and the motion for new trial hearings." Because the Defendant has failed to show that Cross's independent testing results were material or

likely to change the result of the Defendant's trial, we conclude that the trial court did not abuse its discretion by denying the motion for new trial on this basis.

**B. Special Agent Cannon's TBI Personnel File.** Second, the Defendant contends that Special Agent Cannon's personnel records, which were never revealed to the jury, cast doubt on her credibility as a trial witness and the accuracy of her reporting. See State v. Johnson, E2013-02356-CCA-R3-CD, 2015 WL 913657, at *23 (Tenn. Crim. App. Mar. 2, 2015). He claims that aside from Special Agent Cannon's scientifically questionable conclusions and testimony, as explained above, Special Agent Cannon's personnel file shows that she resigned from the TBI following an investigation into her misconduct that "included incorrect time recordings on payroll time sheets over multiple pay period" and "case notes for work performed on . . . days [Special Agent Cannon] wasn't present in the laboratory." The Defendant asserts that following his conviction, he made numerous attempts to secure Special Agent Cannon's personnel file, which culminated in his current counsel suing the TBI for its failure to comply with the Public Records Act before the TBI finally released some records related to Special Agent Cannon's departure.

The trial court, in denying the motion for new trial, held that "the information regarding Special Agent Cannon's investigation" was "not constitutional material in this case." The court held that the Defendant had failed to show that "the result of the trial would likely change with the information discovered between the verdict and the motion for new trial hearings."

The proof presented at the motion for new trial hearing showed that trial counsel had knowledge that Special Agent Cannon had left the TBI after conducting the testing in the Defendant's case but failed to obtain additional information from the State, failed to obtain Special Agent Cannon's personnel file, and failed to cross-examine Special Agent Cannon regarding the reason she left the TBI at his trial. Consequently, we conclude that the Defendant has not shown reasonable diligence in seeking this newly discovered evidence. See Meade, 942 S.W.2d at 566; Jones, 452 S.W.2d at 367.

We also conclude that the Defendant failed to show that the evidence surrounding Special Agent Cannon's resignation from the TBI was material or likely would have changed the result of his trial. Here, the Defendant failed to show that Special Agent Cannon's errors, consisting of incorrect time recordings and case notes reflecting work performed by her on days that she was not present in the laboratory, were related to the Defendant's case or occurred during the time that Special Agent Cannon tested the evidence in the Defendant's case. We agree with the State that given the nature and timing of Special Agent Cannon's administrative errors, a jury would not likely have found that she lied about identifying sperm on the slide taken from the victim's drawer or about

- 65 -

concluding that the DNA in the non-sperm fraction from this sample belonged to the Defendant. We agree with the State that if Special Agent Cannon had falsified the test results in this case, the results would have contained overwhelming evidence of the Defendant's guilt, rather than test results that were somewhat inconclusive.

We also recognize that proof about Special Agent Cannon's resignation from the TBI is impeachment evidence, which is generally not a basis on which to grant a new trial. See Sheffield, 676 S.W.2d at 554 (stating that newly discovered evidence that "merely contradicts or attempts to impeach" a witness's testimony "is unlikely to produce a different result" for the purpose of obtaining a new trial). Moreover, we cannot conclude that this impeachment proof concerning Special Agent Cannon's resignation was so crucial to the Defendant's guilt or innocence that it would probably result in an acquittal. See Singleton, 853 S.W.2d at 496. We reiterate that although mainly circumstantial, there was substantial proof of the Defendant's guilt in this case. See id. (concluding that "[b]ecause the evidence linking Singleton to the sale of marijuana was based on the agents' testimony that Singleton handed the co-defendant, Lane, a set of keys to the defendant's truck, new evidence that conclusively establishe[d] the nonexistence of a key to the truck seriously weaken[ed] the case against the defendant"). Unlike the facts in Singleton, Special Agent Cannon and her report were not the only pieces of evidence indicating the Defendant's guilt. At trial, the State relied on the victim's testimony, proof suggesting that the Defendant destroyed incriminating messages on his and the victim's cell phones, evidence showing that the Defendant or M.R. destroyed possible physical evidence on the victim's comforter and sheets, and information indicating that the Defendant had an inappropriate relationship with M.R., his other adoptive daughter. We cannot conclude that if we presented all the new and old evidence, a jury would have returned a verdict more favorable to the Defendant than the one returned in the original trial. Goswick, 656 S.W.2d at 359 (quoting Evans, 557 S.W.2d at 938). For all these reasons, we conclude that the trial court did not abuse its discretion in denying the motion for new trial on this basis.

**II. Newly Discovered Forensic Electronic Evidence.** The Defendant contends that if the newly discovered forensic electronic evidence had been presented to the jury, then it would likely have changed the result of his trial. This newly discovered evidence included proof that the Defendant was not the iCloud account administrator for the iPhones belonging to him and the victim, that anyone with access to their iCloud account could have remotely reset these phones, that the iPhones were reset after all electronic devices had been seized from the Defendant, and that the victim had access to and was using her iPhone within the timeframe that it was erased though a factory reset. The Defendant asserts that this newly discovered electronic evidence contradicted the State's assertion at trial that the Defendant was the only person who could have erased the iPhones belonging to him and the victim

- 66 -

While the State acknowledges that the cell phone evidence constitutes newly discovered evidence, it asserts that the Defendant was not reasonably diligent in pursuing this evidence before trial and that this cell phone evidence would not likely have changed the jury's verdict. Specifically, the State claims that because the cell phone evidence was available at the time of trial, the Defendant only needed to request an independent examination of the cell phones, and the Defendant's decision to pursue another strategy at trial is fatal to his request for a new trial on this basis. The State also asserts that because the evidence did not identify who "factory reset" the cell phones belonging to the Defendant and the victim, this new cell phone evidence would not likely have changed the jury's verdict. We agree with the State.

At trial, the State relied on Lieutenant Smithhart's testimony and the fact that the victim's comforter and sheets were in the dryer when the search warrant was executed to argue for the adverse inference instruction in Tennessee Pattern Jury Instruction 42.27 to be given to the jury. The trial court later asserted that it did "think [there was] evidence to support the inclusion" of this special instruction, based on the comforter and sheets being in the dryer and the Defendant's and the victim's phones being factory reset. It then said that "[w]hether or not we have concealment or destruction of evidence is a decision for the jury to make." The court added, "I'm not saying that's proof the [D]efendant did either of those things, but it's enough for the jury to have the instruction to determine if they think he did it, from the proof[.]" The court then granted the State's request to include the following instruction regarding the inference of concealment or destruction of evidence:

> Any attempt by a person to conceal or destroy evidence is a circumstance which, when considered with all the facts of the case, may justify an inference of guilt. While that inference is by no means strong enough of itself to warrant conviction, yet it may become one of a series of circumstances from which guilt may be logically inferred. Whether the evidence presented proves beyond a reasonable doubt that the defendant so acted is a question for your determination. If this fact is proven, this fact alone does not allow you to find that the defendant is guilty of the crime alleged. However, since an attempt by a defendant to conceal or destroy evidence may be caused by a consciousness of guilt, you may consider this fact, if it is so proven, together with all of the other evidence when you decide the guilt or innocence of the defendant. On the other hand, a person entirely innocent of a particular crime may attempt to conceal or destroy evidence and this may be explained by proof offered, or by the facts and circumstances of the case.

Whether there was any attempt to conceal or destroy evidence by the defendant, the reasons for it, and the weight to be given to it, are questions for you to determine.

During its closing argument, the State argued that the Defendant did not remove the semen on the drawer to the victim's bed because it was not visible to the naked eye but that "everything else [the Defendant] could control he did something about." The State then referenced the special instruction on inference of concealment or destruction of evidence and emphasized that the Defendant, from the beginning of his interview with Detective Merritt, either wanted "personal control of [the victim]'s iPhone, or he wanted it in the hands of Don Baker, once [the victim] was taken to the Baker residence" because the Defendant "knew that there was incriminating evidence on that phone." The State also stressed that although the Defendant claimed he needed his iPhone for work because it had his work contacts and work emails, "[a]ll of the data [wa]s erased" on the Defendant's phone when Lieutenant Smithhart examined it, and the Defendant was "the only person that had control over that phone." The State also argued that "[the Defendant] was the Apple administrator on [the victim]'s iCloud account," that he "had the ability to go in and track [the victim], and he "had the ability to set [the victim]'s phone to factory default."

The trial court, in its order denying the motion for new trial, found that "[n]o witnesses testified during the trial that the [D]efendant was the only person who could have reset the phones." It noted that although the Defendant denied that the administrator of the iCloud account could prevent a user from turning off the Find My iPhone feature, the Defendant admitted telling Detective Merritt during his interview that he overrode the function that allows users to turn off the Find My iPhone feature. The trial court said that while there was "an inconsistency in the [D]efendant's testimony," this was "not proof that the [D]efendant could stop someone else from factory resetting the phones or that he was the only person who could have done so as the administrator." The trial court held that the "information regarding the resetting of the iPhones" was "not constitutionally material." The court then concluded that the Defendant had failed to show that "the result of the trial would likely change with the information discovered between the verdict and the motion for new trial hearings."

The Defendant maintains that this newly discovered electronic evidence creates a critical timeline for key events regarding the resetting of the phones and rebuts the State's unchallenged trial narrative that only the Defendant could have reset these phones. Specifically, the Defendant claims this newly discovered evidence established that (1) the victim still had access to her iPhone when it was factory reset; (2) the Defendant no longer had access to his iPhone, computers, or iPads when his iPhone was factory reset; and (3)

there was a single Apple ID, such that anyone with access to it could remotely start a factory reset for any device connected to the account.

First, the Defendant argues that this newly discovered evidence established that the trial proof regarding the cell phones was misleading. He claims that Spore's testimony, in contrast to the State's assertion at trial, established that the Defendant was not the administrator of the iCloud account and that he did not have the exclusive authority to reset his phone and the victim's phone. He claims Spore's testimony explained that any individual with access to the account, including the victim, could have deleted the iPhones and that both the Defendant's and the victim's iPhones were reset several hours after the Defendant's electronic devices were seized by the police.

Second, the Defendant contends that because the forensic electronic evidence presented at trial was a core component of the State's case, the result of the Defendant's trial would have been different had the jury heard this newly discovered forensic electronic evidence. He asserts that the trial court provided the jury with an adverse inference instruction based on his alleged resetting of the iPhones. He also claims the jury never heard any evidence to contradict the State's theory about the timeline regarding when the iPhones were reset or regarding the individuals who had the motive and opportunity to reset them, and if the jury had heard the new electronic evidence presented at the motion for new trial hearing, then the adverse instruction would not have been given. The Defendant insists that the evidence presented at the motion for new trial hearing raises substantial questions about the forensic electronic evidence presented at trial as well as the State's arguments during closing concerning this evidence.

We conclude that Spore's independent testing results constitute newly discovered evidence. However, we agree with the State that the Defendant has failed to establish that he diligently pursued this new electronic evidence. See Meade, 942 S.W.2d at 566; Jones, 452 S.W.2d at 367. Even though this evidence was available at trial, the Defendant failed to request an independent examination of the cell phones and failed to present an expert, like Spore, to testify as to his findings. Instead, trial counsel pursued the strategy at trial of having Lieutenant Smithhart admit that he did not know who factory reset these phones and that he did not know when the phones were factory reset. Accordingly, we conclude that the Defendant has failed to show that he diligently pursued this electronic evidence.

We also conclude that the Defendant failed to show that this newly discovered electronic evidence was material or likely would have changed the result of his trial. Although Spore presented new evidence regarding the time when the Defendant's and the victim's phones were factory reset, Spore was unable to identify the individual who factory reset the phones. Spore stated that the victim could not have used her phone to factory

- 69 -

reset the Defendant's phone because the victim's phone was factory reset first. In addition, Spore asserted that anyone with the username and password for the iCloud account could initiate a remote factory reset from their personal device or from any device with a web browser. We conclude that because Spore's testimony never identified who factory reset the phones, this evidence is not likely to have changed the outcome of the Defendant's trial. See Goswick, 656 S.W.2d at 359; Evans, 557 S.W.2d at 938.

**III. <u>Newly Discovered Evidence Related to the Victim's History.</u>** The Defendant argues that had the newly discovered records related to the victim's mental health history been presented to the jury, the result of his trial would have been different. He claimed these newly discovered records show that (1) the victim likely suffered from impaired capacity both at the time she made the allegations against the Defendant and at the time of trial, and (2) the victim made prior unsubstantiated allegations of sexual abuse committed against her by an older sibling, which could have been used to impeach the victim's testimony at trial. The Defendant asserts that this case hinged on his credibility and the victim's credibility and that if the jury had heard that the "victim suffered from serious mental health issues that greatly impacted her ability to perceive the events around her, to be an accurate historian of those events, and to correctly convey them to a jury," then the result of his trial likely would have been different. The State counters that the Defendant failed to show that the records related to the victim's mental health history are so crucial to his guilt or innocence that their admission will probably result in an acquittal. We conclude that the Defendant has waived this issue and that, waiver notwithstanding, the Defendant is not entitled to relief.

The trial court, in its order denying the motion for new trial, held that "the records concerning the victim . . . were not constitutionally material." The court then determined that the Defendant had failed to show that "the result of the trial would likely change with the information discovered between the verdict and the motion for new trial hearings."

Here, the Defendant contends that the hundreds of pages of sealed records from both DCS and other entities that were disclosed during the civil litigation show that the trial court, during its 2017 in camera review, did not have all the records related to the victim's mental health issues, many of which could have been used to cross-examine the victim at trial. The Defendant claims these records establish a history of neglect that contributed to the victim's serious mental health issues. We initially note that the Defendant has failed to show reasonable diligence in seeking these records, as most, if not all, of these records would have existed prior to and during the Defendant's trial. See Meade, 942 S.W.2d at 566; Jones, 452 S.W.2d at 367. Moreover, the Defendant has failed to explain how any class of records regarding the victim's mental health history would be material or how this evidence would likely change the result of the Defendant's trial. We decline the

- 70 -

Defendant's invitation to review the hundreds of sealed documents to determine whether any of these documents are material or would likely change the result of the Defendant's trial. Accordingly, the Defendant has waived this issue. See Tenn. R. Ct. Crim. App. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

Waiver notwithstanding, we agree with the State that any additional records about the victim's mental health issues would not likely have changed the result of the Defendant's trial. At the motion for new trial hearing, the defense presented testimony from Dr. Brodie and Dr. Alexander in an effort to show that the victim had impaired capacity, both at the time the victim made the allegations against the Defendant and at the time of her trial testimony. However, the trial court, in its order denying the motion for new trial, held that it was "highly unlikely . . . [it] would have allowed testimony by either Dr. Brodie or Dr. Alexander to be admitted during the trial pursuant to Tenn. R. Evid. 617 without either expert actually conducting an examination of the victim." See Tenn. R. Evid. 617 ("A party may offer evidence that a witness suffered from impaired capacity at the time of an occurrence or testimony."). The court noted that the evidence showed the victim "maintained employment and made good grades in school" around the time of her disclosure against the Defendant. It also recognized that the defense theory at trial was that the victim "was lying because she was mad at the [D]efendant's parenting decisions, not that she suffered from any impaired capacity at the time of the events or during her testimony." Consequently, the trial court held that "[a]n expert witness such as Dr. Brodie or Dr. Alexander would not have aided the defense" and if such testimony had been presented, "it likely would have made the victim an even more sympathetic witness."

We agree that testimony from experts like Dr. Brodie and Dr. Alexander would not likely have changed the result of the Defendant's trial. First, because Dr. Brodie and Dr. Alexander never examined the victim, the Defendant has failed to show that testimony from Dr. Brodie or Dr. Alexander would have been admissible. Cf. Newsome v. State, 995 S.W.2d 129, 135 (Tenn. Crim. App. 1998) (stating that before coram nobis relief may be granted, "it must be established, and the trial court must find, that the newly discovered evidence may have resulted in a different judgment had it been presented at the trial" and that "[t]his rule presupposes that the evidence would be admissible pursuant to the applicable rules of evidence and is material to the issues or grounds raised in the petition." (emphasis added)); see State v. Hall, No. M2012-00336-CCA-R3-DD, 2013 WL 5761311, at *17 (Tenn. Crim. App. Oct. 22, 2013) (applying similar reasoning to the trial court's denial of relief based on newly discovered evidence in a delayed appeal). We also conclude that additional records about the victim's mental health issues would not likely have changed the result of the Defendant's trial. The Defendant failed to present any evidence indicating that the victim suffered from impaired capacity at the time of her disclosure or

during her testimony at trial. Given the proof showing that the victim was able to maintain employment and good grades around the time of her disclosure and that the victim was able to testify clearly and coherently at trial, we conclude that the trial court did not abuse its discretion in denying a new trial based on the Defendant's claim that newly discovered evidence would have established the victim's impaired capacity.

In addition, we conclude that because the Defendant failed to show that the victim's prior allegation of sexual abuse by an older sibling was false, the Defendant could not have used it to impeach the victim's testimony at trial. See Tenn. R. Evid. 608(b) (providing that specific instances of conduct may be used to impeach a witness during cross-examination if the conduct is probative of the witness's character for truthfulness or untruthfulness); see also State v. Wyrick, 62 S.W.3d 751, 782 (Tenn. Crim. App. 2001) ("[A] victim's prior false accusation of crime is probative of the witness's character for truthfulness or untruthfulness."); State v. Willis, 735 S.W.2d 818, 822 (Tenn. Crim. App. 1987) ("In the absence of proof that [the victim] falsified the other allegation [of sexual abuse], the fact that she accused another person of committing another sexual offense against her is immaterial."). Even if the Defendant had been able to show that the victim made a false allegation of sexual abuse committed against her by an older sibling, such evidence is impeachment evidence, which is generally not a basis on which to grant a new trial. Sheffield, 676 S.W.2d at 554 (stating that newly discovered evidence that "merely contradicts or attempts to impeach" a witness's testimony "is unlikely to produce a different result" for the purpose of obtaining a new trial). Such impeachment proof would not be so crucial to the Defendant's guilt or innocence that its admission would probably result in an acquittal. See Singleton, 853 S.W.2d at 496. Accordingly, we conclude that the trial court did not abuse its discretion in denying a new trial based on this evidence.

**IV. Due Process Violations.** The Defendant argues that the State's failure to disclose the circumstances of Special Agent Cannon's departure from the TBI as well as the victim's records related to her mental health issues violated the Defendant's right to due process of law. See Brady v. Maryland, 373 U.S. 83 (1963). The Defendant also contends that the trial court violated his due process rights by not conducting a complete in camera review of the victim's DCS records for potentially exculpatory information. See Pennsylvania v. Ritchie, 480 U.S. 39 (1987).

In response, the State asserts that the prosecution had no duty to discover or disclose impeachment evidence known to the TBI agents and DCS workers who were not acting on the government's behalf in this case. See Kyles v. Whitley, 514 U.S. 419, 437 (1995) (noting that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police") (emphasis added). The State also claims that the TBI investigative file and the DCS records are not

material because their absence at trial does not undermine confidence in the jury's verdict. The State additionally asserts that because the Defendant was unable to make a showing prior to trial that any DCS records were likely to have favorable and material evidence, the Defendant was not entitled to an in camera review of the victim's complete DCS file.

We conclude that the Defendant failed to show the TBI investigative file was material. We also conclude that the Defendant waived the issue regarding the DCS records and, waiver notwithstanding, the Defendant is not entitled to relief on this issue. Finally, we conclude that the Defendant waived the Pennsylvania v. Ritchie issue and that, in any case, the trial court fully satisfied its obligations under Ritchie.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution guarantee every defendant the right to a fair trial. See Johnson v. State, 38 S.W.3d 52, 55 (Tenn. 2001). In Brady, 373 U.S. at 87, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

In order to prove a Brady violation, the defendant must establish the following four elements:

1) that the defendant requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);

2) that the State suppressed the information;

3) that the information was favorable to the accused; and

4) that the information was material.

Johnson, 38 S.W.3d at 56 (citing State v. Edgin, 902 S.W.2d 387, 390 (Tenn. 1995); State v. Walker, 910 S.W.2d 381, 389 (Tenn. 1995)).

The defendant has the burden of proving a Brady violation by a preponderance of the evidence. See Edgin, 902 S.W.2d at 389. When considering a Brady claim, this court reviews the trial court's findings of fact, such as whether the defendant requested the information or whether the State withheld the information, de novo with a presumption that the findings are correct unless the evidence preponderates otherwise, while this court

reviews the trial court's conclusions of law, including whether the evidence was favorable to the accused or material, de novo with no presumption of correctness.  Cauthern v. State, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004).

The prosecution is not obligated to investigate or to gather evidence for the defendant.  State v. Reynolds, 671 S.W.2d 854, 856 (Tenn. Crim. App. 1984).  It has no duty to "seek out exculpatory evidence not already in its possession or in the possession of a governmental agency."  State v. Marshall, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992).  In addition, "[t]he prosecution is not required to disclose information that the accused already possesses or is able to obtain[.]"  Id. (citing State v. Caldwell, 656 S.W.2d 894, 897 (Tenn. Crim. App. 1983); Banks v. State, 556 S.W.2d 88, 90 (Tenn. Crim. App. 1977)).  "When exculpatory evidence is equally available to the prosecution and the accused, the accused 'must bear the responsibility of [his] failure to seek its discovery.'"  Id. (quoting United States v. McKenzie, 768 F.2d 602, 608 (5th Cir. 1985)).

"Evidence 'favorable to an accused' includes evidence deemed to be exculpatory in nature and evidence that could be used to impeach the [S]tate's witnesses."  Johnson, 38 S.W.3d at 55-56; see State v. Jackson, 444 S.W.3d 554, 593 (Tenn. 2014).  "Evidence is deemed to be material when 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"  Johnson, 38 S.W.3d at 58 (quoting Edgin, 902 S.W.2d at 390).  When determining whether a defendant has adequately established the materiality of favorable evidence suppressed by the State, "a reviewing court must determine whether the defendant has shown that 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine the confidence of the verdict.'"  Id. (quoting Irick v. State, 973 S.W.2d 643, 657 (Tenn. Crim. App. 1998)).

"Failing to disclose Brady materials may impair the adversary process in various ways, including causing the defense to 'abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued.'"  Jackson, 444 S.W.3d at 595 (quoting United States v. Bagley, 473 U.S. 667, 682 (1985)).  Defendants seeking to establish the materiality element for a Brady violation should emphasize "any and all ways in which suppression of evidence impaired the adversary process and undermined confidence in the outcome of the proceeding."  Id.

**A.  Information Regarding Special Agent Cannon.**  The Defendant argues that he requested information about Special Agent Cannon's departure from the TBI; the State suppressed this information, which was in the possession of the TBI acting on the government's behalf in this case; the information was favorable to the Defendant because it cast doubt upon Special Agent Cannon's credibility as a witness as well as the accuracy

of her reporting; and this information was material because the jury's verdict, without this information, is unworthy of confidence. He claims that because he has fulfilled the four Brady factors, he is entitled to a new trial.

First, the Defendant asserts that he made a general request for discovery materials and exculpatory information. In addition, prior to trial, he claims trial counsel unsuccessfully attempted to contact Special Agent Cannon at the TBI. Trial counsel claimed that the prosecutor originally assigned to the Defendant's case may have told him that Special Agent Cannon was no longer working at the TBI but did not explain the circumstances of her departure. Ms. Kuykendall, who assisted trial counsel in the Defendant's case, testified that she and trial counsel were told, either by Special Agent Cannon or somebody who worked at the TBI, that Special Agent Cannon had "moved on to better job opportunities."

Second, the Defendant claims the State suppressed the true circumstances of Special Agent Cannon's departure from the TBI, which was in the possession of a law enforcement agency working on behalf of the State. See Kyles, 514 U.S. at 437 ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."). In addition, he asserts that the prosecutor barely mentioned Special Agent Cannon's departure from the TBI and that the prosecutor referred to Special Agent Cannon as "TBI Agent Cannon" throughout the Defendant's trial. Although the trial court held that this information concerning Special Agent Cannon was "as available to the defense as it was to the State, the Defendant argues that "current counsel's attempts to obtain [Special Agent Cannon's] records were thwarted by the State and the TBI at every turn, . . . eventually leading to the filing of an action to obtain the records via [a] Public Records Act request[.]" See Johnson v. TBI, No. 20-1066-IV (Davidson County Chancery Court). The Defendant argues that regardless of whether the prosecutors in the Defendant's case personally knew the reasons for Special Agent Cannon's departure, "the TBI is unquestionably a state law enforcement agency that was working on behalf of the State," and Brady's requirement of disclosure applies to proof in police possession that was not turned over to the prosecution. See Jackson, 444 S.W.3d at 594.

Third, the Defendant contends that this evidence, which casts doubt on Special Agent Cannon's credibility as a witness and on the accuracy of her reporting, was favorable to the Defendant. Cross testified that Special Agent Cannon's personnel file showed she resigned amid an internal investigation that involved her documentation of test results on days that she did not work. The Defendant asserts that even if this file did not clearly establish that Special Agent Cannon's false documentation was occurring while she performed the testing in this case, Special Agent Cannon's falsification of the records was

still probative of her credibility because it "calls into question a material, although not indispensable, element of the prosecution's version of the events [and] challenges the credibility of a key prosecution witness." Id. at 593. The Defendant argues that the jury never heard the evidence regarding Special Agent Cannon's departure from the TBI, and therefore, was never able to make a "true and accurate assessment" of her credibility as a witness or the credibility of the work she performed in this case.

Fourth, the Defendant contends that the evidence concerning Special Agent Cannon's departure from the TBI was material because without it, the jury's verdict is not worthy of confidence. During closing argument at trial, the prosecutor argued that the results of Special Agent Cannon's DNA testing were "the biggest piece of corroboration" for the victim's testimony and that the Defendant failed to offer "any plausible explanation" for why his semen was on the victim's bedroom drawer. The Defendant reiterates that "[t]he question is not whether [he] would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles, 514 U.S. at 434. The Defendant claims that given the importance of Special Agent Cannon's testimony, the absence of this evidence challenging her credibility undermined confidence in the outcome of his trial and resulted in a verdict in which this court can have no confidence.

In denying the motion for new trial, the trial court held that the evidence concerning Special Agent Cannon's resignation from the TBI "was as available to the defense as it was to the State." The court found that there was no indication that the State was aware that Special Agent Cannon had been "under investigation before she resigned for falsifying time sheets." The trial court also determined that trial counsel "should have sought this information [regarding Special Agent Cannon's resignation] during his investigation if he wanted to impeach the State's witness rather than use it to attack the credibility of the victim." The court also concluded that "[i]n any event, . . . the information about [Special] Agent Cannon was not material." It reasoned that at trial, the defense relied on Special Agent Cannon's testimony "to establish that the DNA detected in the victim's room could have come from the [D]efendant's skin cells" and that "although semen was found on [the victim's] bed, DNA evidence could not show that [the semen] came from the [D]efendant, just that his DNA was found in an area that tested positive for semen." In addition, the trial court noted that trial counsel "used the testimony of [Special] Agent Cannon to show that semen was not found in areas specifically described by the victim." Accordingly, the trial court concluded that there had "not been a showing that had evidence of the investigation into [Special] Agent Cannon been introduced during the trial, that there is a reasonable probability of a different result."

The State concedes that Special Agent Cannon's TBI personnel file contains impeachment evidence favorable to the defense but asserts that there was no due process violation because the prosecution had no duty to discover or disclose this impeachment evidence.  See Sutton v. Carpenter, 617 Fed. App'x 434, 440 (6th Cir. 2015).  While the State acknowledges that the TBI is a governmental agency that investigated both the Defendant and Special Agent Cannon, it argues that the Defendant offered "no evidence that the same TBI agents or teams participated in both investigations." Id.  In other words, the State claims that the Defendant offered no proof that the TBI agents who investigated Special Agent Cannon's administrative errors also assisted in the Defendant's criminal prosecution.  Consequently, the State urges this court to hold, consistent with the persuasive federal precedent, that the State only has an obligation to disclose "information possessed by members of the prosecution team." Id. at 441 (listing supporting cases).  The State claims that Special Agent Cannon was never part of the prosecution team because she resigned several months before the Defendant was even charged in this case. See id.  In addition, the State argues that the trial court properly denied a motion for new trial on this issue because the information about Special Agent Cannon's resignation was available to the Defendant to the same degree as it was to the prosecutor.

The State also argues that the TBI investigative file was not material.  Although the State acknowledges that the TBI investigative file on Special Agent Cannon had some impeachment value, it argues that "the nature and limited scope of the timekeeping errors would not likely have caused the jury to believe [Special Agent] Cannon falsified the lab results" and that "[t]he timing of [Special Agent] Cannon's other record-keeping errors also diminishes their relevance."  Consequently, the State contends that the absence of the TBI investigative file regarding Special Agent Cannon did not affect the outcome of the Defendant's trial and that the State's non-disclosure of this evidence does not undermine confidence in the verdict.

We agree with the trial court and the State that Special Agent Cannon's TBI personnel file was not material.  As such, it is unnecessary to resolve the Defendant's remaining claims pertaining to this issue.  The Defendant has failed to show that Special Agent Cannon's errors, consisting of incorrect time recordings and case notes reflecting work performed by her on days that she was not present in the laboratory, were in any way related to the Defendant's case or occurred during the time that Special Agent Cannon tested the evidence in the Defendant's case.  When considering Special Agent Cannon's administrative errors in unrelated cases, along with the substantial evidence of the Defendant's guilt, we conclude that the Defendant has failed to show that her TBI personnel file was material.

**B. The Victim's DCS Records.** The Defendant also asserts that the State's failure to disclose the DCS records related to the victim's mental health issues violated Brady. He claims that he requested these DCS records by asking the trial court to conduct an in camera review of the DCS records, that the State suppressed this information, this information was favorable to his case, and this information was material.

In response, the State contends that it had no duty to discover or disclose these DCS records related to the victim's mental health issues because DCS was not acting on the government's behalf in the Defendant's case. See Kyles, 514 U.S. at 437 (stating that a "prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police") (emphasis added). The State argues that courts have routinely rejected Brady claims premised on evidence possessed by uninvolved government agencies. See id.; see also Hall v. Mays, 7 F.4th 433, 446 (6th Cir. 2021) (declining to hold that the prosecutor had a duty to disclose mental health records of a key prosecution witness held by the Tennessee Department of Corrections (TDOC) because the TDOC officials were not acting on behalf of the government in the case). The State notes that the Defendant cites two unpublished opinions by this court for the proposition that "Brady applies in a limited format to DCS records." See State v. Turner, No. M2020-01729-CCA-R3-CD, 2022 WL 1948713, at *16 (Tenn. Crim. App. June 6, 2022); Ritter v. State, No. E2008-01278-CCA-R3-PC, 2009 WL 3711991, at *8 (Tenn. Crim. App. Nov. 6, 2009). However, the State argues that these two cases simply referenced DCS obligations under Ritchie and did not hold that prosecutors violate Brady when DCS fails to produce all potentially exculpatory evidence for a trial court's in camera review. See id.

Here, the Defendant argues that although he requested these DCS records by asking the trial court to conduct an in camera review of the DCS records, the State suppressed this information. He claims that because DCS is a state agency, the State had a duty to disclose DCS records. In addition, he asserts that although the process for obtaining otherwise shielded records required the State to submit these DCS records to the trial court for an in camera review pursuant to Ritchie, the State failed to ensure that the trial court had before it all the DCS records necessary to make a fair assessment of the potentially exculpatory information.

The Defendant also contends that the DCS records were favorable to the Defendant's case. He asserts that M.R. indicated in her affidavit that she remembered being questioned in a DCS investigation after there was an allegation that the victim had been sexually abused by her older sibling, K.H. The Defendant claims that because this sexual abuse allegation against her sibling was unsubstantiated, this evidence could have been used to impeach the victim at trial. See Wyrick, 62 S.W.3d at 780; State v. Smith,

- 78 -

No. E2006-02642-CCA-R3-CD, 2008 WL 5272480, at *10 (Tenn. Crim. App. Dec. 19, 2008). He also asserts that the records related to the victim's mental health issues could have allowed the defense to impeach her on the basis that she had impaired capacity under Rule 617 and could have provided extrinsic evidence of the victim's impaired capacity.

Lastly, the Defendant claims these DCS records were material. He reiterates although the trial court found the victim and the Defendant to be equally credible at trial, the jury did not hear evidence of the victim's mental health history that impaired her capacity to accurately perceive and relay the events relevant to the Defendant's case, and the jury did not hear proof about the victim's unsubstantiated prior allegation of sexual abuse by her older sibling. He claims that this evidence challenges the victim's credibility and that if this proof had been available at trial, the result of the proceeding would have been different.

The trial court, in denying the motion for new trial, held that although the Defendant claimed that the absence of the records concerning the victim's mental health issues resulted in a violation of his due process rights by the State, the Defendant had "failed to support this claim during the motion for a new trial." The court also observed that although the defense made a specific request during discovery for Brady information, much of the information of which the Defendant currently complains, including the DCS records, was "not in possession of the State or normally obtainable by the exercise of due diligence."

Although the Defendant argues that the State's failure to disclose the DCS records related to the victim's mental health issues violated Brady, he has failed to identify any specific class of records that would undermine confidence in the verdict and has failed to cite to the specific portion of the record that contains this information. We again decline the Defendant's invitation to review the hundreds of sealed DCS documents to determine whether any of these documents are material. Accordingly, the Defendant has waived this issue. See Tenn. R. Ct. Crim. App. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

Waiver notwithstanding, we conclude that the Defendant has failed to show that there is a reasonable probability that had this evidence been disclosed to the defense, the result of the proceeding would have been different. The Defendant failed to present any evidence indicating that the victim suffered from impaired capacity at the time of her disclosure or during her testimony at trial. In addition, because the Defendant failed to show that the victim's prior allegation of sexual abuse by an older sibling was false, the Defendant could not have used this evidence to impeach victim's testimony at trial.

Accordingly, the Defendant has not shown that the State's failure to disclose the DCS records related to victim's mental health issues violated <u>Brady</u>.

**C.** <u>**Pennsylvania v. Ritchie.**</u> Lastly, the Defendant asserts that the trial court violated his due process rights by failing to conduct a complete <u>Pennsylvania v. Ritchie</u> review of all the documents, both from DCS and other entities, that the Defendant obtained from the civil discovery and then submitted to the trial court under seal. He claims "[t]he records obtained and contained in this record under seal exceed in both quality and quantity the records reviewed by the trial court during the 2017 review and depict a life of far-reaching neglect that contributed to victim's serious mental health issues."

The Defendant asserts that although he submitted these records to the trial court under seal, the court only reviewed "the records from the Smoky Mountain Children's Home," and then the court "released only a single page that 'could possibly contain potentially exculpatory material.'" He also admits that the trial court ordered DCS records related to victim's prior claim of sexual abuse by a sibling be tendered to the court for an in camera review but required the Defendant to "provide to the court additional information to allow the court to enter a sufficiently specific order, e.g. the state and/or county in which the investigation occurred, the name of the older sibling, the approximate year of the investigation, etc." The Defendant claims the trial court admitted it was "very likely" that the 2017 DCS documents placed under seal did not contain every DCS record ever compiled that related to victim, and then the trial court excused its failure to conduct a full review by asserting that the records it reviewed in 2017 "appear[ed] to constitute a complete and total copy of the records relating to the charges" in the Defendant's case. The Defendant insists that the trial court "did not have the quality or quantity of records that were later disclosed in the concomitant civil litigation," which included "hundreds of pages of material, some provided from outside of DCS, . . . that was not disclosed following the court's review," and the Defendant asserts that these records, obtained through the civil discovery, "could have been used to cross-examine victim"

In response, the State argues that this <u>Pennsylvania v. Ritchie</u> issue is distinct from the <u>Brady</u> issue regarding these records, although it acknowledges that it implicates the same due process concerns. While noting that the Defendant seems to have conflated the <u>Brady</u> and the <u>Pennsylvania v. Ritchie</u> issues, the State contends that to the extent the Defendant adequately presented the <u>Ritchie</u> claim for review, he is not entitled to relief.

In <u>Pennsylvania v. Ritchie</u>, 480 U.S. at 56-58, the United States Supreme Court held that the Due Process Clause of the Fourteenth Amendment required the state trial court to conduct an in camera review of a protective service agency's confidential investigative file concerning child abuse to determine whether this file contained information that was

- 80 -

"material," meaning that it probably would have changed the outcome of the defendant's trial. The court concluded that if the file did contain material information, then the defendant would be given a new trial. Id. at 58. However, if the file did not contain material information, or if the non-disclosure of this information was harmless beyond a reasonable doubt, then the trial court could reinstate the defendant's prior convictions for rape, involuntary sexual intercourse, incest, and corruption of a minor. Id. The court also held that on remand the defendant could not require the trial court to search through the investigative file "without first establishing a basis for his claim that it contains material evidence." Id. n.15 (citing United States v. Valenzuela-Bernal, 458 U.S. 858, 867 (1982) ("He must at least make some plausible showing of how their testimony would have been both material and favorable to his defense.")). The court observed that a defendant's right to discover exculpatory evidence does not include the unsupervised authority to search the State's files and make his own determination regarding the materiality of the information. Id. at 59. The court then concluded that both the defendant's and the State's interests in ensuring a fair trial could be fully protected by requiring that the confidential files be submitted only to the trial court for an in camera review and for a determination regarding materiality. Id. at 60. The court also recognized that allowing full disclosures of such confidential files to defense counsel in a child abuse case would unnecessarily sacrifice the State's compelling interest in protecting child abuse information. Id.

While the Defendant claims that the trial court violated due process by failing to conduct a complete Ritchie review of all the information, both from DCS and other entities, that was obtained from the civil discovery and then submitted to the court under seal, he has failed to make any plausible showing of how these records regarding victim's mental health history would be material. Once again, we decline the Defendant's invitation to review the hundreds of sealed documents to determine their materiality. Accordingly, the Defendant has waived our review of this Ritchie issue. See Tenn. R. Ct. Crim. App. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

In any case, we conclude that the trial court fulfilled its obligations under Ritchie in this case. Prior to trial, the trial court ordered DCS to produce victim's records for an in camera review so the trial court could examine them for potentially exculpatory information. The trial court conducted its in camera review, filed the DCS documents under seal, and then apparently disclosed a small number of documents to the State and the defense. Although the Defendant claims that DCS failed to produce victim's complete file for this in camera review, he has failed to prove that DCS did not disclose victim's complete file or that any specific undisclosed records would have changed the outcome of his trial.

Following his conviction at trial, the Defendant obtained some additional records through discovery in the civil case and asked the court to conduct an in camera review of these records. Thereafter, the trial court entered an order partially denying the Defendant's renewed motion for an in camera review of victim's records. The court concluded that the Defendant had failed to make the necessary showings to justify the need for an in camera review of the Defendant's requested records from "every care provider or organization that even remotely had contact with" [victim]. The trial court noted that the Defendant had provided certain records from the Smoky Mountain Children's Home under seal, and after reviewing these Smoky Mountain Children's Home records in camera, the court disclosed a single page that "could possibly contain potentially exculpatory material." In addition, after reviewing M.R.'s affidavit, the trial court ordered that DCS investigatory records related to victim's prior claim of sexual abuse by an older sibling be given to the court for an in camera review, so long as the Defendant was able to provide "additional information to allow the court to enter a sufficiently specific order; e.g. the state and/or county in which the investigation occurred, the name of the older sibling, the approximate year of the investigation, etc." After noting Dr. Barker's testimony at trial that she did not see any signs that victim had been sexually abused and that victim never disclosed that she was sexually abused, the trial court held that there was "no indication that Dr. Barker's records would contain potentially exculpatory material."

In response to the Defendant's claim that the size of the DCS file placed under seal by the court after the in camera review in 2017 was "too small to possibly encompass all of the records that should exist, the trial court stated that it "re-reviewed the DCS records that were placed under seal in 2017," which contained "over 300 pages and 7 compact discs." The court acknowledged that although it was "very likely" that the DCS records placed under seal in 2017 "d[id] not contain every record DCS ever compiled" regarding victim and her siblings, the 2017 DCS records placed under seal "appear[ed] to constitute a complete and total copy of . . . any records relating to the charges and [victim]" Accordingly, the trial court concluded that the Defendant "ha[d] not made a sufficient showing for any additional demands on DCS." Although the trial court ordered DCS to produce the records regarding victim's prior allegation of sexual abuse by an older sibling, DCS subsequently notified the court that it no longer had any paper records associated with this sibling and that any such records would have been destroyed pursuant to DCS policy.

We conclude that the Defendant has failed to make a plausible showing to the trial court that any specific additional records were likely to contain material evidence. Because the trial court fully satisfied its obligations under Ritchie, the Defendant is not entitled to relief on this issue.

**V.  The Victim's Forensic Interview.**  The Defendant, while acknowledging that trial counsel waived plenary review of this issue by failing to make a contemporary objection, nevertheless contends that the trial court committed plain error by permitting the State to play the recording of victim's forensic interview in its entirety.  In response, the State contends that the trial court's admission of victim's entire forensic interview as a prior consistent statement was not plain error because the defense made a tactical decision to use the entire forensic interview to further impeach victim's credibility.  The State also asserts that there was no breach of a clear and unequivocal rule of law because the prosecution was entitled to rebut the defense's suggestion that victim's trial testimony was a recent fabrication or deliberate falsehood that was motivated by a desire for a cash windfall in her civil lawsuit against the Defendant.

For this court to find plain error,

> "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)).

Plain error "must be of such a great magnitude that it probably changed the outcome of the trial."  Adkisson, 899 S.W.2d at 642 (citations and internal quotations marks omitted).  It is the defendant's burden to persuade an appellate court that the trial court committed plain error.  State v. Hatcher, 310 S.W.3d 788, 808 (Tenn. 2010).  "[T]he presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established."  Smith, 24 S.W.3d at 283.  A recognition of plain error "should be limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial."  Adkisson, 899 S.W.2d at 642.  Whether the plain error doctrine has been satisfied is a question of law that this court reviews de novo.  State v. Knowles, 470 S.W.3d 416, 423 (Tenn. 2015).

Typically, out-of-court statements offered to prove the truth of the matter asserted are inadmissible evidence.  See Tenn. R. Evid. 801, 802.  Moreover, evidence of a prior consistent statement is generally not admissible for the sole purpose of bolstering a witness's credibility.  State v. Rimmer, 623 S.W.3d 235, 284 (Tenn. 2021) (citing State v.

Braggs, 604 S.W.2d 883, 885 (Tenn. Crim. App. 1980)). Nevertheless, "when a defendant attacks a witness's credibility, the State may rehabilitate the witness by offering evidence of a prior consistent statement." Id. (citing State v. Benton, 759 S.W.2d 427, 433 (Tenn. Crim. App. 1988)). The admission of a prior consistent statement is allowed: "(1) where the statement is offered to rebut the implication that the witness's testimony was a recent fabrication; and (2) when deliberate falsehood has been implied." Id. This exception allows the prior consistent statement to be used as "a means of rebuffing such attacks" and to show "that the witness's trial testimony is consistent with statements made before any improper influence or motive to lie existed." State v. Herron, 461 S.W.3d 890, 905 (Tenn. 2015) (citing Sutton v. State, 291 S.W. 1069, 1070 (Tenn. 1927)). "[A] prior consistent statement may be admitted pursuant to this exception only when the witness's testimony has 'been assailed or seriously questioned to the extent that the witness'[s] credibility needs shoring up.'" Id. (quoting Benton, 759 S.W.2d at 433-34). Prior consistent statements admitted under this exception cannot be used as substantive evidence of the truth of the matter asserted and should be used only to rehabilitate the witness's credibility. Id.

During its redirect examination of victim, the State asked the trial court during a bench conference to play victim's December 4, 2013 forensic interview as "a prior consistent statement" following the defense's extensive cross-examination of victim's inconsistent statements from her forensic interview, particularly the defense's questions to victim about the Defendant's ejaculate on victim's bed and on her purple rug. The trial court initially held that the State could not play the entire forensic interview, only the parts that were "consistent with what [victim] was inconsistent" on at trial. The State then asserted that defense counsel had talked to victim about so many inconsistencies from her forensic interview that he called into question "her entire statement" in an attempt to impeach her, which was why the State believed "it would be fair to play [victim's] entire statement [from the forensic interview] so the jury would have context." Defense counsel responded that victim had admitted to her statements concerning the purple rug, so she had not been inconsistent at all. The trial court then stated,

> Here's the thing . . . , [your cross-examination] attacked [victim's] credibility, though. It doesn't—the prior consistent statement doesn't just have to go to that one issue. It can go to other things that she has said, but not for the truth of the matter asserted, just to show that she's being consistent.

Defense counsel then stated, "I don't care if he plays [the forensic interview]. It'll take a while." The State then asked the trial court to play the entire forensic interview because it would "help everybody." Defense counsel then repeated, "I don't care," before the bench conference concluded.

- 84 -

Thereafter, the trial court told the jury that it was going to allow the State to play the December 4, 2013 forensic interview but that the jury could not consider the forensic interview videotape "for the truth of the matter asserted." The court instructed the jury that it could only use the forensic interview out-of-court statement to help the jury "judge the credibility of [victim]" and the credibility of victim's testimony from the witness stand. The videotape from victim's forensic interview on December 4, 2013, was then published to the jury. The forensic interview was played in part, and then the jury was dismissed for lunch. Thereafter, the trial court asked the parties if they had any issues, and both defense counsel and the State said they did not. After the jury returned from lunch, the remainder of the forensic interview was played "for the purposes of [victim's] credibility evaluation."

The trial court, in its order denying the motion for new trial, noted that trial counsel "did not object to the publication of the [victim's] forensic interview." It then concluded that it was "not plain error for the court to allow [the victim's forensic] interview to be played."

The Defendant has failed to establish that he did not waive this issue for tactical reasons. See State v. Vance, 596 S.W.3d 229, 254 (Tenn. 2020) (reiterating that it is the defendant's burden to persuade an appellate court that all five factors for plain error review have been met). The record shows that trial counsel attempted to use all of victim's inconsistent statements, including the ones she made during the forensic interview, as a way to discredit victim at trial. Trial counsel cross-examined victim at length regarding the vastly different statements about the Defendant's alleged abuse that she provided in her trial testimony, her interview with Detective Merritt, and her forensic interview. The defense also had victim admit that she filed a civil lawsuit in 2016 against the Defendant and the Smoky Mountain Children's Home, wherein she sought 17 million dollars in damages. During closing arguments, defense counsel suggested that victim's statements were "all over the board," that victim had a motive to lie about the abuse because she "didn't like [the Defendant's] rules" and "didn't want to be there anymore," and that "the allegations in [victim's] civil lawsuit [we]re different" from the other allegations she had made. Because a major part of the defense strategy was to impeach victim with her inconsistent statements about the Defendant's alleged abuse, the Defendant has not shown he did not waive the playing of the entire forensic interview for tactical reasons.

We also conclude that the Defendant has failed to show that a clear and unequivocal rule of law was breached, that a substantial right of the Defendant was adversely affected, or that consideration of the error is necessary to do substantial justice. The trial court properly allowed the State to play the entire forensic interview as a prior consistent statement to refute the defense's suggestion that victim's testimony was a recent fabrication

- 85 -

or a deliberate falsehood. Because the Defendant has failed to establish all five factors required for plain error, he is not entitled to relief.

**VI. Ineffective Assistance of Counsel.** The Defendant also contends that he received ineffective assistance of counsel. He claims trial counsel failed to engage the services of an expert on the forensic biological evidence; failed to engage the services of an expert on the forensic electronic evidence; failed to obtain the TBI personnel file regarding Special Agent Cannon's resignation; and failed to request and utilize records regarding victim's mental health as well as failed to engage the services of a mental health expert. The Defendant also argues that trial counsel was ineffective in withdrawing his objection to the playing of the entire recording of victim's forensic interview. In response, the State maintains that the trial court properly concluded that trial counsel was not ineffective. We agree with the State.

The right to effective assistance of counsel is protected by both the United States Constitution and the Tennessee Constitution. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. To prevail on an ineffective assistance of counsel claim, the Defendant must establish that (1) his lawyer's performance was deficient and (2) this deficiency prejudiced the defense. Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996); Strickland v. Washington, 466 U.S. 668, 687 (1984). A defendant successfully demonstrates deficient performance when the defendant establishes that his attorney's conduct fell "below an objective standard of reasonableness under prevailing professional norms." Goad, 938 S.W.2d at 369 (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). Prejudice arising therefrom is demonstrated once the defendant establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 370 (quoting Strickland, 466 U.S. at 694). "Because a [defendant] must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Id.

In assessing an attorney's performance, we "must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." State v. Burns, 6 S.W.3d 453, 462 (Tenn. 1999) (citing Strickland, 466 U.S. at 689). In addition, we must avoid the "distorting effects of hindsight" and must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Strickland, 466 U.S. at 689-90. "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Id. at 688-89. However, "'deference to matters of strategy and tactical choices applies only if the choices are

informed ones based upon adequate preparation.'"  House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (quoting Goad, 938 S.W.2d at 369).

The Defendant notes that the State's closing argument at trial focused on three main pieces of evidence: (1) the victim's testimony; (2) Special Agent Cannon's DNA testing that allegedly established the presence of the Defendant's semen on a drawer in the victim's bedroom; and (3) evidence suggesting that the Defendant deleted the contents of iPhones belonging to him and the victim.  He claims this DNA evidence bolstered the victim's credibility by providing corroboration for her testimony and damaged the Defendant's credibility because he was unable to provide sufficient explanation for the presence of his DNA on the drawer.  The Defendant argues that in cases like this, where the State's "theory of the case hinges on expert forensic science testimony, the acquisition of an expert witness for the defense may be exactly what professional norms under Strickland v. Washington require."  See Kendrick v. State, 454 S.W.3d 450, 475 (Tenn. 2015).

**A. Forensic Biological Evidence.**  First, the Defendant asserts that trial counsel was ineffective in failing to engage the services of an expert on the forensic biological evidence, who could have presented opposing biological evidence and could have helped him prepare for cross-examination.  He argues that although trial counsel had a strategy to address the biological evidence in this case, this strategy is not entitled to deference because it was based on inadequate preparation.

The trial court, in denying the motion for new trial, concluded that trial counsel "was not deficient in failing to obtain a DNA expert" because trial counsel "developed a reasonable trial strategy to address the DNA evidence and used it to his advantage."  The court noted "[r]ather than attacking [Special] Agent Cannon's findings, [trial counsel] used them to cast doubt on the victim's claims," and it concluded that "[a]n independent expert would not have assisted [trial counsel] in this strategy."  The trial court also concluded that the Defendant had failed to establish that he was prejudiced by any alleged deficiency:

> [Trial counsel] effectively used the testimony of [Special] Agent Cannon to support his theory of the case that the victim was lying.  Had the [D]efendant sexually abused the victim as she claimed, the absence of his semen in the majority of places that [Special] Agent Cannon tested discredited the victim.  To then impeach [Special] Agent Cannon's reliability would also impeach [trial counsel's] own argument.  There has been no proof presented that [Special] Agent Cannon was dishonest in her work on this case or any other case.  The reviewing agent came to the same conclusions as [Special] Agent Cannon.  The DNA evidence in this case was not a proverbial "smoking gun."

In support of his claim that trial counsel's performance was deficient, the Defendant asserts that trial counsel relied on his own outdated and incomplete knowledge about forensic DNA testing to cross-examine Special Agent Cannon at trial and that Cross's testimony at the motion for new trial hearing highlighted how an expert could have attacked Special Agent Cannon's findings regarding the forensic biological evidence in this case. He also claims that no proof supports trial counsel's claim that his failure to seek expert assistance was based on the Defendant's refusal to pay for an expert. The Defendant asserts that trial counsel's strategy for confronting the forensic biological evidence was not reasonable because it was based on his erroneous belief that a vasectomy eliminates sperm count, rather than merely reducing sperm count. He also claims that trial counsel's strategy for handling Special Agent Cannon's conclusion that there was sperm on the drawer was unreasonable because he failed to consult with any expert witnesses. Finally, the Defendant argues that even if trial counsel had not been mistaken in his belief that the Defendant's vasectomy prevented his production of sperm, his failure to develop a sound strategy to present that theory to the jury was ineffective.

The Defendant also asserts that he was prejudiced by trial counsel's deficient performance. He claims that trial counsel's deficient investigation into the forensic biological evidence as well as his failure to consult with an expert to educate himself on the evidence prepared by Special Agent Cannon and to obtain countervailing evidence meant that the jury never heard that Special Agent Cannon left the TBI under a cloud of suspicion based on her falsification of time sheets, that the test that Special Agent Cannon claimed confirmed the presence of semen was only a presumptive test, that Special Agent Cannon consumed the entire sample that allegedly contained spermatozoa without creating visual documentation of her results, and that the raw data for her testing indicated the presence of non-human DNA. The Defendant asserts that Cross's testimony at the motion for new trial hearing establishes serious doubt about Special Agent Cannon's evidence, even without considering the proof showing that Special Agent Cannon left the TBI under suspicious circumstances. As a result, the Defendant argues that if the jury had been aware of the above proof when it considered Special Agent Cannon's testimony regarding DNA evidence, the result of his trial likely would have been different.

We conclude the Defendant has not shown that trial counsel's failure to hire a forensic biological expert was deficient. The record shows that trial counsel filed a motion to suppress the bedroom drawer tested in this case on the basis that the drawer was not mentioned in the search warrant application. Trial counsel also filed a motion in limine to suppress the test results from the drawer on the ground that the testing eliminated the victim as a contributor of the sample. We agree with the trial court's findings that trial counsel employed a reasonable trial strategy of using Special Agent Cannon's findings to cast doubt

- 88 -

on the victim's claims and that a forensic biological expert would not have helped trial counsel pursue this strategy. Although trial counsel erroneously believed that the Defendant's vasectomy meant that he could not produce sperm, trial counsel vigorously argued that the Defendant's DNA in the non-sperm fraction of the sample did not conclusively establish that the sperm belonged to the Defendant.

We also conclude that the Defendant has not shown that any deficiency on trial counsel's part regarding a forensic biological expert resulted in prejudice. Cross acknowledged that Special Agent Cannon saw sperm when she examined the sample taken from the drawer. As we previously noted, while this small sample was consumed by Special Agent Cannon in testing, Cross failed to present any evidence contradicting Special Agent Cannon's documented findings, which included Special Agent Cannon's use of multiple presumptive tests with different limitations to confirm the presence of semen in the samples taken from Area 1 and Area 2 of the drawer. In addition, Cross acknowledged that the visual observation of sperm is considered an "confirmatory test" and that the "very small amount of sperm" seen by Special Agent Cannon was consistent with sperm from a vasectomized male. Moreover, Special Agent Asbury asserted that while the double immunodiffusion test performed by Cross was negative for semen in Area 1 of the drawer, the immunodiffusion test does not detect lower levels of semen and is no longer used by the TBI because it is "subpar with sensitivity."

We also reiterate that Cross's alternative theory, that the sperm on the drawer may have come from the family dog, is unpersuasive. Special Agent Asbury asserted that TBI analysts are trained to distinguish human and non-human sperm. In addition, while Cross stated that the "off-ladder peak" in the DNA printouts tended to occur when there was non-human DNA, Special Agent Asbury opined that dog semen would have contained several off-ladder peaks and that the drawer sample contained a full human DNA profile. She also asserted that the presence of non-human DNA in a sample would not mean that that the semen in that area was from a non-human source. As for Cross's claim that the P30 lateral flow test could test positive for dog semen, Special Agent Asbury asserted that the only non-human bodily fluid that had tested positive with the P30 lateral flow test was "a Rhesus monkey." Cross admitted that although she could have tested the drawer for canine or dog semen, she did not. Because the Defendant has not shown that trial counsel's failure to hire a forensic biological expert was deficient or prejudicial, he is not entitled to relief.

**B. <u>Forensic Electronic Evidence.</u>** The Defendant next asserts that trial counsel was ineffective in his handling of the forensic electronic evidence in this case. He claims trial counsel was deficient in not engaging the services of an expert to evaluate the State's expert's opinion about the forensic electronic evidence and to introduce contrary forensic electronic evidence, which prevented the jury from hearing that the Defendant was not the

administrator of the iCloud account and that the phones were actually reset <u>after</u> all the Defendant's electronic devices connected to the shared iCloud account were seized by the KCSO but <u>before</u> the victim's phone was collected by Detective Merritt. The Defendant also asserts that trial counsel's failure to hire a forensic electronic expert led to the trial court granting the State the adverse inference instruction based on the Defendant's alleged destruction of the evidence on these iPhones. He claims that because trial counsel's strategy for addressing the electronic evidence was based on insufficient investigation and his own ignorance of the technology, it is not entitled to deference. The Defendant also contends that trial counsel's deficiencies regarding the forensic electronic evidence prejudiced him. He claims that because trial counsel failed to conduct an adequate investigation and failed to obtain a forensic electronic expert, the evidence suggesting that the Defendant was the only person who could have reset these iPhones was virtually unchallenged at trial. He also asserts that if trial counsel had hired an expert like Spore, the defense would have been able to mount a successful challenge to the evidence presented by the State and could have avoided the trial court providing the adverse inference instruction to the jury.

The trial court, in its order denying the motion for new trial, found that trial counsel's "investigation into the electronic evidence was constitutionally sufficient and his decision not to retain an electronic evidence expert was a reasonable strategic decision." The court noted that trial counsel "obtained the evidence regarding the phones through discovery," was "aware that the phones had been reset," "knew that the State's expert would not testify that the [D]efendant was the only one who could have reset the phones," and "discussed the electronic evidence with another attorney who was much more familiar with the technology involved." The court also recognized that trial counsel "had a strategy to deal with the evidence during the trial," which included trial counsel "get[ting] the State's expert to concede that he did not know who reset the phones or when they were reset" and emphasizing "the inconsistent statements of the victim, the testimony of the victim's sister, and the testimony of [Dr.] Barker." The court held that "[w]ithout direct evidence showing that the [D]efendant was the only one who could have reset the phones," trial counsel's "decision to focus on other areas of weakness in the State's case was reasonable." Ultimately, the trial court held that the Defendant "failed to show that trial counsel was deficient in his performance in this area" and "failed to establish that he was prejudiced by the alleged deficiency," reasoning that

> Mr. Spore's testimony would not likely have made a difference had it been presented during the trial. At most, he could say that neither person had their phones when they were reset. This would leave the jury with the same information it already had, namely that the defendant or anyone with the iCloud account username and password could have reset the phones,

including the victim, the defendant, and the sister. The victim was not at her home and was less likely to have access to an electronic device connected to the internet than the [D]efendant would have been.

We conclude the Defendant has failed to show that trial counsel's strategy regarding the electronic evidence was deficient. Although trial counsel was not an expert on this technology, he discussed it with attorney Julie Kuykendall, who was "very knowledgeable" and helped him prepare for Lieutenant Smithhart's cross-examination at trial. At trial, trial counsel was able to get Lieutenant Smithhart to admit that he did not know who factory reset the Defendant's and the victim's cell phones or when these phones were factory reset.

We also conclude that the Defendant failed to establish that any alleged deficiencies on the part of trial counsel resulted in prejudice. No witness testified at trial that the Defendant was the "administrator" of the iCloud account or that the Defendant was the only individual who could have erased the cell phones. Spore's testimony at the motion for new trial showed that anyone with the username and password for the iCloud account could factory reset the phones from their personal device or from a web browser on a totally different device. We conclude that because the new cell phone evidence does not establish the identity of the person who factory reset these phones, there is no reasonable probability that the result of the trial would have been different, and trial counsel's failure to present this evidence at the Defendant's trial does not undermine confidence in the verdict.

**C.  TBI File on Special Agent Cannon.** Third, the Defendant asserts that trial counsel was ineffective in failing to obtain the TBI investigative file regarding Special Agent Cannon's resignation, which allowed her testimony to go to the jury unchallenged. He claims trial counsel made no effort to consult with Special Agent Cannon, other than a phone call to the TBI and an attempt to drop by her new place of employment. He also asserts that trial counsel made no attempt to inquire about Special Agent Cannon's departure from the TBI.

Trial counsel's defense strategy at trial was to emphasize the inconsistencies in victim's allegations and the lack of forensic evidence in the accompanying areas of the home tested by Special Agent Cannon. This strategy also included trial counsel highlighting the inconclusive nature of Special Agent Cannon's DNA results.

The trial court, in its order denying the motion for new trial, observed that defense expert Cross testified that she was "concerned about the investigation into conduct by [Special] Agent Cannon concerning dishonesty in completing her time sheets, although [Cross] conceded that nothing in the TBI investigation file on [Special] Agent Cannon

showed any discrepancies around the time [Special Agent Cannon] performed the testing in this case." The trial court found that trial counsel pursued a reasonable defense strategy:

> [Trial counsel] believed that the DNA evidence reported by the TBI contradicted the victim's testimony about the abuse. . . . The victim testified about sexual acts at multiple locations in the home and described some specific areas[,] such as on the purple rug. Yet, none of the locations tested revealed semen or the [D]efendant's DNA other than one spot on the side of a wooden drawer. In other words, [trial counsel]'s strategy was to show that the DNA evidence was inconsistent with the victim's allegations. The court believes that this was a reasonable strategy based upon the evidence discovered during the pretrial investigation.

The trial court acknowledged that trial counsel's failure to investigate the circumstances surrounding Special Agent Cannon's change in employment prior to trial was a "closer call" than some of the other issues raised about the forensic biological evidence. The court recognized that the fact that Special Agent Cannon had been investigated by the TBI "for an act of professional dishonesty . . . could have been used by the defense to call into question the credibility of [Special] Agent Cannon as a witness" and would not have required trial counsel to obtain an expert to discover this information. After acknowledging that "the decision on how to deal with the State's witnesses is a strategic decision," the trial court held that trial counsel's "choice to use the [Special Agent Cannon]'s testimony to support his case rather than attack her credibility was reasonable in light of all the facts in the case." Accordingly, the trial court found that the Defendant had failed to establish trial counsel's deficiency on this issue by clear and convincing evidence, even though was a "close issue."

The trial court also held that the Defendant had failed to establish that he was prejudiced by this alleged deficiency because trial counsel "effectively use[d] the testimony of [Special] Agent Cannon to support his theory of the case that the victim was lying [about the sexual abuse]." The trial court explained:

> Had the [D]efendant sexually abused the victim as she claimed, the absence of his semen in the majority of places that [Special] Agent Cannon tested discredited the victim. To then impeach [Special] Agent Cannon's reliability would also impeach his own argument. There has been no proof presented that [Special] Agent Cannon was dishonest in her work on this case or any other case. The reviewing agent came to the same conclusions as [Special] Agent Cannon. The DNA evidence in this case was not a proverbial "smoking gun."

Accordingly, the trial court held that the "outcome of the trial would likely have been the same absent trial counsel's deficiency."

Though a close issue, the Defendant failed to show that counsel was deficient in failing to obtain the TBI investigative file regarding Special Agent Cannon's resignation. Trial counsel's defense strategy was to discredit victim by showing that the DNA evidence was inconsistent with victim's allegations, which was a reasonable strategy given that the majority of Special Agent Cannon's test results were at odds with victim's allegations. Trial counsel also emphasized the inconclusive nature of Special Agent Cannon's results, given that the Defendant's DNA was only found in the non-sperm fraction of the sample she tested. Trial counsel's decision to use Special Agent Cannon's favorable testimony and test results to support his case rather than to attack Special Agent Cannon's credibility was a reasonable strategic decision in light of the facts in this case. See Alley v. State, 958 S.W.2d 138, 149 (Tenn. Crim. App. 1997) ("Trial counsel may not be deemed ineffective merely because a different procedure or strategy might have produced a different result."); Williams v. State, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980) (reiterating that not every mistake or legal misconception deprives a defendant of his constitutional right to effective representation); see also Owens v. State, No. M2011-02188-CCA-R3-PC, 2013 WL 1384936, at *18 (Tenn. Crim. App. Apr. 4, 2013) (concluding that counsel made an "informed tactical decision" to not question an expert about the pending medical board proceeding to revoke his medical license because counsel "elicited favorable testimony about whether the victim suffocated and whether the victim was conscious at the time the duct tape was applied"). Accordingly, we conclude the Defendant has not shown that trial counsel's failure to investigate Special Agent Cannon's change in employment was deficient.

The Defendant also failed to show that trial counsel's alleged deficiency prejudiced him. Cross admitted that nothing in the TBI's investigative file on Special Agent Cannon showed any discrepancies around the time she performed the testing in this case, and the Defendant was unable to provide proof that she was dishonest in her work on his case or any other case. Moreover, Special Agent Asbury refuted Cross's theories on the evidence and ultimately came to the same conclusions about the biological evidence as Special Agent Cannon. Because the Defendant has failed to show that trial counsel's failure to investigate Special Agent Cannon's change in employment was deficient or prejudicial, he is not entitled to relief on this issue.

**D. Records Regarding the Victim's Mental Health.** Fourth, the Defendant argues that trial counsel was ineffective in failing to request records regarding the victim's mental health, in failing to ensure that the trial court conducted an adequate Pennsylvania v.

Ritchie review, in failing to develop an adequate strategy to argue that the victim's mental health issues affected her credibility and impaired her capacity, in failing to secure the services of a mental health expert to assist him in utilizing the information, and in failing to seek an independent evaluation of the victim He also contends that but for trial counsel's deficient performance in the handling of these issues, the result of the proceeding would have been different. He claims that trial counsel's delay in obtaining records regarding the victim's mental health, either through the civil discovery process or a Ritchie review, meant that these records could not be used at trial to attack the victim's credibility or argue she had impaired capacity, which prejudiced him. He also argues that when the trial court finally asked DCS to forward records regarding the victim's allegation that an older sibling sexually abused her, DCS had destroyed these records.

The trial court, in denying the motion for new trial on this issue, held that trial counsel was not deficient in failing to consult with a mental health expert regarding the victim. It noted that trial counsel relied on the information he obtained pre-trial from Dr. Barker, who "testified effectively for the defense during the trial" and who "knew [the victim] better than any hearsay statements contained in records other people made about [the victim]." The trial court found that Dr. Barker was "much more effective at trial than Dr. Brodie or Dr. Alexander were at the motion for new trial hearing" and stated that it was "highly unlikely that the court would have allowed testimony by either Dr. Brodie or Dr. Alexander to be admitted during the trial pursuant to Tenn. R. Evid. 617 without either expert actually conducting an examination of the victim." The trial court also recognized that because the defense theory at trial was that victim was lying about the sexual abuse because she was mad at the Defendant's parenting decisions, "not that she suffered from any impaired capacity at the time of the events or during her testimony[, a]n expert witness such as Dr. Brodie or Dr. Alexander would not have aided the defense" and "would have made [victim] an even more sympathetic witness."

Regarding the Defendant's claim that trial counsel was ineffective in failing to obtain certain records of the victim during the pretrial investigation, the court observed:

> Current defense counsel engaged in extensive efforts to obtain any and all records ever created relating to the victim in this matter, going as far as seeking her dental records. Despite the effort and expense, the [D]efendant has failed to show that trial counsel was ineffective in his pretrial investigation regarding confidential records of the victim.

The trial court found that trial counsel testified that he was able to obtain some records through a Pennsylvania v. Ritchie court review by the trial court of the DCS records regarding the victim and was able to obtain some records through the civil lawsuit. The

court noted that trial counsel said he obtained most of his information regarding the victim from M.R. and the Defendant, who "had extensive knowledge of the victim and her sad life history." It also recognized that the Defendant had access to a huge amount of information about the victim due to "the unique nature of the [D]efendant's work at Smoky Mountain Children's Home." Ultimately, the court concluded that the Defendant failed to establish that trial counsel's performance regarding the victim's mental health records was deficient or that any alleged deficiency was prejudicial:

> The court finds that trial counsel conducted a reasonably sufficient investigation into the victim's past. The defendant has failed to present to the court during the motion for new trial hearings any records concerning the victim that added significant impeachment information about the victim that trial counsel did not already know. The [D]efendant has failed to establish that trial counsel was deficient or that he suffered prejudice in this area.

We agree with the trial court that trial counsel was not deficient in relying on the information from the Defendant, M.R., and Dr. Barker about the victim's mental health, rather than seeking additional records concerning the victim's mental health. We also agree that Dr. Barker, who treated the victim for an extended period of time, was more effective than Dr. Brodie or Dr. Alexander. Accordingly, we conclude the Defendant has not shown that trial counsel was deficient in failing to request these records regarding the victim's mental health, in failing to ensure that the trial court conducted an adequate Pennsylvania v. Ritchie review, in failing to develop an adequate strategy to argue that the victim's mental health issues affected her credibility and impaired her capacity, in failing to secure the services of a mental health expert to assist him in utilizing the information, and in failing to seek an independent evaluation of the victim

We also conclude that the Defendant has failed to show that trial counsel's failure to obtain additional mental health records or additional mental health experts was prejudicial. The trial court specifically discredited Dr. Alexander's testimony and concluded that it was unlikely that it would have admitted testimony by Dr. Brodie or Dr. Alexander at trial pursuant to Tennessee Rule of Evidence 617 because neither of these experts had examined the victim. Because the Defendant has never identified a class of records that likely would have made a difference in his case, he is unable to establish that he was prejudiced by trial counsel's failure to obtain these records. The Defendant has also failed to show that the victim's prior allegation that her older sibling sexually abused her was false. See Wyrick, 62 S.W.3d at 780 ("Prior false reports of crime are relevant to a witness's credibility."). Accordingly, the Defendant is not entitled to relief on this issue.

**E. Forensic Interview.** Fifth, the Defendant argues that trial counsel was ineffective in withdrawing his objection to the State's playing of the entire recording of the victim's forensic interview. He claims that the record contains no proof supporting the trial court's conclusion that trial counsel made a "strategic decision" to allow the forensic interview to be played. The Defendant also asserts that trial counsel's deficient performance regarding the victim's forensic interview prejudiced him because the forensic interview bolstered the victim's credibility by providing critical details regarding the victim's claims against the Defendant when her trial testimony about these allegations had been vague. He claims that if trial counsel had not abandoned his objection regarding the victim's forensic interview, the trial court likely would not have played the entire video of the interview because the law does not support the playing of forensic videos under the circumstances that existed in this case. Lastly, the Defendant claims that if trial counsel had not abandoned his objection, the issue would have been properly preserved for plenary review on appeal.

The trial court, in denying the motion for new trial on this issue, found that it "clearly instructed the jury that the out-of-court statement [in the forensic interview] could not be considered as substantive evidence" and was "only offered to judge the credibility of the victim's testimony at trial." The court also asserted that "[t]rial counsel used inconsistencies in the statements of the victim effectively during closing argument." Accordingly, the trial court held that the Defendant had "failed to demonstrate that trial counsel was either deficient or that he was prejudiced" by trial counsel's performance regarding the forensic interview.

At trial, trial counsel twice stated, "I don't care" when the State sought to play the forensic interview. At trial, trial counsel pursued a reasonable defense strategy of highlighting the victim's inconsistent statements, including the ones she made during her forensic interview, in an attempt to discredit her. The record shows that the forensic video was not admitted as substantive proof and that the trial court provided a limiting instruction to the jury. See Herron, 461 S.W.3d at 905 ("[U]pon request, a trial court should instruct the jury as to the limited purpose for which a prior consistent statement has been admitted."). We agree with the trial court that the State was entitled to play the entire recording of the victim's forensic interview, which rebutted the defense's claim that the victim's testimony was a "recent fabrication" or "a deliberate falsehood." Therefore, the Defendant has failed to show that trial counsel's handling of the forensic interview was deficient or prejudicial.

**VII. Election in Count 4.** The Defendant argues that the State's erroneous election in Count 4 failed to protect his right to a unanimous jury verdict in that count. Although he concedes he waived plenary review of this issue by failing to make a contemporaneous

objection, he asserts that this erroneous election rises to the level of plain error. The State counters that the election does not constitute plain error, claiming that consideration of the issue is not necessary to do substantial justice because the State was permitted to rely on "generic evidence" to support the charge of rape and because the absence of a modified unanimity instruction was harmless. We conclude that the Defendant is not entitled to plain error relief on this issue.

The right to a jury trial, which is protected by both the Tennessee and United States Constitutions, also requires that a jury's verdict be unanimous. Tenn. Const. art. I, § 6; U.S. Const. amend. VI, XIV; see State v. Kendrick, 38 S.W.3d 566, 568 (Tenn. 2001); Ramos v. Louisiana, 590 U.S. 83, 92 (2020). In other words, all twelve jurors must unanimously agree that the defendant committed the particular criminal act charged before returning a verdict of conviction. Kendrick, 38 S.W.3d at 568. A defendant's right to a unanimous verdict has been described as "fundamental, immediately touching the constitutional rights of an accused . . . ." Burlison v. State, 501 S.W.2d 801, 804 (Tenn. 1973).

The election of offenses doctrine developed to protect this fundamental right to a unanimous verdict. State v. Qualls, 482 S.W.3d 1, 9 (Tenn. 2016). "The election doctrine refers to the prosecutor's duty in a case where evidence of multiple separate incidents is introduced to elect for each count charged the specific incident on which the jury should deliberate to determine the defendant's guilt." Id. at 9-10 (citing State v. Rickman, 876 S.W.2d 824, 828 (Tenn. 1994)); see State v. Walton, 958 S.W.2d 724, 727-28 (Tenn. 1997) (granting plain error relief where the State "did not seek to narrow the multiple incidents by asking the victim to relate any of the incidents to a specific month, memorable occasion, or special event" and "did not elect which of the numerous types of sexual acts it relied upon to establish the convictions[,]" which allowed each juror "to choose independently the act(s) of abuse upon which to base a verdict," resulting in the "grab bag" result the court condemned in Tidwell v. State, 922 S.W.2d 497, 501 (Tenn. 1996)). As this court recognized,

> Not only must the [S]tate's election identify and distinguish offenses sufficiently to allow the trier of fact to render discrete and unanimous verdicts on each, the [S]tate must . . . support this election with evidence sufficient for a reasonable trier of fact to find that the offenses occurred as elected beyond a reasonable doubt.

State v. Hines, No. 01C01-9709-CC-00405, 1999 WL 33107, at *4 (Tenn. Crim. App. Jan. 27, 1999); see State v. Breeden, No. E2019-00983-CCA-R3-CD, 2020 WL 5638589, at *8 (Tenn. Crim. App. Sept. 21, 2020).

The need for an election is not confined to situations in which the Defendant is charged with a single crime and the proof at trial shows that multiple crimes of that type were committed; an election is also required when there is proof of more than one crime and the defendant is charged with multiple counts of the same crime. See, e.g., Walton, 958 S.W.2d at 727-28; Breeden, 2020 WL 5638589, at *14; State v. Harris, No. M2018-01680-CCA-R3-CD, 2019 WL 5704185, at *10 (Tenn. Crim. App. Nov. 5, 2019).

The election requirement supplements the general unanimity instruction and helps "ensure that the jury understands its obligation to agree unanimously that the defendant committed the same criminal act before it may convict the defendant of a criminal offense." Qualls, 482 S.W.3d at 10 (citing State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999)). If the State were allowed to present evidence of several criminal acts that all allegedly occurred within the time period covered by the indictment but not required to make an election of offenses, "juror unanimity would be compromised because nothing would prevent jurors from 'reach[ing] into the brimming bag of offenses and pull[ing] out one for each count.'" Id. (quoting Tidwell, 922 S.W.2d at 501); see State v. Shelton, 851 S.W.2d 134, 137 (Tenn. 1993) ("A defendant's right to a unanimous jury before conviction requires the trial court to take precautions to ensure that the jury deliberates over the particular charged offense, instead of creating a 'patchwork verdict' based on different offenses in evidence.") (quoting State v. Brown, 823 S.W.2d 576, 583 (Tenn. Crim. App. 1991)). The election doctrine "assists the defendant in preparing for and defending against the specific charge, protects the defendant from double-jeopardy concerns, 'enables the trial judge to review the weight of evidence in its role as thirteenth juror[, and] enables an appellate court to review the legal sufficiency of the evidence.'" Qualls, 482 S.W.3d at 10 (quoting State v. Brown, 992 S.W.2d 389, 391 (Tenn. 1999)). However, the most significant purpose served by the election doctrine is to "ensure that the jurors deliberate over and render a verdict based on the same offense[.]" Brown, 992 S.W.2d at 391; see Shelton, 851 S.W.2d at 138 ("[T]he purpose of election is to ensure that each juror is considering the same occurrence.").

The Tennessee Supreme Court has recognized that "'[t]here is no right to a perfect election, and indeed, . . . the election requirement may be satisfied in a variety of ways.'" Qualls, 482 S.W.3d at 10 (quoting Knowles, 470 S.W.3d at 424). In fact, "'[a]ny description that will identify the prosecuted offense for the jury is sufficient.'" Knowles, 470 S.W.3d at 424 (quoting Shelton, 851 S.W.2d at 138). The State may elect offenses by narrowing the multiple incidents by asking the victim to relate any of the incidents to a specific month, by identifying a particular type of abuse, or by specifying the unique surroundings or circumstances that help identify an incident. Qualls, 482 S.W.3d at 10-11;

Shelton, 851 S.W.2d at 138 ("If, for example, the evidence indicates various types of abuse, the prosecution may identify a particular type of abuse and elect that offense.").

The presentment in this case charged the Defendant with two counts of rape. Before closing arguments, the State made the following election: "Count 4, wherein 14-year-old [victim] was in her own bedroom when the [D]efendant came into her room and placed his hand beneath her underwear and did penetrate her vagina with his fingers[.]". The State also made the following election regarding the other rape count:

> As to Count 3, wherein 14-year-old [victim] was in the bed of the [D]efendant and awoke to the [D]efendant's hand beneath her underwear, and the [D]efendant did penetrate her vagina with his finger. You remember that testimony that came out clearly during the course of [victim]'s testimony here on the stand. She talked about that, talked about how it made her feel. You remember she said she closed her eyes, and she hoped that it would end. That's all she could think of.

At trial, the victim testified that the Defendant digitally penetrated her vagina while they were "[i]n his bed." When the prosecutor asked her to describe the circumstances of that incident, the victim said:

> It was the middle of the night. Normally I would wake up and I would feel him doing that, or I would be falling asleep, and he would do it as I was falling asleep. He normally tried to keep it pretty quiet so that no one would find out.

When asked how many times the Defendant did this to her, the victim said that she was "not sure." The prosecutor asked her if the Defendant did this to her anywhere other than his bed, and the victim replied, "In my bedroom." When asked to describe a time that this happened in her bedroom, the victim stated, "I don't remember a specific time in my bedroom where he did that, but I remember it in his room." Then the following exchange occurred:

Prosecutor:  And when he would have done that in your bedroom, was that at night or during the day?

Victim:  Both.

Prosecutor:  Okay. Tell us about a time that it happened during the day that you remember.

- 99 -

Victim:      It all runs together.

Prosecutor:   Would that have happened before you turned 15?

Victim:      Yes.

The Defendant asserts that the erroneous election in Count 4 amounts to plain error. However, he also argues, under plenary review, that this court should reverse the Defendant's rape conviction because the erroneous election was not harmless beyond a reasonable doubt. We reiterate that "[i]f a defendant has not otherwise properly preserved an issue for review, he bears the burden of persuading an appellate court that plain error entitles him to relief." Knowles, 470 S.W.3d at 425 (citing State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007)). Because the Defendant waived plenary review of this issue by failing to make a contemporaneous objection to the election in Count 4, the Defendant bears the burden of establishing plain error.

The Defendant argues that the victim only testified to the Defendant digitally penetrating her in his bed and that the victim could not remember the Defendant digitally penetrating her in her bedroom. He claims that even though the victim did not testify to any other incident of digital penetration, "the State expressly elected for Count 4 an incident of digital penetration that occurred in victim's room." The Defendant insists that because no proof supported the facts elected by the State for Count 4, the record does not clearly evince a set of facts upon which the jury could have based a unanimous verdict on that count. See Knowles, 470 S.W.3d at 424 ("Because the election requirement safeguards a criminal defendant's fundamental, constitutional right to a unanimous jury verdict, errors pertaining to the sufficiency of the prosecution's election are subject to plain error review.").

On the other hand, the State characterizes the victim's above testimony as "generic evidence" because it describes a "pattern of abuse," rather than a "specific incident." See Qualls, 482 S.W.3d at 12. The State asserts that this type of generic evidence is perfectly acceptable but acknowledges that the trial court should have given a modified unanimity instruction to ensure that the jury unanimously decided that the Defendant committed all the acts of digital penetration that occurred in victim's bedroom before she turned fifteen years old. See id. at 17. The State argues that the Defendant cannot show that the lack of a modified unanimity instruction "was of sufficient magnitude that it probably changed the outcome of the trial." State v. Hester, 324 S.W.3d 1, 56 (Tenn. 2010). It notes that the jury convicted the Defendant on every count charged in the presentment, which "expressed its unanimous conclusion that the victim[] w[as] credible and that the defendant committed

- 100 -

all the acts described by the victim[]." Qualls, 482 S.W.3d at 19; see State v. Ledbetter, No. M2018-00846-CCA-R3-CD, 2020 WL 853733, at *16 (Tenn. Crim. App. Feb. 20, 2020) (concluding that the absence of a modified unanimity instruction was harmless beyond a reasonable doubt because the jury's verdict "indicated it credited the victim's testimony and rejected the Defendant's testimony"). Consequently, the State asserts that consideration of the alleged election error is not necessary to do substantial justice. It claims that it was entitled to rely on generic evidence to support the rape charge and that the Defendant failed to carry his burden of showing that the absence of a modified unanimity instruction likely changed the outcome of trial.

Contrary to the State's argument, we conclude that the election in Count 4 was sufficient to properly identify the offense charged in that count for the purpose of juror unanimity. See Qualls, 482 S.W.3d at 10. The presentment charged two counts of rape by digital penetration that occurred at different times and in different locations. The State's election during closing arguments made clear that one incident of rape took place in the Defendant's bedroom and another incident of rape occurred in victim's bedroom, which was adequately supported by victim's testimony at trial. We reiterate that the State may elect offenses by specifying the unique surroundings or circumstances that help identify an incident. Id. at 10-11. We also note that the trial court instructed the jury on the need for juror unanimity in the jury instructions, and the jury is presumed to follow the court's instructions. See State v. Banks, 271 S.W.3d 90, 137 (Tenn. 2008). Because the Defendant has failed to show that a clear and unequivocal rule of law was breached, that a substantial right belonging to him was adversely affected, or that consideration of the error is necessary to do substantial justice, the Defendant is not entitled to plain error relief.

**VIII. Sufficiency of Evidence.** The Defendant asserts that the evidence presented at trial was insufficient to sustain his conviction for sexual battery by an authority figure in Count 1 and his conviction for rape in Count 4. The State counters that when the evidence is viewed in the light most favorable to the State, the jury reasonably concluded that the State proved each element of these offenses beyond a reasonable doubt. We agree with the State.

The trial court, in its order denying the motion for new trial, reiterated that during the motion for judgment of acquittal at trial, it found insufficient evidence to support Count 10 of the presentment, which was dismissed. However, the trial court held at that time that there was "sufficient evidence to support all other counts and submitted them to the jury." The court then "reaffirm[ed], without further comment, its findings at trial that the evidence supports each judgment as entered by the court."

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury. Dorantes, 331 S.W.3d at 379. When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

**A. Sexual Battery by an Authority Figure in Count 1.** The Defendant contends that the victim's testimony, even assuming it was true and credible, was too vague to permit a jury to conclude beyond a reasonable doubt that the Defendant committed the acts alleged in Count 1. See State v. James, No. 01C01-9601-CR-00016, 1997 WL 141323, at *5 (Tenn. Crim. App. Mar. 27, 1997) (concluding that the evidence was insufficient to support the defendant's conviction for aggravated rape because "the trial testimony was vague as to whether there was an actual penile penetration relating to this incident").

The presentment stated that the Defendant "[o]n or about the 25th day of December . . . did unlawfully and knowingly have sexual contact with [victim], to wit: by placing

[his] hand . . . on the breast of [victim], who was, at the time of the offense, thirteen (13) years of age or older but less than eighteen (18) years of age, and [the Defendant] had, at the time of the offense, parental authority over [victim] and used such authority to accomplish the sexual contact, in violation of T.C.A. 39-13-527 . . . ."

As charged in this case, sexual battery by an authority figure is "unlawful sexual contact with a victim by the defendant" when the victim at the time of the offense was "thirteen (13) years of age or older but less then eighteen (18) years of age" and "[t]he defendant had, at the time of the offense, parental . . . authority over the victim and used the authority to accomplish the sexual contact[.]"  Tenn. Code Ann. § 39-13-527(a). "Sexual contact" is defined as "the intentional touching of the victim's . . . intimate parts[,]" including the "breast of a human being."  Id. §§ 39-13-501(2), (6).

The victim testified that on Christmas Eve when she was fourteen years old, the Defendant "put his hand down [her] pants," which was the "first time" she remembered the Defendant sexually abusing her.  On that night, M.R. was on the left side of the bed, the Defendant was in the center, and the victim was on the right side of the bed.  The victim said they all went to sleep, but the victim awoke when she felt the Defendant's hand "around [her] pants," and she "was scared because [she] didn't really know what was happening at such a young age."  She said that during this incident, the Defendant touched her "on her vagina" and "on top of her underwear," as relevant to Count 2, and then "move[d] his hand up to [her] belly area and onto [her] chest area."  The victim said the Defendant stopped touching her when she "would move away" and "would roll over or try to pretend that it wasn't happening."

Initially, we note that the Defendant risked waiving this issue by failing to cite the appropriate statute for the charged offense and by failing to identify the element he claims the State failed to prove beyond a reasonable doubt.  See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."); Tenn. R. App. P. 27(a)(7) (A brief shall contain "[a]n argument . . . setting forth . . . the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on.").  In any case, when viewing this evidence in the light most favorable to the State, a rational jury could have found that the Defendant had unlawful sexual contact with victim on or about Christmas Eve 2011 when the Defendant "move[d] his hand . . . onto [her] chest area."  The jury could have understood the reference to "chest area" to mean "breast," which is defined as an "intimate part" under Code section 39-13-501(2).  Moreover, the evidence presented at trial established that the victim was fourteen years old and that the Defendant was her adoptive father at the time of this

incident. Although the Defendant claims that the victim's testimony was vague because she went on to testify in general terms that the Defendant would "sometimes" stop and "sometimes" get mad and because she acknowledged that these incidents all ran together, we conclude that the evidence the victim presented was sufficiently specific to sustain the Defendant's conviction in Count 1 for sexual battery by an authority figure.

**B.    Rape in Count 4.**   The Defendant also contends that the evidence was insufficient to sustain his conviction of rape in Count 4 because the evidence presented at trial did not align with the State's election for this count. The Defendant claims the State's election in Count 4 was based on the Defendant digitally penetrating the victim's vagina while they were in her bedroom when the victim was fourteen years old. However, he claims that because no proof established that the digital penetration occurred in the victim's bedroom, the proof is insufficient to sustain his conviction in Count 4. In response, the State contends that the "real issue" is "whether the jury was properly instructed, given the State's election[.]"

During closing arguments, the State made the following election: "Count 4, wherein 14-year-old [victim] was in her own bedroom when the [D]efendant came into her room and placed his hand beneath her underwear and did penetrate her vagina with his fingers[.].

As charged in this case, "[r]ape is unlawful sexual penetration of a victim by the defendant" where "[f]orce or coercion is used to accomplish the act[.]" Tenn. Code Ann. § 39-13-503(a)(1). "Coercion" includes "the use of parental . . . authority over a child less than fifteen (15) years of age[.]" Id. § 39-13-501(1). "Sexual penetration" includes "any . . . intrusion, however slight, of any part of a person's body . . . into the genital or anal openings of the victim's . . . body[.]" Id. § 39-13-501(7).

At trial, the prosecutor asked the victim how many times the Defendant digitally penetrated her vagina, and victim said that she was "not sure." The prosecutor then asked her if the Defendant digitally penetrated her anywhere other than his bed, and victim replied, "In my bedroom." When asked to describe a time that this happened in her bedroom, victim stated, "I don't remember a specific time in my bedroom where he did that, but I remember it in his room." The relevant exchange, as cited in the section of this opinion concerning election then occurred.

We conclude that this proof is sufficient to sustain the Defendant's conviction for rape in Count 4. The evidence shows that the Defendant digitally penetrated the victim's vagina in the victim's bedroom and that the Defendant used his parental authority over victim to coerce her to do this at a time when victim was less than fifteen years old.

- 104 -

Accordingly, the evidence is sufficient to sustain the Defendant's conviction in Count 4.

**IX. <u>Dual Convictions in Counts 1 and 2.</u>** The Defendant claims that his dual convictions for sexual battery by an authority figure in Counts 1 and 2 violate double jeopardy principles and must be merged because the Defendant's acts alleged in these counts, which occurred "quickly and virtually simultaneously," constitute "one offense." See State v. Johnson, 53 S.W.3d 628, 633 (Tenn. 2001) ("If the entire instance of sexual contact occurs quickly and virtually simultaneously, then only one offense has occurred, even if more than one touching has occurred."). The State counters that Counts 1 and 2 do not violate double jeopardy because they do not relate to the same offense, given that they punish the Defendant for intentionally touching two different intimate parts. We agree with the State.

Both the United States and Tennessee Constitutions protect an accused from being "twice put in jeopardy of life or limb" for "the same offense." U.S. Const. amend. V; Tenn. Const. art. I, § 10. The double jeopardy clause protects against a second prosecution for the same offense after an acquittal, protects against a second prosecution for the same offense after conviction, and protects against multiple punishments for the same offense. State v. Watkins, 362 S.W.3d 530, 541 (Tenn. 2012). The Defendant claims his issue relates to the third category, protection against multiple punishments for the same criminal offense. "'Whether multiple convictions violate double jeopardy is a mixed question of law and fact, which we review de novo without any presumption of correctness.'" State v. Itzol-Deleon, 537 S.W.3d 434, 441 (Tenn. 2017) (quoting Watkins, 362 S.W.3d at 539).

"In single prosecutions, multiple-punishment claims fall into one of two categories: (1) 'unit-of-prosecution' claims or (2) 'multiple description' claims." State v. Smith, 436 S.W.3d 751, 766 (Tenn. 2014) (citing Watkins, 362 S.W.3d at 543). This is a unit-of-prosecution claim because the Defendant, who was "convicted of multiple violations of the <u>same</u> statute[,] asserts that the multiple convictions are for the same offense." Id. (citing Watkins, 362 S.W.3d at 543).

Unit-of-prosecution cases demand a determination of "'what the legislature intended to be a single unit of conduct for purposes of a single conviction and punishment.'" Watkins, 362 S.W.3d at 543 (quoting Geroge C. Thomas, A Unified Theory of Multiple Punishment, 47 U. PITT. L. REV. 1, 11 (1985)). "Where two violations of the same statute rather than two violations of different statutes are charged, courts determine whether a single offense is involved not by applying the Blockburger test, but rather by asking what act the legislature intended as the 'unit of prosecution' under the statute."

United States v. Weathers, 186 F.3d 948, 952 (D.C. Cir. 1999); see Watkins, 362 S.W.3d at 543.

In State v. Phillips, 924 S.W.2d 662, 663-64 (Tenn. 1996), a unit-of-prosecution case, the defendant contended that because his three convictions for aggravated rape arose from a single criminal episode, his convictions violated double jeopardy. The evidence presented at trial established that the defendant penetrated the victim's vagina with a plastic object, his mouth, and his penis while in the victim's bed. Id. at 664. The Tennessee Supreme Court noted that "each of the above-described acts [wa]s separately defined in Tenn. Code Ann. § 39-13-501(7) as a discrete type of sexual penetration subsumed by Tenn. Code Ann. § 39-13-502, the aggravated rape statute." Id. at 664-65. The court also recognized that each act was "capable of producing its own attendant fear, humiliation, pain, and damage to the victim" and that "[e]ach type of penetration requires a purposeful act on the part of the perpetrator." Id. at 665. After observing that each of the defendant's sexual acts "required a different body position and engaged different body parts," the court held that "each penetration constituted a distinct, unlawful invasion of the victim's body." Id. at 665. The court then suggested that the following factors were "significant" in determining whether an act occurring during a particular episode constituted a single violation or multiple violations of a statute:

> 1. The nature of the act;
> 2. The area of the victim's body invaded by the sexually assaultive behavior;
> 3. The time elapsed between the discrete conduct; [and]
> 4. The accused's intent, in the sense that the lapse of time may indicate a newly formed intent to again seek sexual gratification or inflict abuse[.]

Id.[4] The court noted that "the presence and absence of any one factor or a combination of them other than the nature of the act is not determinative of the issue." Id. Ultimately, the court held that the defendant committed three offenses of aggravated rape as charged and that punishment could be imposed for each of these offenses without violating double jeopardy. Id. at 666.

Here, the trial court, in denying the motion for new trial, found that "the [D]efendant did intend to commit separate acts of sexual assault on the night in question." The court noted that the Defendant began by touching the victim's vagina by reaching inside her pants and when the victim moved to her stomach to try to get him to stop, the Defendant

_____
[4] Although the Phillips court listed cumulative punishment as a fifth factor, the United States Supreme Court held that two convictions for the same offense may violate double jeopardy, even if the trial court orders the resulting sentences served concurrently. Rutledge v. United States, 517 U.S. 292, 302-03 (1996). Therefore, we do not consider this factor.

- 106 -

began to touch her breast, which "required a different positioning of his hands on her body and a response to her resistance when she changed her body position." Accordingly, the trial court held that because these separate sexual batteries "did not arise out of the same transaction," there was no double jeopardy violation.

We note that the Defendant, as well as the trial court, mistakenly relied on a different, non-exclusive test reserved for multiple description cases involving a single victim. See Itzol-Deleon, 537 S.W.3d at 450-51. Because the instant case is a unit-of-prosecution case, we conclude that it is appropriate to apply the Phillips factors.

The unit-of-prosecution for the offense of sexual battery by an authority figure is each act of intentionally touching the victim's intimate parts. See Tenn. Code Ann. §§ 39-13-527(a), -501(2), (6). The General Assembly specifically distinguished "the primary genital area" from the "breast of a human being." See id. § 39-13-501(2). Accordingly, the plain language of this statute makes "[t]he area of the victim's body invaded by the sexually assaultive behavior" significant. See Phillips, 924 S.W.2d at 665. In addition, while there may not have been substantial time between the touching of the victim's vagina and her breast, the Defendant had a newly formed intent when he touched each of the two different areas on the victim's body. See id. Because the separate acts of touching the victim's vagina and breast constitute two different offenses, we conclude that the Defendant's convictions in Counts 1 and 2 do not violate double jeopardy.

**X. Sentencing.** The Defendant maintains that the trial court abused its discretion by denying all forms of alternative sentencing and by imposing a partially consecutive sentence. He claims this court should modify his sentence to a concurrent alignment, for an effective eight-year sentence, with the Defendant serving four years in incarceration for his convictions for statutory rape by an authority figure before serving the remainder of his sentence on probation for his other convictions. In response, the State contends that the trial court did not abuse its discretion by denying alternative sentencing and by ordering partially consecutive sentencing.

Pursuant to State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012), this court reviews sentencing decisions under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." The 2005 amendments to the Sentencing Act "served to increase the discretionary authority of trial courts in sentencing." Id. at 708.

Pursuant to the 2005 amendments to the Sentencing Act, a trial court must consider the following when determining a defendant's specific sentence:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; [and]

(7) Any statement the defendant wishes to make on the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b). The defendant has the burden of showing the impropriety of the sentence on appeal. Id. § 40-35-401, Sentencing Comm'n Cmts. The trial court shall impose "a sentence justly deserved in relation to the seriousness of the offense[.]" Id. § 40-35-102(1). The court must also consider the defendant's potential for rehabilitation or treatment. Id. §§ 40-35-102(3)(C), -103(5). In addition, the court must impose a sentence "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Id. §§ 40-35-103(2), (4).

At the sentencing hearing, the State admitted the presentence investigation report and a victim impact statement from victim. The defense admitted the Defendant's psychosexual report, which stated that he was at a low risk to reoffend, and letters in support of the Defendant. The defense also presented testimony from the Defendant's pastor; the fiancé of the Defendant's adopted son; the Defendant's biological daughter, J.B.; and the Defendant's adopted daughter, M.R.

The Defendant also provided an allocution, stating that he was convicted of crimes that he did not commit and that while he had the greatest respect for the trial court and the judicial system, he believed the system erred in his case. He said that as a child, he was neglected and physically abused and was eventually taken in by his girlfriend's grandmother and great aunt, who helped him find his potential, disciplined him when he needed it, and provided "compassion, understanding, and strict rules." The Defendant concluded his allocution by stating:

> Your Honor, I'm not sure why I'm here. It's really not easy for me to accept it, but I assume God has orchestrated the events of my life for his purpose. In the short time I've been incarcerated, God has used me to share

the gospel of Jesus Christ with inmates. One of which accepted him. That has been a real blessing, despite the circumstances that I'm in.

Your Honor, I respectfully ask you to consider that I'm not a threat to anyone or the community, that I worked my whole life to be the opposite of that, and I would ask you to sentence me to probation for the things that I'm probatable for and minimum sentencing for the offenses for which I'm not eligible.

I will not be a burden to this Court in the future. I will instead continue to work hard to support my family, the community, and the church in which I serve.

Defense counsel also referenced a support letter from the Defendant's ex-wife, Jessica.

At the conclusion of the sentencing hearing, the trial court imposed sentences of three years for the three convictions for sexual battery by an authority figure, eight years for the two rape convictions, four years for the three convictions for statutory rape by an authority figure, and four years for the one incest conviction. See id. §§ 40-35-112(a)(2), (3). The court ordered the statutory rape by an authority figure conviction in Count 5 served consecutively to the rape conviction in Count 3, for an effective sentence of twelve years.

Thereafter, the trial court, in its order denying the motion for new trial, held that it "made extensive findings in support of the sentencing decisions when judgment was entered" and that it "now reiterate[d] those findings." In addition, the court said it was "very cognizant of the arguments made by counsel during the sentencing hearing and gave the [D]efendant every proper consideration under the law." It then held that the Defendant presented "no new proof or argument as to how the court's decision was inconsistent with the purposes and principles of the Tennessee criminal sentencing laws."

First, the Defendant claims that the trial court abused its discretion in denying all forms of alternative sentencing. While he acknowledges that he was statutorily ineligible for probation for his convictions for statutory rape by an authority figure in Counts 5, 6, and 7, see id. § 39-13-532(c), he asserts that he was eligible for probation for the remainder of his convictions, whose sentences were each less than ten years. See State v. Langston, 708 S.W.2d 830, 832-33 (Tenn. 1986) (concluding that a "sentence" of "ten (10) years or less" as used in Code section 40-35-303(a) refers to the specific sentence for each conviction offense). The Defendant argues that the trial court denied alternative sentencing

- 109 -

solely based on the circumstances of the offenses, despite making several findings in support of alternative sentencing. Moreover, he asserts that because the circumstances of the offenses were not more egregious than those contemplated by the proscribing statutes, this factor does not support the imposition of a fully incarcerative sentence. See State v. Trent, 533 S.W.3d 282, 292-93 (Tenn. 2017) ("[B]efore a trial court can deny probation solely on the basis of the offense itself, the circumstances of the offense as particularly committed in the case under consideration must demonstrate that the defendant committed the offense in some manner more egregious than is contemplated simply by the elements of the offense."); State v. Fields, 40 S.W.3d 435, 441 (Tenn. 2001) (In order for a trial court to deny alternative sentencing to avoid depreciating the seriousness of the offense under Code section 40-35-103(B), the circumstances of the offense "as committed, must be especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree, and the nature of the offense must outweigh all factors favoring probation." (internal citation and quotation marks omitted)). Finally, the Defendant claims the trial court failed to account for the fact that the Defendant was required to serve a period of incarceration for his conviction for statutory rape by an authority figure.

The abuse of discretion standard, accompanied by a presumption of reasonableness, applies to a trial court's determination regarding the manner of service of a sentence. State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012). Any sentence that does not involve complete confinement is an alternative sentence. See generally Fields, 40 S.W.3d 435. Tennessee Code Annotated section 40-35-102(6)(A) states that a defendant who does not require confinement under subsection (5) and "who is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary[.]" However, a trial court "shall consider, but is not bound by, the advisory sentencing guideline" in section 40-35-102(6)(A). Tenn. Code Ann. § 40-35-102(6)(D). A trial court should consider the following when determining whether there is "evidence to the contrary," indicating that an individual should not receive alternative sentencing:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Id. § 40-35-103(1)(A) - (C); see State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

- 110 -

We note that the trial court's determination of whether the defendant is entitled to an alternative sentence and whether the defendant is a suitable candidate for full probation are different inquiries with different burdens of proof. State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). Even if the defendant is considered a favorable candidate for alternative sentencing, the defendant has the burden of establishing suitability for full probation. See id. (citing Tenn. Code Ann. § 40-35-303(b)).

A defendant is eligible for probation if the actual sentence imposed upon the defendant is ten years or less and the offense for which the defendant is sentenced is not specifically excluded by statute. Tenn. Code Ann. § 40-35-303(a). However, "the defendant is not automatically entitled to probation as a matter of law." Id. § 40-35-303(b) (2011), Sentencing Comm'n Comments. Rather, the defendant must demonstrate that probation would "'subserve the ends of justice and the best interest of both the public and the defendant.'" State v. Carter, 254 S.W.3d 335, 347 (Tenn. 2008) (quoting State v. Housewright, 982 S.W.2d 354, 357 (Tenn. Crim. App. 1997)). When determining whether to grant probation, the trial court should consider the following factors: "(1) the defendant's amenability to correction; (2) the circumstances of the offense; (3) the defendant's criminal record; (4) the defendant's social history; (5) the defendant's physical and mental health; and (6) special and general deterrence value." Trent, 533 S.W.3d at 291.

At the sentencing hearing, the trial court recognized that the Defendant was eligible for probation for all his convictions, except his convictions for statutory rape by an authority figure in Counts 5, 6, and 7. See Tenn. Code Ann. § 39-13-532(c). However, the court held that the Defendant failed to establish his suitability for probation. Although the court recognized that the Defendant had no criminal history, it found that confinement was necessary to avoid depreciating the seriousness of the offenses, which involved "the extensive and lengthy sexual abuse of the [D]efendant's own daughter[.]" See id. § 40-35-103(1)(B). Specifically, the trial court made the following findings concerning the seriousness of the Defendant's offenses in this case:

> . . . I do think the circumstances are aggravated in this case. Even though the [D]efendant's prior history and behavior in the community has been admirable, what he did to this young girl is so serious and so aggravated, that it was his own daughter and it went on for a lengthy period of time, that to turn around and say, "Just report to a probation officer, stay out of trouble," I think would—would not be a just result.

In addition, when considering whether measures less restrictive than confinement had been frequently or recently been applied unsuccessfully, the trial court acknowledged that the Defendant had never been on probation before and that there was "no reason . . . to doubt that he is not treatable and amenable to rehabilitation." See id. § 40-35-103(1)(C). However, the court stated that the biggest factors impacting the manner of the sentence were "the nature of these offenses" and "the danger of depreciating the seriousness of those offenses." Ultimately, the court held that "a sentence of confinement [wa]s warranted in these cases."

The record fully supports the trial court's decision to order a sentence of confinement for each of the Defendant's conviction offenses based on the serious and aggravated nature of these offenses. See id. § 40-35-103(1)(B); Trent, 533 S.W.3d at 291. The Defendant was not a favorable candidate for alternative sentencing for his two rape convictions, which were Class B felony offenses. See Tenn. Code Ann. § 40-35-102(6)(A). In addition, we agree with the trial court that the Defendant failed to establish his suitability for probation for any of his conviction offenses. See Carter, 254 S.W.3d at 347. The Defendant adopted the victim as his daughter while working for the Smoky Mountain Children's Home and then sexually abused her for almost two years while claiming to be a pillar of the community and a leader in his church. The trial court properly determined that the Defendant abused his position of trust in his home and his community to commit "really horrible" and "despicable acts." Accordingly, we conclude that the trial court did not abuse its discretion in ordering a sentence of confinement for each of the Defendant's convictions.

Second, the Defendant argues that the trial court abused its discretion by imposing partially consecutive sentencing based upon Code section 40-35-115(b)(5). He claims the trial court emphasized the relationship between him and victim as well as the time span and character of the abuse alleged in applying this subsection, even though the elements of the charged offenses and the number of charged offenses "adequately accounted for" this evidence.

The Tennessee Supreme Court held that the same "abuse of discretion standard, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations." State v. Pollard, 432 S.W.3d 851, 860 (Tenn. 2013); see Bise, 380 S.W.3d at 708; Caudle, 388 S.W.3d at 278-79. "[T]he presumption of reasonableness . . . giv[es] deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)[.]" Pollard, 432 S.W.3d at 861. "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be

presumed reasonable and, absent an abuse of discretion, upheld on appeal." Id. at 862 (citing Tenn. R. Crim. P. 32(c)(1); Bise, 380 S.W.3d at 705). When imposing consecutive sentences, the court must still consider the general sentencing principles that each sentence imposed shall be "justly deserved in relation to the seriousness of the offense," "no greater than that deserved for the offense committed," and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. §§ 40-35-102(1), -103(2), -103(4); State v. Imfield, 70 S.W.3d 698, 708 (Tenn. 2002).

Here, the trial court ordered partially consecutive sentencing pursuant to Code section 40-35-115(b)(5):

> [t]he defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims[.]

Tenn. Code Ann. § 40-35-115(b)(5).

Regarding the relationship between the Defendant and victim, the trial court observed that the Defendant was the victim's adoptive father and she was his adopted daughter, so they could not "get a whole lot closer than that." The court also noted that the Defendant took the victim "out of a bad situation, brought her into [his] home, and then victimized her, and so th[e] nature of the relationship was very scarring to the victim in this case." As for the time span of the undetected sexual activity, the court found that the Defendant sexually abused the victim "repeatedly over almost a two-year period of time." Regarding the nature and scope of the sexual acts, the court found that the Defendant's acts involved "full-blown intercourse and sexual penetration." Finally, the trial court found that the extent of the residual, physical and mental damage to the victim was "significant" because the victim "continue[d] to suffer severe emotional trauma from the abuse and ha[d] very little support to help her through the healing process." Based on these factors, the court held that there was "support for consecutive sentencing" and ordered the four-year sentence at thirty percent for the statutory rape by an authority figure conviction in Count 5 served consecutively to the eight-year sentence at one hundred percent for the rape conviction in Count 3, for an effective sentence of twelve years.

The record fully supports the trial court's decision to order a partially consecutive twelve-year sentence in this case. Although the Defendant claims, without citing any authority, that the elements of the charged offenses as well as the number of charged

- 113 -

offenses "adequately accounted for" his familial relationship with victim as well as time span of the undetected sexual activity, Code section 40-35-115(b)(5) specifically allows the trial court to consider these factors, along with the other factors in that subsection, to order consecutive sentencing, regardless of the number of conviction offenses or the elements of these offenses. Moreover, while the trial court could have ordered all the Defendant's sentences served consecutively pursuant to Code section 40-35-115(b)(5) for an effective sentence of forty-one years, it did not. Therefore, we conclude that the trial court did not abuse its discretion in ordering a partial consecutive sentence of twelve years in this case.

**XI. Cumulative Errors.** While the Defendant claims that any one of the aforementioned errors, standing alone, warrants a new trial, he also asserts that the cumulative effect of these errors entitles him to a new trial. The Defendant claims that the State failed to disclose exculpatory evidence pursuant to Brady, that the trial court failed to conduct a Ritchie review to protect his due process rights, and that trial counsel was ineffective in failing to conduct an adequate investigation, in failing to obtain the assistance of expert witnesses to assist him at trial, and in failing to develop sound strategies for rebutting the State's proof. In addition, the Defendant maintains that at trial, the State presented misleading testimony about the forensic biological and electronic evidence and made an erroneous election of offenses, which prevented the jury from hearing vital proof challenging the accuracy of the forensic evidence, the credibility of the State's DNA expert, and the credibility of the victim He contends that because the aggregate effect of these errors deprived him of the right to a trial in which this court can be reasonably confident of the outcome, this court should reverse his convictions and remand his case for a new trial on all counts. The State responds that the cumulative error doctrine is inapplicable. We agree and conclude that the Defendant is not entitled to relief.

The cumulative error doctrine "is a judicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." Hester, 324 S.W.3d at 76. The cumulative error doctrine only applies when there has been more than one error committed during the trial proceedings. Id. at 77 ("To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings.").

Initially, we agree with the State that Brady violations are not appropriate for a cumulative error analysis because the remedy for a single Brady violation is a new trial. See Jackson, 444 S.W.3d at 597 (stating that because the defendant established the four

requirements to establish a <u>Brady</u> violation, he is entitled to a new trial). However, we also conclude that the Defendant in this case failed to establish a single <u>Brady</u> violation.

In addition, while this court has applied cumulative error to claims of ineffective assistance of counsel, the Defendant failed to show that trial counsel was deficient on any of the issues raised. <u>See</u> <u>Chandler v. State</u>, No. M2017-01639-CCAR3-PC, 2018 WL 2129740, at *10 (Tenn. Crim. App. May 9, 2018) (quoting <u>Gooch v. State</u>, No. M2014-00454-CCA-R3-PC, 2015 WL 498724, at *10 (Tenn. Crim. App. Feb. 4, 2015) ("In the post-conviction context, 'a petitioner cannot successfully claim he was prejudiced by [trial] counsel's cumulative error when the petitioner failed to show [trial] counsel's performance was deficient.'")).

Because the Defendant is not entitled to relief on any of the issues he raises on appeal, we need not consider the cumulative effect of these alleged errors. Accordingly, the Defendant is not entitled to relief in this case.

## CONCLUSION

The judgments of the trial court are affirmed.

_____
CAMILLE R. MCMULLEN, PRESIDING JUDGE